```
                    UNITED STATES DISTRICT COURT

                         DISTRICT OF HAWAII


------------------------------
MICHAEL SOTO,                 )
                              )
         Plaintiff,           )
                              ) Civil No. 1:23-cv-00181-DKW-KJM
    vs.                       )
                              )
LVNV FUNDING, LLC; NELSON     )
& KENNARD, ATTORNEYS AT       )
LAW; RESURGENT CAPITAL        )
SERVICES, L.P.; and DATA      )
SEARCH NY, INC. d/b/a         )
TRAKAMERICA,                  )
                              )
         Defendants.          )
------------------------------


              DEPOSITION OF MICHAEL SOTO

        Taken on behalf of the Defendants, via online video
conference, commencing at 10:00 a.m., on March 22, 2024,
pursuant to Notice.


BEFORE:  SANDRA J. GRAN, CSR NO. 424
         Registered Professional Reporter
```

EXHIBIT G

```
 1    APPEARANCES:

 2    For the Plaintiff:

 3         JUSTIN A. BRACKETT, ESQ.
           Attorney at Law
 4         515 Ward Avenue
           Honolulu, Hawaii 96814
 5         Telephone 808-377-6778
           Email justinbrackettlaw@gmail.com
 6


 7    For the Defendants:

 8         BEN MOHANDESI, ESQ.
           Yu Mohandesi LLP
 9         633 West Fifth Street, Suite 2800
           Los Angeles, California 90071
10         Telephone 213-377-5505
           Email bmonhandesi@yumollp.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  these calls to be produced.  And I will have to look, of
2  course, at the Nelson & Kennard discovery request, but I do
3  believe we requested any call recordings.  So if there are
4  any, please provide those.
5        MR. MOHANDESI:  If I had them, I would have.  I was
6  told that they're -- those recordings no longer exist.  I will
7  certainly inquire again.
8        MR. BRACKETT:  Thank you very much.
9  MR. MOHANDESI:
10     Q.   At what point on September 1st, 2022, did you
11 recognize that the garnishment notice that was sent to your
12 employer had a social security number that did not belong to
13 you?
14     A.   When she sent me the documents in the email, I
15 started looking at it and reviewing it closely, and then I
16 noticed that the last four digits -- because it's XXX, etc.
17 The last four wasn't mine.  And then I looked at the address,
18 and I said this is not even my address.  Because I'm looking
19 at the steps of service and so forth, just out of, you know,
20 my work, my experience of dealing with legal documents, and I
21 noticed these mistakes.  So I definitely brought it to
22 Kristine's attention and said to her, "Look, look at these
23 mistakes.  This is not mine; I know that."  And then, I had to
24 inform her that, "Please don't take this out until we can get
25 this resolved and verified."

1         And she said, "Well, it's a -- it's a garnishment
2    order, and we're not allowed to ignore garnishment orders, but
3    I'll check with our attorney" or whatever, whoever she had to
4    talk to see what they could do to help me out.
5         Q.   And were any wages garnished?
6         A.   No.
7         Q.   During her deposition, Ms. Brown said that when you
8    informed her that the social security number that's identified
9    on the garnishment notice did not belong to you, that she
10   believed you, and she recognized that it didn't belong to you.
11   Is that consistent with your memory?
12        A.   Yes.
13        Q.   After that discussion with Ms. Brown on September
14   1st, 2022, where you told her, Hey, this is -- this address on
15   this garnishment is not mine, and the social security is not
16   mine, this is not me; after that discussion, did you have any
17   other discussions with Ms. Brown about the garnishment?
18        A.   Yes.  I told her that I'm looking for an attorney,
19   that I verified it that this is, in fact, incorrect, you know,
20   so I had to go find an attorney, that I'm going to try and
21   resolve this.  Please, whatever you can do, don't garnish my
22   wages because it's important.
23        Q.   When was this conversation?
24        A.   Probably the next day 'cause I was on the phone in
25   the parking lot during my breaks trying to get an attorney.

1      A.    Then they called the police.

2      Q.    Why did -- do you have an understanding of why the
3 police were called?

4      A.    Because it's a PED violation.

5      Q.    What is a PED violation?

6      A.    Personal electronic device violation in the
7 shipyard.

8      Q.    And did the police arrive?

9      A.    Yes, they did.

10     Q.    And what happened next?

11     A.    They were informed by physical security that I had
12 an unauthorized personal electronic device within the
13 shipyard, and that my passes were being confiscated, and that
14 they needed to do their report and take me to the police
15 station.

16     Q.    What happened next?

17     A.    They started getting my information, they then
18 informed the project team that I would not be allowed to
19 continue working that day.  I would be escorted and taken to
20 the police facility for documentation and processing, and then
21 the job because I'm the SSHO, cannot pursue their work for
22 that day.  Because of that, they had to stop and shut down the
23 operations until they could find a replacement.  And they
24 apologized to the project team members, to CCI, the company,
25 and they understood.  They also checked to see if anybody else

1        A.   I believe so.

2        Q.   So this letter is dated September 22, 2022, so

3   sometime in mid-October of 2022 you received your badges and

4   credentials back?

5        A.   Yeah, that's because it took them almost two weeks

6   -- 14 days just to check my phone.  Because my phone is

7   confiscated, it's taken into evidence, so I'm without a phone;

8   I'm without access to any work until this matter is resolved.

9   So it takes them two weeks just to examine the phone, and then

10  they get to (inaudible) --

11           THE REPORTER:  I'm sorry.  You're breaking up again.

12  I'm sorry.  The last I heard was, "so it takes them two weeks

13  just to examine the phone, and then they get to" --

14           MR. MOHANDESI:  It looks like he's frozen again,

15  huh?

16           THE REPORTER:  Yeah.

17           MR. MOHANDESI:  There he goes.  Okay.  Let's try

18  that.  Why don't you let him know where you left off, Sandra,

19  please?

20       (Reporter read as requested.)

21           THE WITNESS:  Then they notify you that -- when they

22  initially took me to the police station, they said it would

23  take two weeks to examine my phone.  It depends on -- on their

24  volume of technicians available.  Okay?  In my instance, it

25  took them 14 days or two weeks.  They call you in; they say

```
 1         A.    Yes, it's in October.
 2         Q.    Do you recall how many days of work you had missed?
 3         A.    I'd say about a month, close to a month.
 4         Q.    Did your employer discipline you for taking your
 5   phone onto the job site?
 6         A.    They did not officially discipline me, but by not
 7   assigning me anywhere else, sending me anywhere else, it was
 8   like an imposed suspension.
 9         Q.    Were there other places where you could have worked
10   during that time?
11         A.    They have other clients that needed SHHOs, yes.
12         Q.    So your reading of the situation that your employer
13   did not reassigned you -- reassign you to another location,
14   you interpreted that as being kind of an unofficial
15   disciplinary action?
16         A.    Yes, sir.
17         Q.    Did anyone at RTS actually tell you that?
18         A.    No.
19         Q.    And do you know when, after the September 22, 2022,
20   letter from RTS, when the job site responded and said, Okay,
21   we will reissue his badges?
22         A.    The shipyard notified me on a Thursday preceding to
23   going to work on Monday in October.
24         Q.    Okay.  Mr. Soto, I'm attaching as Exhibit 4 to your
25   deposition a three-page document, and I'll represent to you
```

1  You can answer.
2      A.   I was so filled with anxiety and trying to make
3  calls, trying to get ahold of these individuals that sent this
4  garnishment to my employer, I did not realize I had not put my
5  phone in my car as I normally do and leave it behind, that I
6  had in my vest pocket.  And I went in, and the gate I go into
7  is an unmanned gate with a card reader, so I punched in my
8  code and did not realize -- also, I was rushing to get back
9  'cause the guys were coming back from lunch, and I have to be
10 on-site when they start working, otherwise, it's noncompliance
11 of the contract, both myself as the representative of RTS and
12 as well as the client performing the work for the military.
13     Q.   You said you were preoccupied trying to make calls.
14 Who were you trying to call?
15     A.   I was trying to get help.  I was trying to contact
16 these individuals for NVLV.  I was trying to get hold of
17 attorneys.  I was trying to get things situated to get this
18 thing behind me because I'm dealing with court matters and
19 personal matters at a time where I'm trying to do things in a
20 short period of time because I can't take my phone into the
21 CIA area.  And I have to check messages when I come out and go
22 to my car, which is quite a distance away, at least a 10-,
23 15-minute walk.  So, in all that activity, I inadvertently
24 forgot that I did not leave my phone in my car as I usually do
25 and entered with it not knowing and just picking up on work,

1   what's to stop this from happening again and then what -- you
2   know, I'm in a very competitive profession, and so I don't
3   know how this would hurt me, so I'm preoccupied by that worry.
4   And I think if you were to spend a day in my shoes, you would
5   understand how this could come about.  Like I said, on the
6   mainland, if you wanted to be a police officer, you've got 50
7   states to choose from.  In Hawaii, if you want to live in
8   Hawaii, you only have a few selections, four counties and
9   maybe some state entities.  The same thing with my profession.
10  If you want to make my kind of money, you have to work on
11  military projects.  So, at any time, something could come up,
12  and I was worried about that any time that this garnishment
13  could be taken out of context and I'd get affected.  That's my
14  worry.  And I don't need to tell you how expensive Hawaii is,
15  and so a loss of even a week's pay can hurt you.  No matter
16  how well you keep up with your bills and save money, it can
17  hurt you.  So --
18       Q.   Did you --
19       A.   Sorry.
20       Q.   Sorry, I --
21       A.   So that kept me up at nights.
22       Q.   Did you -- did you receive any sort of treatment for
23  the anxiety, fear, or loss of sleep?
24       A.   Yeah.  I talked over with my Dr. Katsura about the
25  stresses because I'm under a weight management program.  And I

1   told him what was bothering me, that I had a lot of stress
2   related to some personal issues caused on suddenly and without
3   giving too specifics because I didn't want to think that he
4   had to worry about me paying my doctor bills, you know.  So I
5   talked to them, and then I, you know, talked to my primary
6   treatment doctor to make sure that it wasn't affecting my
7   blood pressure, and it was, so I had to take prescribed
8   medications for it.  That was --
9        Q.   Okay.  So --
10       A.   They also noticed in my lab that -- indicators of my
11  body's chemicals that I was under some kind of stress and
12  that's with Dr. Lencinas.
13       Q.   Did you identify two doctors just right now, or were
14  you referring to the same doctor the whole time?
15       A.   Two doctors.  I had one that's a dietary doctor, the
16  doctor who is helping with my weight management, that's
17  Dr. Katsura.
18       Q.   Can you spell that, please?
19       A.   K-A-T-S-U-R-A.
20       Q.   And do you have Dr. Katsura's first name?
21       A.   Can I look at my phone?  I have it in my phone.
22       Q.   Of course, sure.  Thank you.
23       A.   (Pause - referring.)  Bruce S. Katsura.
24       Q.   Thank you.  And you said that you -- he's your
25  weight management doctor.  Is that correct?

RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street, #2460, Honolulu, HI 96813
808-524-2090 courtreporters@hawaiirr.com

```
 1                  C E R T I F I C A T E

 2   STATE OF HAWAII     )
                         )  SS.
 3   COUNTY OF MAUI      )

 4         I, SANDRA J. GRAN, do hereby certify:

 5         That on March 22, 2024, at 10:00 a.m., appeared
     before me MICHAEL SOTO, the witness whose deposition is
 6   contained herein; that prior to being examined, he was by me
     duly sworn or affirmed pursuant to Act 110 of the 2010 Session
 7   of the Hawaii State Legislature.

 8         That the deposition was taken down by me in machine
     shorthand and was thereafter reduced to typewritten form under
 9   my supervision; that the foregoing represents, to the best of
     my ability, a true and correct transcript of the proceedings
10   had in the foregoing matter.

11         That pursuant to Rule 30(e) of the Hawaii Rules of
     Civil Procedure, a request for an opportunity to review and
12   make changes to the transcript:

13    X   Was made by the deponent or a party (and/or
          their attorney) prior to the completion of the
14        deposition.
         Was not made by the deponent or a party (and/or
15        their attorney) prior to the completion of the
          deposition.
16       Was waived.

17         I further certify that I am not an attorney for any
     of the parties hereto, nor in any way concerned with the
18   cause.

19         DATED this 5th day of April, 2024, in Maui, Hawaii.

20

21                      [signature]

22
                        _____
23                      SANDRA J. GRAN, RPR, HI CSR 424

24

25
```

Reporter's Certificate                                          151