1

IN THE UNITED STATES DISTRICT COURT

OF THE DISTRICT OF HAWAII

MICHAEL SOTO,                    ) CASE NO.
                                 ) 1:23-CV-00181 DKW-KJM
            Plaintiff,           )
                                 )
        vs.                      )
                                 )
LVNV FUNDING, LLC, NELSON &      )
KENNARD, ATTORNEYS AT LAW,       )
RESURGENT CAPITAL SERVICES,      )
L.P., and DATA SEARCH NY,        )
INC., d/b/a TRAKAMERICA,         )
                                 )
            Defendants.          )
_____)

VIDEOCONFERENCE 30(b)(6) DEPOSITION OF CRYSTAL TORRES

Taken on behalf of the Plaintiff, commencing at

9:03 AM HST, on Tuesday, July 16, 2024, pursuant to

Notice.

REPORTED BY:

TERI HOSKINS, CSR. NO. 452
Registered Merit Reporter

2

1                        APPEARANCES

2    FOR PLAINTIFF:

3            JUSTIN A. BRACKETT, ATTORNEY AT LAW
             BY:  JUSTIN A. BRACKETT, ESQ.
4            515 Ward Avenue
             Honolulu, Hawaii 96814
5            (808)377-6778
             justinbrackettlaw@gmail.com
6

7

8    FOR DEFENDANT DATA SEARCH NY, INC. d/b/a TRAKAMERICA:

9            YU MOHANDESI, LLP
             BY:  BEN MOHANDESI, ESQ.
10           633 West Fifth Street, Suite 2800
             Los Angeles, California 90071
11           (213)377-5505
             bmohandesi@yumollp.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                          CONTENTS

2   DEPONENT                                        PAGE

3       CRYSTAL TORRES

4         EXAMINATION BY MR. BRACKETT                 6

5

6

7                          EXHIBITS

8   DEPOSITION EXHIBIT                               PAGE

9   Exhibit 1   Deposition notice                     26

10  Exhibit 2   Second amended complaint             112

11  Exhibit 3   RCS 0001-0018                        140

12  Exhibit 4   TRAK 0294                            155

13  Exhibit 5   screen shot/data from                161
                transmission history
14
    Exhibit 6   Responses to interrogatories by      188
15              Resurgent Capital

16  Exhibit 7   TRAKAmerica's answer to plaintiff's  190
                second amended complaint
17

18

19

20

21

22

23

24

25

4

Tuesday, July 16, 2024

9:03 AM HST


CRYSTAL TORRES,

having been first duly sworn or affirmed to tell the

truth, the whole truth, and nothing but the truth, was

examined and testified as follows:


MR. BRACKETT:  All right.  Good morning,

everyone.  My name is Justin Brackett, and I'm the

attorney for the plaintiff, Michael Soto.

This is the deposition of Defendant Data

Search NY, Inc., doing business as TRAKAmerica's

designated 30(b)(6) witness in the matter of Michael

Soto versus LVNV Funding, LLC, Nelson & Kennard,

Attorneys at Law, Resurgent Capital Services, L.P.,

and Data Search NY, Inc., doing business as

TRAKAmerica, a case bearing court file No.

1:23-CV-00181 DKW-RT, for the U.S. District Court for

the District of Hawaii.

This deposition is taking place via Zoom on

July 16th, 2024.  A court reporter will

stenographically be recording these proceedings at all

times unless otherwise specified.

As a preliminary matter, we wish to

1    eliminate interruptions.  I'm insisting on strict

2    enforcement of the Rule 30(c)(2) of the Federal Rules

3    of Civil Procedure.  I ask that no speaking objections

4    be lodged, and in the event an objection could be

5    interpreted as suggestive, the deponent be asked to

6    leave the room before the objection is stated.

7           Moreover, I request the deponent only be

8    instructed not to answer when necessary to preserve a

9    privilege, to enforce a limitation ordered by the

10   Court, or to present a motion to terminate or limit

11   pursuant to Rule 30(d)(3).

12          The defendant Data Search NY, Inc. may be

13   referred to as "TRAK" or "TRAKAmerica" throughout this

14   deposition; the defendant LVNV Funding, LLC may be

15   referred to as "LVNV" throughout this deposition; and

16   the defendant Resurgent Capital Services, L.P. may be

17   referred to as "Resurgent" throughout the deposition.

18          Would all present please identify themselves

19   for the record, beginning with the witness.

20          THE WITNESS:  My name is Crystal Torres.

21   I'm the senior vice president of Client Services for

22   TRAKAmerica.

23          MR. MOHANDESI:  Ben Mohandesi, counsel for

24   defendants and the witness.

25          COURT REPORTER:  And I'm Teri Hoskins, the

6

1    court reporter.

2            MR. BRACKETT:  Thanks, all.

3

4                    EXAMINATION

5    BY MR. BRACKETT:

6        Q.   As I stated, my name is Justin Brackett.

7    I'm the attorney for Michael Soto.

8            First off, let's just ask a few questions

9    here.

10           Crystal, a moment ago, you said you were the

11   senior vice president of -- and I didn't catch the

12   last part.  What was that?

13       A.   TRAKAmerica.

14       Q.   Did you have another name that you have for

15   your title?

16       A.   No.  There's an abbreviate name, S.V.P. of

17   Client Services.

18       Q.   Okay.  Client Services.  That's what it was.

19       A.   Um-hum.

20       Q.   Sorry about that.

21           And as the senior vice president of Client

22   Services, what do you do there at TRAK?

23       A.   I manage teams of Client Services liaisons

24   and Client Services managers that interact on a

25   day-to-day basis with our clients and our supplier

7

1   network.

2        Q.   How many teams do you manage?

3        A.   Well, I consider it one team, but I have

4   four direct reports that have subordinates to them, so

5   I guess four teams.

6        Q.   And who is TRAK's client in this matter?

7        A.   Resurgent.

8        Q.   Does TRAK also represent LVNV funding?

9             MR. MOHANDESI:  Objection, form.

10            THE WITNESS:  I'm sorry?

11            MR. MOHANDESI:  You can answer.  I'm going

12   to assert objections.

13            THE WITNESS:  Okay.

14            MR. MOHANDESI:  Objection to form.

15            But if you have -- unless I instruct you not

16   to answer, if you have an understanding of the

17   question, you can respond.

18            THE WITNESS:  Okay.  Well, technically, our

19   client is Resurgent.  LVNV does own debt that is

20   placed with our office for account management services

21   by Resurgent.

22   BY MR. BRACKETT:

23        Q.   And my question was does TRAK also represent

24   LVNV Funding?

25        A.   I -- I don't believe so.  I believe -- we

8

1    don't represent anyone.  We have a client, which is

2    Resurgent, and Resurgent places debt that is owned by

3    LVNV Funding to our office.

4         Q.   Does TRAK represent Resurgent -- or -- I'm

5    sorry.  Does TRAK represent Nelson & Kennard?

6              MR. MOHANDESI:  Objection, form.

7              THE WITNESS:  We don't represent anyone that

8    I'm aware of.

9    BY MR. BRACKETT:

10        Q.   Does TRAK employ attorneys?

11        A.   We have a general counsel.

12        Q.   And who is that?

13        A.   Greg Harmer.

14        Q.   How do you spell his last name?

15        A.   H-a-r-m-e-r.

16        Q.   Any other attorneys there at TRAK?

17        A.   Not to my knowledge.

18        Q.   Is TRAK representing Resurgent as their

19   attorney in this matter?

20        A.   No.

21        Q.   Which employees at TRAK worked on the

22   account that is the subject this far lawsuit?

23             MR. MOHANDESI:  I'm going to object as being

24   outside the scope of the deposition notice, but if you

25   have personal knowledge, you may answer.

9

1          THE WITNESS:  Yeah, I'm not really sure what

2    is meant by "worked on this account."

3    BY MR. BRACKETT:

4          Q.   Do you understand which account we're

5    discussing?

6          A.   Yes.

7          Q.   And that's the Credit One account that was

8    assigned or somehow transferred over to LVNV Funding

9    and is now being collected from Michael Soto, right?

10         A.   Yes.

11         Q.   And as far as that account is concerned, who

12   at TRAK has knowledge of that account?

13         A.   Well, I just want to mention it's not now

14   being collected.  The account is no longer active in

15   our office.  But who has knowledge of the account?

16   Myself, our legal team.  Those are the people that I

17   know have -- our performance management team that

18   would have knowledge of the account -- of that

19   specific account.

20         Q.   And as far as your legal team is concerned,

21   would that be the gentleman that you referred to

22   earlier as your general counsel?

23         A.   Yes, and those on his team.

24         Q.   So other than Greg Harmer, who is on that

25   team?

10

1      A.    Caitlin Brown is our V.P. of Legal

2    Operations, I believe is her title, and Jaimie Evans,

3    who's a director of Legal Operations.  I might have

4    the titles wrong, but Legal, definitely.

5      Q.    Are they attorneys, Caitlin and Jaimie?

6      A.    No, not to my knowledge.

7      Q.    And how do you spell Caitlin?

8      A.    C-a-i-t-l-i-n.

9      Q.    And how do you spell Jaimie?

10     A.    J-a-i-m-i-e.

11     Q.    Those are always a little bit different

12   every time it seems.

13     A.    Extra i's, yeah.

14     Q.    All right.  And how does TRAK decide when to

15   file a case against a consumer debtor?

16          MR. MOHANDESI:  Objection, form.

17          THE WITNESS:  TRAK doesn't decide -- or TRAK

18   doesn't file cases.

19   BY MR. BRACKETT:

20     Q.    My question was how does TRAK decide when a

21   case should be filed against a consumer debtor?

22     A.    TRAK doesn't decide when a case should be

23   filed.

24     Q.    How does TRAK decide when to issue a

25   garnishment?

11

1      A.    TRAK doesn't decide when to issue a

2  garnishment.

3      Q.    How does TRAK decide to authorize a

4  settlement of an LVNV Funding account?

5      A.    Well, in the case of Resurgent, our client,

6  they have granted a settlement authority to the

7  attorney firm; so TRAK doesn't decide to authorize a

8  settlement.  That is within the scope of what the

9  attorney can decide on themselves.

10     Q.    So Resurgent leaves that authority to their

11  attorney representatives?

12     A.    Yeah.  In the context of their placing

13  accounts to the attorney firm, they allow the

14  attorneys to negotiate settlement at their discretion.

15     Q.    Does LVNV also authorize -- well, let me

16  take that back.  Strike that.

17           Does Resurgent authorize/grant authority to

18  the attorney firm to file lawsuits against consumers?

19           MR. MOHANDESI:  Object --

20           THE WITNESS:  Yes.

21           MR. MOHANDESI:  -- to form.

22           I think you asked if Resurgent authorizes

23  attorneys to file lawsuits on their behalf?

24           MR. BRACKETT:  Um-hum.  Yes.

25           THE WITNESS:  I believe so, yes.

12

BY MR. BRACKETT:

1

2       Q.    And does Resurgent also provide the

3   authority to the attorney representative to decide

4   when to issue a garnishment?

5       A.    Yes.

6       Q.    Does Resurgent talk directly with the

7   attorney when these communications are happening?

8            MR. MOHANDESI:  Objection, outside the scope

9   of the categories in the deposition notice.  However,

10  if you have personal knowledge, you may answer.

11           THE WITNESS:  Not to my knowledge.

12  BY MR. BRACKETT:

13      Q.    Who does Resurgent communicate with?

14           MR. MOHANDESI:  Same objection.

15           THE WITNESS:  In what context?

16  BY MR. BRACKETT:

17      Q.    Who does Resurgent communicate with in

18  regards to deciding when to issue a garnishment?

19           MR. MOHANDESI:  Objection, form.

20           THE WITNESS:  To my knowledge, they don't

21  communicate, generally, on account-specific

22  garnishments or specifically at the account level.

23  BY MR. BRACKETT:

24      Q.    Do they communicate with TRAK?

25      A.    Resurge- --

13

1              MR. MOHANDESI:  Objection, form.

2              THE WITNESS:  Yeah, with regard to what

3       communication?

4       BY MR. BRACKETT:

5          Q.    With regard to communications about the

6       garnishment.

7          A.    They didn't communicate with us about any

8       garnishment in this case.

9          Q.    That's Resurgent, right?

10         A.    Resurgent didn't communicate with TRAK

11      regarding any garnishment in this case.

12         Q.    Did Nelson & Kennard communicate with TRAK

13      regarding the garnishment in this case?

14         A.    No.  There were no communications with

15      regard to this specific account that I could find

16      between TRAK or -- and Nelson & Kennard or with

17      Resurgent.

18         Q.    So who was Nelson & Kennard communicating

19      with?

20         A.    I don't know.  They wouldn't -- there was no

21      communication required, as far as I know.

22         Q.    Who hired the subservicer Nelson & Kennard?

23         A.    TRAK.

24         Q.    How does TRAK communicate with Nelson &

25      Kennard?

14

1      A.    We communicate in various ways, but

2   primarily through email.

3      Q.    What other systems are used?

4      A.    Telephone.  We communicate -- we pass data

5   back and forth between Resurgent and Nelson & Kennard

6   through data files that are sent through FTP.

7      Q.    In those data files, does TRAK have access

8   to all those communications?

9      A.    Yeah, TRAK -- so yeah, TRAK has a database

10  that contains all of the data that's passed back and

11  forth between Resurgent and Nelson & Kennard.

12     Q.    And so TRAK is the intermediary between

13  those two entities, Resurgent and Nelson & Kennard,

14  right?

15     A.    With regard to the passing of data back and

16  forth, yes.

17     Q.    Were there any emails between TRAK and

18  Nelson & Kennard regarding this account?

19     A.    Not that I could find any emails prior to

20  the lawsuit.

21     Q.    Which lawsuit are you referring to, the

22  one --

23     A.    By --

24     Q.    -- in -- oh, sorry.  I didn't mean to speak

25  over you.

15

1          Which lawsuit were you referring to?

2      A.    The lawsuit filed by the plaintiff.

3      Q.    The lawsuit of Michael Soto vs LVNV Funding,

4  et al.?

5      A.    Correct.

6      Q.    How was the account assigned to Nelson &

7  Kennard in the first place?

8      A.    It's -- we assign accounts to the law firm

9  using a placement file that contains the account data

10 that goes to the law firm after receiving a placement

11 from our client, Resurgent, in this case.

12     Q.    So the placement file is sent from Resurgent

13 to TRAK, and then TRAK relays that placement file to

14 Nelson & Kennard?

15     A.    The placement data, yes, to Nelson &

16 Kennard.  It's not the exact same file, because it's

17 parsed out to various attorneys.

18     Q.    Now, you had a different word there that you

19 used instead of "placement file."  You said -- what

20 was that?

21     A.    Placement data?

22     Q.    How many attorneys or law firms are in the

23 TRAK network?

24     A.    I don't know the exact number, but if I had

25 to guess, it would be about 25 to 30.

16

1      Q.   And that's law firms and/or individual

2   attorneys?

3      A.   I believe they're all law firms.  And we

4   also do have collection agencies in our network, so if

5   you added them, maybe total of 30 total

6   subcontractors.

7      Q.   And how many entities does TRAK receive

8   placement data from other than Resurgent?

9      A.   I don't know the exact number, but it would

10  be from all of our clients, which, if I had to guess,

11  maybe 20.

12     Q.   So TRAK has approximately 20 debt collection

13  entities that placed data with it?

14          MR. MOHANDESI:  Objection, form.

15          THE WITNESS:  To my knowledge, we have about

16  twenty clients placing placement files to us

17  currently, plus or minus maybe five or ten.  To be

18  honest, I don't know the exact number.

19  BY MR. BRACKETT:

20     Q.   Sure.

21          Are any of these entities not debt

22  collectors?

23     A.   I don't know if I'm qualified to answer that

24  question.

25     Q.   Why not?

17

1      A.   Well, I know that they're financial

2  institution, banks, debt buyers, but I don't know if

3  that qualifies as the term "debt collector" that

4  you're -- I don't know the definition exactly, if it's

5  aligned with all of those.  But our clients are banks,

6  financial institutions, debt buyers.

7      Q.   Which banks are your clients?

8           MR. MOHANDESI:  I'm going to object to form,

9  and it's outside the scope of the deposition

10 categories.

11          Actually, to the extent there's any sort of

12 confidentiality with your arrangements with other

13 clients, I'm going to instruct the witness to adhere

14 to that confidentiality requirement, if there is one.

15          THE WITNESS:  Yeah, we have confidentiality

16 requirements with all of our clients.

17 BY MR. BRACKETT:

18     Q.   So you can't even identify who they are?

19     A.   I don't believe so.  I wouldn't without

20 consulting that requirement, and I don't know -- I

21 don't believe I can.

22     Q.   Is Resurgent a bank?

23     A.   No, not to my knowledge.

24     Q.   What is Resurgent?

25     A.   I believe they are a debt buyer.  They're a

18

1    servicer.  They're a servicer for entities that own

2    debt.

3         Q.   So you say Resurgent is a debt servicer?

4         A.   They're -- I think so, yes.  I don't really

5    know the definition of "debt servicer," but I do know

6    that they are an account servicer and that they

7    service accounts that are owned by other entities.

8         Q.   Are any of those accounts that they're

9    servicing current in payments?

10        A.   Not the ones that are placed -- that are

11   placed to our office for management, no.  They may

12   have others that I don't have, you know, insight into.

13        Q.   So the accounts that are placed with TRAK

14   are all in default?

15        A.   Yes.

16        Q.   And does TRAK communicate any orders to the

17   attorneys to issue a garnishment?

18        A.   No.

19        Q.   TRAK leaves it up to the attorney

20   subservicer to determine whether or not to issue a

21   garnishment?

22        A.   Yes.

23        Q.   So those attorneys may never issue a

24   garnishment?

25        A.   True.

19

1      Q.    And TRAK would be okay with that?

2      A.    Yeah.

3      Q.    And what is your -- we've already went

4   through what your title and position is.  What do you

5   do on a day-to-day basis for TRAK?

6      A.    Well, like I had mentioned, I manage teams

7   of people that manage the inner -- the

8   communications -- email communications, primarily,

9   between our supplier network and our clients; so if

10  there were account-level questions or information that

11  a client needed to know from a law firm, for example,

12  then our -- my team liaises between the two to answer

13  those questions or inquiries.  And we also are

14  responsible for reporting deliverables to the clients,

15  you know, based on the clients' needs.

16     Q.    And when you say "clients," you're not

17  referring to, like, legal client; you're talking about

18  just business clients, right?

19     A.    Yeah, the banks or debt buyers that we

20  have -- that are our clients.

21     Q.    In the supplier network, who are you

22  referring to there?

23     A.    The attorney firms or the collection

24  agencies that are handling the accounts.

25     Q.    And as that intermediary, you have access to

20

1    all the communications between the supplier network

2    and the client, right?

3         A.    Well, there are no communications between

4    the supplier and network and the client, normally.

5    The communications are between TRAK and the supplier

6    network and the client and the supplier network, but

7    yes, I have access to all of the email communications

8    that go -- that involve those communications that I

9    just mentioned.

10        Q.    So the communications go either from the

11   client to TRAK or from TRAK to the supplier network,

12   right?

13        A.    Correct.

14        Q.    Never directly from the supplier network to

15   the client?

16        A.    Generally not.  Correct.

17        Q.    And TRAK has access to all of those

18   communications?

19        A.    Yes.

20        Q.    It would be improper for a collection

21   attorney like Nelson & Kennard to communicate directly

22   with Resurgent, right?

23             MR. MOHANDESI:  Objection --

24             THE WITNESS:  Yes.

25             MR. MOHANDESI:  -- form.

21

```
 1            THE WITNESS:  We -- we don't recommend that.
 2    Correct.
 3    BY MR. BRACKETT:
 4        Q.    Nelson & Kennard are supposed to communicate
 5    with TRAK.  Is that right?
 6        A.    Yes.
 7        Q.    And TRAK is supposed to communicate, then,
 8    to Resurgent?
 9        A.    Correct.
10        Q.    Keeps it simple that way, right?
11        A.    I suppose.
12        Q.    And that way, there's no cross
13    communications where they're going over your head and
14    you didn't know about them talking to the supplier
15    network, the client communicating with the supplier
16    network.  You need to know about all those
17    communications, right?
18            MR. MOHANDESI:  Objection, form.
19            THE WITNESS:  Yeah, it's not something that
20    normally happens.
21    BY MR. BRACKETT:
22        Q.    And do you have agreements with the supplier
23    network?
24        A.    Yes.
25        Q.    And do you have agreements with the clients?
```

22

1        A.   Yes.

2        Q.   Is there an agreement between TRAK and

3   Nelson & Kennard?

4        A.   Yes.

5        Q.   Is there an agreement between TRAK and

6   Resurgent Capital Services?

7        A.   Yes.

8        Q.   Is there an agreement between TRAK and LVNV

9   Funding, LLC?

10        A.   I do not believe so, no.

11        Q.   When did you start working for TRAK?

12        A.   In September of 2010.

13        Q.   What does TRAK do?

14             MR. MOHANDESI:  Objection, form.

15             THE WITNESS:  TRAK provides account

16   management services to finance banks, like I

17   mentioned, that -- buyers, and we receive accounts

18   from those clients and place them with our supplier

19   network that performs collection activity on the

20   accounts.

21   BY MR. BRACKETT:

22        Q.   You said they place those accounts with --

23   I'm sorry, I didn't catch that.

24        A.   Our supplier network; so the attorneys and

25   collection agencies.

23

1      Q.   Does TRAK have any relationship with LVNV

2  Funding?

3      A.   Not to my knowledge.

4      Q.   What is the relationship between Resurgent

5  Capital Services, L.P. and TRAK?

6      A.   Are they the -- that -- they're our client.

7           The reason why I hesitated is I wasn't sure

8  that was a different name than you said earlier, but

9  they're our client.

10     Q.   And, again, TRAK is not a law firm, right?

11     A.   No, we are not.

12     Q.   By "client," you mean customer, basically,

13  right?

14     A.   Yeah.  That's the terminology we use for our

15  customers.

16     Q.   And what is the relationship between

17  TRAKAmerica and Nelson & Kennard Attorneys at Law?

18     A.   We refer to Nelson & Kennard as our supplier

19  or our subcontractor vendor.

20     Q.   Does TRAK manage the litigation for these

21  entities?

22     A.   No.

23     Q.   Can you describe for me how the account

24  would make its way from Resurgent Capital to Nelson &

25  Kennard?

24

1      A.   Yes.   So Resurgent provides a -- an

2   electronic placement file, which is a file data that

3   contains account information for accounts they're

4   placing to our office, and then we import that data

5   into our system where we -- our database, I guess I

6   should say, where we maintain that data.  And then we

7   generate a placement file that goes to the attorney's

8   office, and, like I mentioned, those get parsed out

9   based on the state that the debtors live in to go to

10   the appropriate state-level attorney, and that file

11   gets sent to the attorney through an FTP site.

12      Q.   Is that how the account that is the subject

13   of this litigation would transfer?

14      A.   Yes.

15      Q.   How many accounts were received in that

16   import file with Mr. Soto's Credit One account?

17      A.   I do not know.

18      Q.   How many accounts were placed with Nelson &

19   Kennard from that FTP file?

20      A.   I do not know.

21      Q.   Were there more than one?

22      A.   There could have been, but I don't know.

23      Q.   Did you review that placement file in

24   preparation for today's deposition?

25      A.   I did, but I don't recall the number of

25

1    accounts in it.

2        Q.   You don't know if it was just the one or

3    more than one?

4        A.   If I had to guess, I believe it was more

5    than one, but I can't recall for sure.

6        Q.   So you don't know if you saw just the one

7    account with Michael Soto's name or saw other accounts

8    when you reviewed it?

9        A.   Definitely in the account -- the file from

10   Resurgent to TRAK, there were more than one account.

11   I can't recall the file that went to Nelson & Kennard.

12       Q.   What have you done in preparation for

13   today's deposition?

14       A.   I reviewed the deposition categories.  I

15   checked the email system to see if there were any

16   communications related to the account, which I didn't

17   find any.

18       Q.   And --

19       A.   I --

20       Q.   Sorry, I don't mean to cut you off.

21            You say -- what was that?

22       A.   I said I reviewed our email data to see if

23   there were any communications that needed to be

24   provided, but there were no communications that took

25   place on the account with regard to the account.

26

1          I looked at the documentation that was

2    exchanged between TRAK and Nelson Kennard and

3    Resurgent, the three of us.  I looked at the placement

4    files that you referenced earlier.  That's what I can

5    recall.

6          Q.   I think you just answered this question, but

7    did you get a copy of the notice of deposition before

8    appearing at this deposition today?

9          A.   Yes, I did.

10          Q.   Did you review it?

11          A.   Yes.

12          Q.   Do you have it there with you now?

13          A.   I don't have it printed, but I have it on my

14    computer.  I can get over to it if I need to.

15          Q.   No problem.  We'll get back to that in just

16    a moment.  Thank you for having that with you.

17          MR. BRACKETT:  I am going to be -- I didn't

18    know who the court reporter was before we logged in a

19    few minutes ago, so I didn't have the exact email

20    address, so I'm going to be emailing you in just a few

21    minutes the exhibits for today, Madame Court Reporter,

22    and then we'll distribute them to you guys.  But

23    Exhibit 1 will be that notice of deposition; so just

24    letting you know.  We'll talk about it in just a few

25    minutes.

27

BY MR. BRACKETT:

Q.   Just a few more basic questions.

Have you ever taken -- or -- I'm sorry -- have you ever had your deposition taken before?

A.   Yes.

Q.   How many times?

A.   Once.

Q.   How long ago was that?

A.   In 2020.

Q.   Was that on behalf of TRAK?

A.   Yes.

Q.   And what was the name of that case?

A.   I don't recall.

Q.   Do you remember the debtor's name?

A.   No.

Q.   Do you remember the law firm's name?

A.   No.  I don't know if there was a law firm involved.  I -- I don't recall who was involved.

Q.   Do you remember who your client was for that deposition?

A.   With certainty, no, but I do think it was Resurgent Capital Services.

Q.   Have you ever testified in court?

A.   No.  Well, I've only done on my -- what I'm doing right now.  That was what it was.  No.

28

1     Q.    This is a deposition.

2     A.    Okay.  No, I haven't testified in court.

3     Q.    So of course you're doing fantastic.  We're

4  not talking over each other, and I'm sure the court

5  reporter is glad for that.  Throughout the day today,

6  I'll be asking you questions, and then I'll give you

7  time to respond.

8          Sometimes, Attorney Mohandesi will interpose

9  some objections to my question, and unless he tells

10 you not to answer, I'm expecting an answer from you.

11 Is that okay?

12    A.    Yes.

13    Q.    Okay.  Now, of course you're doing great

14 too.  Earlier, I broke my own rule and I said

15 "Uh-huh," and we don't want to be doing that.  We want

16 to just be saying audibly "Yes" or "No."  That way,

17 the court reporter can get a clear record.  Okay?

18    A.    Understood.  Thanks.

19    Q.    If at any time throughout the deposition

20 today you need to take a break, you need to get some

21 water or need to go to the restroom or anything of

22 that nature, if you would, just let me know.  You can

23 put your hand up or say, you know, "Can I take a

24 break?" and I'll gladly provide that.

25          If there is a question pending -- and some

29

1    people even say if there's a string of questions

2    pending.  I don't go that far, but if there's a

3    question pending, I would ask that you please answer

4    that question, and then we can take our break.  Is

5    that fair?

6         A.    Yes.

7         Q.    All right.  We've been going for a little

8    over 35 minutes now, and I will be taking a break

9    every hour on the hour, just to keep it consistent.

10   That way I don't have to remember, when did we start

11   last?  But I also understand you're in Florida, and so

12   there in Florida, it's 3:38, right?

13        A.    Um-hum.

14        Q.    So I don't -- I don't --

15        A.    Yes.

16        Q.    -- want to -- don't want to get it to where

17   I'm keeping you way too late, so we'll try to limit

18   those breaks, as much as possible, so that we can get

19   through the information and get you out of here today.

20   Is that okay?

21        A.    Yes, that's fine.

22        Q.    All right.  Fantastic.

23              And, like I said, if you have anything -- if

24   you ever are in a situation where you don't understand

25   a question that I've asked, please ask me to restate

30

1    it or clarify.  I'll gladly do that.  Okay?

2        A.    Yes.

3        Q.    And if you do answer, I'll assume you

4    understood the question.  Is that fair?

5        A.    Yes.

6        Q.    All right.  You say you started working for

7    TRAK in 2010, right?

8        A.    Correct.

9        Q.    Do you have any prior experience working in

10   a place similar to TRAK?

11       A.    No.

12       Q.    Have you ever worked for a debt collector

13   before?

14       A.    Yes.

15       Q.    Who was that?

16       A.    I worked for two debt collectors.  One was

17   called Firstsource, and one was called Progressive

18   Management Systems.

19       Q.    When did you work for Firstsource?

20       A.    From 2007 until 2010, when I went to work at

21   TRAK.

22       Q.    And when did you work for Progressive

23   Management Systems?

24       A.    From 1994 to 2007.

25       Q.    So you have a long history of assisting

31

1    others in collecting debts?

2        A.    Correct.

3        Q.    And you understand the community of debt

4    collection?

5        A.    Yes.

6        Q.    You know how the process works?

7            MR. MOHANDESI:  Objection --

8            THE WITNESS:  Yes.

9            MR. MOHANDESI:  -- form.

10   BY MR. BRACKETT:

11       Q.    I mean, I started practicing law in 2005, so

12   I initially was just talking -- or just filing

13   bankruptcies for quite a few years there.  I've only

14   been doing this for a while, so there will be times

15   today that I'll rely on your expertise.  You know much

16   better than I do about how this process works.  Okay?

17   So if I ever ask a question that seems like I am

18   asking a dumb question, I apologize.  I'm just asking

19   because I need to know how this works for my client.

20   Is that fair?

21       A.    Yes.

22       Q.    How are you compensated?  Salary or hourly?

23       A.    Personally?

24       Q.    Yes.

25       A.    Salary.

32

1      Q.   And tell me a little bit about your work

2   flow.  I know that you oversee others.  How does a

3   normal day work in the life of -- how does your normal

4   day work, period?

5      A.   I have a lot of variety to my day, but basic

6   day would involve meetings with clients.  So I have

7   regular meetings with clients.  I have regular

8   meetings with my staff.  I might be handling escalated

9   account-level issues or questions from either clients

10  or staff.  There's a lot that goes in -- you know,

11  it's a lot of variety, so that's high level.

12     Q.   When you say "meetings with staff," are you

13  talking about the four individuals that work under

14  you?

15     A.   Yes.

16     Q.   You also have meetings with their -- like

17  the ones that they oversee?

18     A.   Not -- not normally.

19     Q.   In search and rescue, we have a span of

20  control kind of thing, and usually it's -- you know,

21  they tell you that you don't want to be over three to

22  seven individuals, and then let those individuals be

23  over their own team, and so on and so forth.  Is that

24  sort of how it works there at TRAK?

25          MR. MOHANDESI:  Objection, form.

33

1          THE WITNESS:  Yeah, I don't -- I wouldn't

2    say we subscribe to any kind of structure like that,

3    necessarily.  In my particular team, I have four

4    people that report to me, and some of those people

5    have -- they have anywhere from one to three people

6    that report to them, something like that.

7    BY MR. BRACKETT:

8          Q.   So the four teams, how large are each one?

9          A.   They're relatively small, so each manager

10   might have one to three people that report to them.

11         Q.   What do those folks do?

12         A.   Well, each manager is responsible for a

13   different client relationship, so they primarily --

14   the manager and the liaison, we call them, are the

15   people that report to the manager, they monitor the

16   mailbox that I mentioned earlier about -- for

17   questions coming from the supplier network or coming

18   from the client, and they're also responsible for

19   preparing reporting deliverables that the client has

20   required or addressing any kind of questions or

21   inquiries from the client that they're assigned to.

22         Q.   So the liaison reviews the incoming files

23   from the client?

24         A.   No.  We don't review any files that come in

25   from the client in our team.

34

1          Q.    Who handles that?

2          A.    Well, no one actually reviews the files

3    physically when they come in, if that's what you're

4    meaning.  We have an automated process that processes

5    the files.

6          Q.    What is the name of that process?

7          A.    I don't know that it has a formal name.

8          Q.    Is it a AI kind of program, or how does that

9    work?

10         A.    No.  We have -- no.  I mean, we understand

11   the file specifications of the file that's coming from

12   Resurgent, so when we receive that file, we have a

13   program that's written that imports it into our

14   system.  It's not physically reviewed.

15         Q.    What is the name of that system?

16         A.    Our system is called -- we refer to it

17   internally as AccuTerm.

18         Q.    A-c-c-u-t-e-r-m?

19         A.    Right.

20         Q.    Is that a program that's only used there at

21   TRAK, or do other entities also use AccuTerm?

22         A.    I have never -- I have no knowledge of

23   anyone else that uses AccuTerm.

24         Q.    Is that proprietary to TRAKAmerica?

25         A.    I believe so.

35

1    Q.    And you say each manager is responsible for

2  a different client relationship, right?

3    A.    Yes.

4    Q.    And who is the manager that's responsible

5  for the relationship with Resurgent?

6    A.    His name?

7    Q.    Yes.

8    A.    Abraham Perkins, P-e-r-k-i-n-s.

9    Q.    Any other manager?

10    A.    No.

11    Q.    And so every data file that comes in from

12  Resurgent goes through Abraham?

13    A.    No.  Our team doesn't handle any of the data

14  file processes.

15    Q.    What does Abraham receive?

16    A.    Emails.

17    Q.    What do these emails direct Abraham to do?

18            MR. MOHANDESI:  Objection, form.

19            THE WITNESS:  There's -- I mean, there's --

20  there are either requests for information that the --

21  that the client is asking of the supplier, or

22  directions -- instructions to provide the supplier or

23  vice versa.  Questions coming from the supplier for

24  the client, that's generally what we're dealing in.

25

36

BY MR. BRACKETT:

    Q.   Who is the supplier?

    A.   The law firm or agency, collection agency.

    Q.   And that collection agency may be a law firm?

    A.   Yeah.  Well, we have collection agencies, and we have law firms that are in our supplier network.

    Q.   And what is Nelson & Kennard?

    A.   A law firm.

    Q.   Is Nelson & Kennard also a debt collector?

    A.   I believe they are.  I -- they're a law firm.  I don't know if they qualify, again, as the definition of "debt collector," depending on where you're getting the definition from.

    Q.   My question was what is the automated process looking for?

    A.   And the -- the automated process looks to see that the file that we receive from the client is named with a certain naming convention and has a structure that we have programmed as the expected structure of data that is a placement file.  We call it, like, file layout, matches the program -- that it matches the program.

    Q.   Is there a name for the program?

37

1          A.    If there is, I don't know it.  That's an

2    automated process.

3          Q.    And you were saying earlier that TRAK

4    doesn't review the files as they come in.  They just

5    allow this automated process to -- to do its work and

6    then transfer the files on to your attorney

7    representatives or debt collection representatives?

8          A.    Yes.

9          Q.    And is that then sorted by state?

10         A.    Yes.

11         Q.    And sorted by the type of debt?

12         A.    Yeah, it's not specifically sorted, but

13   it -- the accounts are placed to attorneys based on

14   state.  Some attorneys are assigned to certain clients

15   and some are not.  So that's also a factor.

16         Q.    And who chooses which attorneys to assign to

17   a particular client?

18         A.    Our performance management team.

19         Q.    There at TRAK?

20         A.    Yes.

21         Q.    And do your clients have certain performance

22   requirements?

23         A.    Yes.  I wouldn't say requirements.  More

24   like targets.

25         Q.    And if they fall short of that target, what

38

1    happens?

2         A.   Well, at a very high level, performance

3    determines the volume of business that we are placed,

4    but there -- yeah.

5         Q.   So it determines what volume your client

6    will place with TRAK?

7         A.   Yes.

8         Q.   And so if the performance is not there, then

9    TRAK receives less volume from the client?

10        A.   Yes.

11        Q.   They may go with another entity?

12        A.   Correct.

13        Q.   Who are TRAK's top competitors?

14        A.   I think our most common competitor is to

15   compete directly with law firms themselves, so clients

16   placing directly to a law firm versus using an account

17   management firm like ours.

18        Q.   Have you ever heard of CenterPoint?

19        A.   Yes.

20        Q.   What do you know about CenterPoint?

21        A.   I just know that they are another vendor of

22   Resurgent's.

23        Q.   Does CenterPoint manage some of Resurgent's

24   litigation?

25        A.   I don't really --

39

1          MR. MOHANDESI:  Objection, form.

2          THE WITNESS:  More -- I really don't know

3    anything about that.  I only know their name because I

4    believe they're a vendor or prior vendor of

5    Resurgent's.

6    BY MR. BRACKETT:

7          Q.   What does the liaison do?

8          A.   The liaison monitors the email box and

9    addresses email communication from the supplier

10   network or from the client, and they may also prepare

11   reports for the client at client's request.

12         Q.   And, again, when you say "supplier network,"

13   you're talking about the debt collectors and/or

14   attorney?

15         A.   Yes.  Correct.

16         Q.   And then when you are talking about clients,

17   you're talking about your customers there at TRAK,

18   such as Resurgent Capital?

19         A.   Right.

20         Q.   And you were saying that in your review, you

21   did not find any email communications before this

22   lawsuit was filed?

23         A.   Correct.

24         Q.   Nothing on the Michael Soto lawsuit from

25   Nelson & Kennard?

40

1          A.    No.

2          Q.    Who would Nelson & Kennard request

3     information from for this account?

4          A.    They would request it from our client

5     services team.

6          Q.    Okay.  And would that be via that email to

7     the liaison?

8          A.    Yes, with -- with regard to a lawsuit, they

9     would request it from our legal department, but --

10         Q.    So after -- oh, I apologize.  Sorry.  Go

11    ahead.

12         A.    Yeah.  With regard to the account in

13    general, information requests generally come to the

14    client services team.  If there's a lawsuit filed,

15    then the supplier is -- would be requesting

16    information through our legal department.

17         Q.    But that's only after a lawsuit is filed

18    against your client?

19         A.    Correct, or against the firm.

20         Q.    So after a lawsuit is filed against the firm

21    or the client, Resurgent in this situation, again

22    communications between the supplier network and TRAK

23    would go to the legal team?

24         A.    Correct.

25         Q.    Before that, it would not go to the legal

41

1    team?

2         A.    Right.

3         Q.    It would instead go to the liaison?

4         A.    Yes.

5         Q.    And what kind of information is supposed to

6    go to the liaison?  What kind of request?

7              MR. MOHANDESI:  Objection, form.

8              THE WITNESS:  I'm thinking.

9              The most common thing that the liaison deals

10   in would be account disputes.  So if the law firm had

11   a question that they needed -- a question about a

12   pending dispute situation, that would go through the

13   liaison.

14   BY MR. BRACKETT:

15        Q.    So when there is a dispute by a debtor, that

16   dispute is supposed to go to TRAK?

17        A.    Not through email.  So --

18        Q.    How -- go ahead.

19        A.    There's a file process that the firm --

20   there's a data exchange process that's used for firms

21   to communicate disputes to the client, and it's a

22   similar process to what I described with the placement

23   file.  It passes through TRAK to a client, the client

24   resolves the dispute, and that information is passed

25   through a file again to the firm.

42

1      Q.   So if a consumer disputes a debt like

2   Mr. Soto did, that information would then go to TRAK

3   through the data exchange process.  Is that right?

4      A.   Yes.  Yes.

5      Q.   And then TRAK would send that on to

6   Resurgent?

7      A.   Yes.

8      Q.   And then Resurgent would then respond to

9   TRAK?

10     A.   They don't really respond to TRAK.  They --

11  they would respond to the debtor, normally, and then

12  they would send a file back to TRAK to -- to inform

13  the firm that they responded to the debtor.

14     Q.   Okay.  So Resurgent could send a letter

15  directly to the consumer debt or responding to the

16  dispute?

17     A.   Yes.

18     Q.   But they would also send information back to

19  TRAK explaining, "Hey, we responded to this dispute,"

20  right?

21          MR. MOHANDESI:  Objection, form.

22          THE WITNESS:  That information is included

23  in a data file that they send to us.

24  BY MR. BRACKETT:

25     Q.   And that data file is then relayed through

43

1    TRAK to the attorney law firm supplier network?

2         A.   Yes.

3              MR. BRACKETT:  All right.  It's 10:01 my

4    time, so let's take a five-minute break.  Is that

5    okay?

6              THE WITNESS:  Sure.

7              MR. BRACKETT:  So we're off the record.

8              (Recess ensued from 10:01 to 10:08 AM HST.)

9              MR. BRACKETT:  Back on the record at 10:08

10   Hawaii time.

11   BY MR. BRACKETT:

12        Q.   A couple of questions here about the

13   deposition stuff.  I've got an exhibit that I have now

14   emailed to Ben and also to Teri.  It's the notice of

15   deposition.

16             You've said earlier that you have it there

17   on your computer.  I'll ahead and share it on the

18   screen as well.  Give me just one moment.  I've got to

19   open it.

20             (Document was displayed.)

21   BY MR. BRACKETT:

22        Q.   Okay.  Hopefully you can see that on your

23   screen now.

24        A.   Yes.

25        Q.   Is this the notice of deposition that you

44

1    received?

2          A.   It appears to be, yes.

3          Q.   And in the one that you received, are there

4    seven pages?

5          A.   Sorry.  Bear with me one moment, please.

6               Yes, there are seven pages.

7          Q.   Did you prepare for today's deposition?

8          A.   Yes.

9          Q.   How did you prepare?

10              MR. MOHANDESI:  Object to form --

11              THE WITNESS:  How --

12              MR. MOHANDESI:  -- asked and answered.

13              THE WITNESS:  I reviewed -- do you want me

14   to go through the answer again?

15   BY MR. BRACKETT:

16         Q.   Yes, please.

17         A.   I reviewed the deposition notice -- that

18   notice of deposition; I reviewed the lawsuit; I looked

19   at the email box to see if we had any communications;

20   I also looked to see what documentation we had on file

21   that was exchanged with regard to the account; I

22   looked at the placement file.  I think that's it.

23         Q.   So as far as the lawsuit, what did you

24   review for that?

25         A.   I looked at the complaint that was filed by

45

1    the plaintiff, I believe it's called -- I don't have

2    it here, but the suit -- allegations, I guess.

3        Q.   Was that the second amended complaint?

4        A.   I don't recall.

5        Q.   The one that you looked at, did it name

6    TRAKAmerica or Data Search NY, Inc. as a defendant?

7        A.   I believe so.

8        Q.   And, also, did you review Data Search NY,

9    Inc., doing business as TRAKAmerica, to answer to that

10   complaint?

11       A.   I don't recall that.

12       Q.   Is anyone else going to be testifying on

13   behalf of TRAKAmerica today?

14       A.   Not to my knowledge.

15       Q.   What about when you say the email base for

16   communications -- I think you testified that you said

17   you did not find any communications in that email box

18   before this lawsuit was filed?

19       A.   Right.  I searched for the account number,

20   which is generally what would be contained in the

21   email, and I found no email communication about the

22   account.

23       Q.   What about after this lawsuit was filed

24   against your client LV -- I'm sorry -- Resurgent

25   Capital Services, L.P.?  Were there any communications

46

1    in that email box after this lawsuit was filed?

2        A.    No, not in that email box.

3        Q.    After this lawsuit was filed, how were

4    communications made between TRAK and Resurgent?

5        A.    I haven't seen any communications between

6    TRAK and Resurgent after the lawsuit was filed, but if

7    it were, it would have been made with our legal

8    department.

9        Q.    And if they're with the legal department,

10   then your counsel there, Greg Harmer, would have

11   access to those, right?

12       A.    I believe so.

13       Q.    And then in regards to the documents on file

14   that were exchanged, what documents did you find were

15   exchanged?

16       A.    I found the original account documentation

17   that was sent at the time of placement, the

18   litigation-related documents that were provided by

19   Nelson & Kennard with regard to the lawsuit, that they

20   filed.

21       Q.    Anything else?

22       A.    Also correspondence -- copies of

23   correspondence that were mailed to the debtor or by

24   either Nelson & Kennard or Resurgent, I believe, were

25   included.

47

1      Q.   Anything else?

2      A.   No, I don't think so.

3           MR. MOHANDESI:  And Justin, just for the

4    record, all of those documents were produced just

5    before the deposition.  I sent you a link of all the

6    documents that were exchanged between Nelson & Kennard

7    and Resurgent to TRAK.

8    BY MR. BRACKETT:

9      Q.   And then you also say you reviewed the

10   placement file?

11     A.   I did.

12     Q.   And that would have been the file that was

13   placed by your customer, Resurgent, to you there at

14   TRAK?

15     A.   Yes.

16     Q.   Would there also be notes in that placement

17   file?

18     A.   No.  There's no notes in a placement file.

19     Q.   Is it only documents?

20     A.   No, it's only data.

21     Q.   And that data that is relayed from Resurgent

22   to TRAK, that would be the only data that was then

23   relayed over to Nelson & Kennard, right?

24     A.   Yeah, that's the only data.

25     Q.   So anything that Nelson & Kennard receives,

48

1    TRAK has already received and reviewed before it

2    places that data with Nelson & Kennard?

3              MR. MOHANDESI:  Objection, form.

4              THE WITNESS:  Yes.  It's not reviewed,

5    physically reviewed.

6    BY MR. BRACKETT:

7        Q.    But it could be?

8              MR. MOHANDESI:  Objection, form.

9              THE WITNESS:  It's possible to review.  It's

10   available to review, but it's not reviewed generally.

11   BY MR. BRACKETT:

12       Q.    It's available to TRAK?

13       A.    Correct.

14       Q.    And that way, if Nelson & Kennard has a

15   question, they can go back to TRAK and ask TRAK about

16   it?

17       A.    Yes.

18       Q.    But in this scenario, Nelson & Kennard did

19   not ask TRAK for any follow-up information via email?

20       A.    Correct.

21       Q.    Did it place any phone calls to Nelson &

22   Kennard -- I'm sorry.

23              Did Nelson & Kennard place any phone calls

24   to TRAK asking about the data that was relayed?

25       A.    Not to my knowledge.

49

1        Q.   What about after Michael Soto, my client,

2    the plaintiff in this matter, asserted that it was not

3    his Social Security number?  Did Nelson & Kennard

4    alert TRAK of that?

5        A.   I didn't see any record that they did, no.

6        Q.   Did Nelson & Kennard ask TRAK what to do

7    about it?

8        A.   I didn't see any communication from Nelson &

9    Kennard.

10       Q.   Did Nelson & Kennard ask anything in regards

11   to the garnishment?

12       A.   Not that I saw, no.

13       Q.   Nothing of TRAK?

14       A.   No.

15       Q.   Was it Nelson & Kennard that decided to

16   issue the garnishment?

17       A.   Yes.

18       Q.   And did TRAK provide the authority to

19   Nelson & Kennard to issue that garnishment?

20            MR. MOHANDESI:  Objection, form, asked and

21   answered.

22            THE WITNESS:  The law firm is filing -- or

23   taking legal action on the behalf of the client, so I

24   think it's the client that provides them the authority

25   to do that.

50

BY MR. BRACKETT:

1
2     Q.   Is there a contract between the client and

3  Nelson & Kennard?

4     A.   Not to my knowledge, no.

5     Q.   But there is a contract between the client

6  in this particular scenario, Resurgent Capital

7  Services, LP, and TRAKAmerica, right?

8     A.   Yes.

9     Q.   And there is a contract between TRAKAmerica

10  and Nelson & Kennard?

11     A.   Right.

12     Q.   So all of the authority that Nelson &

13  Kennard has is relayed to it through a contract with

14  TRAKAmerica, right?

15          MR. MOHANDESI:   Objection, form.

16          THE WITNESS:   I don't know the answer to

17  that question.  I know that there's a contract between

18  TRAK and the law firm.  As far as what authority the

19  law firm has in the capacity of their legal

20  representation of the client, I -- I -- we -- we

21  provide the account to the law firm, and they have the

22  authority -- or with the expectation that they're

23  going to perform collection activity, including

24  litigation activity.

25

51

BY MR. BRACKETT:

    Q.   And TRAK gives them that authority?

       MR. MOHANDESI:  Objection, form.

       THE WITNESS:  Again, I think -- it's my
opinion that the client gives them the authority, but
I guess -- I don't know what exactly it says in this
contract.

BY MR. BRACKETT:

    Q.   Have you provided a copy of the contract
between TRAK and Nelson & Kennard to your attorney,
Mr. Mohandesi?

    A.   No.  No.  I have not, no.

    Q.   Has TRAK turned that over to Ben Mohandesi,
the contract between TRAK and Nelson & Kennard?

    A.   Not to my knowledge.

    Q.   Why not?

    A.   I don't know.  The decision on what to turn
over is -- comes from our legal department.

    Q.   Has TRAK provided the contract between
Resurgent Capital Services, LP and Data Search NY,
Inc., doing business as TRAKAmerica, to Ben Mohandesi?

    A.   Not to my knowledge.

    Q.   Why not?

    A.   I don't know the reason.  It's -- the
decision is made by our legal department.

52

1        Q.   So let's take a look at these categories

2   that are on the screen in front of you.

3            You said earlier that it was seven pages,

4   the notice of deposition.  And, you know, scrolling on

5   your screen now through those pages, are these the

6   same seven pages that you received in the notice that

7   you have?

8        A.   Yes.

9        Q.   So in the request for production on page 6,

10  under item c, it asks for all agreements between TRAK

11  and any company or entity as they relate to the debt.

12  Do you see that?

13       A.   Yes.

14       Q.   And those agreements would be the agreements

15  between Resurgent Capital and TRAK, right?

16            MR. MOHANDESI:  Justin, I'm going to object.

17  Well, I'm going to refer you to the objections we

18  served to the deposition notice.

19            You can answer if you have any information.

20            THE WITNESS:  Yes.

21  BY MR. BRACKETT:

22       Q.   And it would also be the contract or the

23  agreement between TRAK and Nelson & Kennard, right?

24       A.   The agreements are not specifically related

25  to this debt, but I...

53

1      Q.   But those agreements do exist, the agreement

2 between Nelson & Kennard and TRAK, right?

3      A.   There is an agreement between Nelson &

4 Kennard and TRAK, yes.

5      Q.   And the agreement between Resurgent and TRAK

6 also exists, right?

7      A.   Yes.

8      Q.   But agreements haven't been provided to your

9 attorney?

10      A.   Not to my knowledge.  I -- I don't know.  I

11 did not provide them.

12      Q.   Do you know of anyone else at TRAK who

13 provided them to Mr. Mohandesi?

14      A.   The only other people that could provide

15 something would be our legal department, but I don't

16 know if they did or not.

17      Q.   And that would be Mr. Harmer?

18      A.   Right.

19      Q.   Do you have those agreements with you today?

20      A.   No.

21      Q.   Are you at work there at TRAK?

22      A.   I'm at home.

23      Q.   Do you typically work from home?

24      A.   Yes.

25      Q.   And when you work from home, do you have

54

1    access to all the records there at TRAK?

2        A.   I do.  I have -- I'm on a different

3    computer.  I'm on my home computer.

4        Q.   Could you provide those agreements to your

5    attorney today, like during this deposition?

6        A.   I could check and see.  I don't know if I

7    have access to the agreements -- the specific

8    agreements.  Normally our legal department handles

9    agreements.

10       Q.   You're the senior vice president, right?

11       A.   Of Client Services.

12       Q.   Have you reviewed the agreement between TRAK

13   and Resurgent before?

14       A.   In my work at TRAK, yes.  Not related to

15   this case.

16       Q.   Why have those not been provided to your

17   attorney?

18            MR. MOHANDESI:  We've already addressed that

19   in our objections.

20            If you have personal knowledge, you may

21   answer.

22            THE WITNESS:  I don't know.

23   BY MR. BRACKETT:

24       Q.   Okay.  And going back up to these topics, I

25   would ask that you go through the topics and confirm

55

1    that you are prepared to testify about each one.

2          Are you prepared to testify about TRAK's

3    internal communications relating to the debt?

4       A.   Yes.

5       Q.   Are you prepared to talk about TRAK's

6    internal communications relating to Michael Soto, the

7    plaintiff?

8       A.   Yes.

9       Q.   Are you prepared to talk about the

10   relationship between TRAK and Plaintiff?

11      A.   Yes.

12      Q.   Are you prepared to talk about the

13   relationship between TRAK and LVNV Funding?

14      A.   Yes.

15          MR. MOHANDESI:  Just interject really quick.

16   I also want to state for the record that we have --

17   our objections also include objections to certain

18   categories that -- and the objections have been

19   served.

20   BY MR. BRACKETT:

21      Q.   Okay.  You may continue --

22          Are you prepared to talk about the

23   relationship between TRAK and Credit One Bank?

24      A.   Yes.

25      Q.   Are you prepared to talk about the

56

1    relationship between TRAK and Resurgent Capital

2    Services?

3         A.    Yes.

4         Q.    Are you prepared to talk about the events

5    that led to TRAK pursuing a garnishment at Plaintiff's

6    place of employment, Raising the Standard Consulting,

7    Inc.?

8         A.    TRAK didn't pursue a garnishment, but I am

9    prepared to discuss item 7.

10        Q.    You are you prepared to talk about the

11   individuals involved in deciding to issue a

12   garnishment at Plaintiff's place of employment,

13   Raising the Standard Consulting, Inc. to LVNV Funding

14   and/or Resurgent Capital Services?

15        A.    Yes, I'm prepared to discuss item 8, but I

16   don't have any knowledge on the individuals involved

17   in deciding to issue the garnishment.

18        Q.    Who would have that information?

19        A.    Nelson & Kennard.

20        Q.    Are you prepared to talk about the

21   individuals involved in deciding to collect the debt

22   from Plaintiff?

23        A.    Yes, I'm prepared to discuss item 9, but

24   I'm -- I do not know who the individuals are that are

25   involved in deciding to collect the debt.

57

1        Q.    Wouldn't the notes on the account identify

2    those individuals?

3             MR. MOHANDESI:   Objection, form.

4             THE WITNESS:   What notes are you

5    referring -- there's no notes on the account.

6    BY MR. BRACKETT:

7        Q.    What about topic 10?   Are you prepared to

8    testify about it?

9        A.    Well, to the extent that I can say that I

10   don't know what information was relied upon by

11   Nelson & Kennard when deciding to collect the debt.

12       Q.    So is that a no, you aren't prepared to

13   testify about item 10?

14       A.    I'm prepared to testify about item 10, that

15   I do not have information about what information

16   Nelson & Kennard relied upon.

17       Q.    Has TRAK spoken to Nelson & Kennard about

18   why they tried to garnish from Plaintiff?

19       A.    Not that I know of.   I have not.

20       Q.    Has anyone at TRAK?

21       A.    I -- not to my knowledge.

22       Q.    What about topic 11?

23       A.    Yes.

24       Q.    Topic 12?   Are you prepared to testify about

25   it?

58

1    A.    Yes.

2    Q.    Topic 13?

3    A.    Yes, but TRAK doesn't -- you know, doesn't

4  issue garnishments, so the topic really isn't

5  applicable.

6    Q.    Does TRAK have any policies, procedures, or

7  processes, manuals or other directives that it uses to

8  decide when to issue a garnishment?

9    A.    No.  We don't issue -- TRAK doesn't issue

10  garnishments.

11    Q.    It relies entirely on its attorney network

12  to decide that?

13    A.    Well, TRAK doesn't issue garnishments.

14    Q.    Does it rely on its attorney, Nelson &

15  Kennard, to determine whether to issue a garnishment?

16    A.    I wouldn't say -- yes.  I mean, the only --

17  garnishments are only issued at the discretion of the

18  attorney firm.

19    Q.    And in this particular instance, that was

20  Nelson & Kennard?

21    A.    Correct.

22    Q.    So Nelson & Kennard are the ones that

23  decided to issue the garnishment at Raising the

24  Standard Consulting, Inc.?

25    A.    Yes.

59

1      Q.   Does TRAK now understand that that was not

2  the correct category for this account?

3      A.   Well, I understand, based on the lawsuit,

4  that the plaintiff has a different Social Security

5  number than the debtor on this account, so there -- it

6  seems like they're not the debtor.

7      Q.   So what has TRAK done to reprimand Nelson &

8  Kennard for this conduct?

9           MR. MOHANDESI:  Objection, form.

10          THE WITNESS:  There's not -- I don't -- I

11  don't know of anything.

12  BY MR. BRACKETT:

13     Q.   Has there been any letter or communication

14  from TRAK to Nelson & Kennard explaining that this was

15  wrong?

16     A.   Not to my knowledge.

17     Q.   Has TRAK requested at any point in time of

18  Nelson & Kennard to release this garnishment?

19     A.   Not that I know.

20     Q.   What about topic 14?  Are you prepared to

21  testify about it?

22     A.   Yes.

23     Q.   Topic 15?

24     A.   Well, I -- sorry.  On 14, yes, I can

25  testify, but we don't have any technology used for

60

1    collecting a debt at TRAK.  TRAK doesn't collect debt.

2         Q.   But TRAK assists in collecting debt,

3    correct?

4              MR. MOHANDESI:  Objection, form.

5              THE WITNESS:  We manage accounts and relay

6    information between clients and law firms.

7    BY MR. BRACKETT:

8         Q.   And earlier, we were discussing technology

9    infrastructures there at TRAK that relay that

10   information from the debt collector, Resurgent, to the

11   debt collection attorneys, Nelson & Kennard, right?

12        A.   Yes.

13        Q.   What about topic 15?  Are you prepared to

14   testify about it?

15        A.   I'm prepared, but -- all authority for

16   collecting the debt from Plaintiff.  We are not

17   collecting the debt from the plaintiff, so, you know,

18   I guess it depends what the question is, but I don't

19   have any knowledge of any authority to collect the

20   debt from the plaintiff, and we don't collect any debt

21   at TRAK.

22   BY MR. BRACKETT:

23        Q.   But you are aware of the authority between

24   Resurgent and TRAK and then, therefore, TRAK to

25   Nelson & Kennard?

61

1      A.   Yes.

2      Q.   And that would be pursuant to the agreements

3  that you discussed earlier, right?

4      A.   Yes.

5      Q.   So any authority would be pulled from those

6  agreements, right?

7           MR. MOHANDESI:  Objection --

8           THE WITNESS:  Yes.

9           MR. MOHANDESI:  -- form.

10          THE WITNESS:  If that exists, then -- if

11 that exists in the agreement, then yes.  I mean, the

12 debt doesn't belong to the plaintiff, to my knowledge,

13 so I don't know if it applies.  There's not an

14 authority to collect from the plaintiff, only from the

15 debtor that we placed to the law firm for collections.

16 BY MR. BRACKETT:

17     Q.   So Nelson & Kennard was working outside the

18 scope of its authority when it did this?

19          MR. MOHANDESI:  Objection, form.

20          THE WITNESS:  I -- I can't say.

21 BY MR. BRACKETT:

22     Q.   But the authority that Nelson & Kennard has

23 to issue garnishments is bestowed upon it by TRAK,

24 right?

25          MR. MOHANDESI:  Objection, form.

62

1          THE WITNESS:  Well, my understanding is that

2    the issuance of a garnishment is done on behalf of the

3    plaintiff in the lawsuit, which is the client, which

4    is Resurgent.

5    BY MR. BRACKETT:

6          Q.   So the authority goes from Resurgent to

7    Nelson & Kennard?

8          A.   I have -- my understanding is that that

9    authority is based on the fact that their attorney of

10   record on the lawsuit that was filed on their behalf.

11         Q.   But there's no agreement between Nelson &

12   Kennard and Resurgent?

13         A.   Not to my knowledge.

14         Q.   Only an agreement between Resurgent and

15   TRAK?

16         A.   Yes.

17         Q.   And an agreement between TRAK and Nelson &

18   Kennard?

19         A.   Yes.

20         Q.   And all communications must go up that chain

21   from Nelson & Kennard to TRAK, and then TRAK relays it

22   on to Resurgent?

23         A.   True.

24         Q.   What about topic 17?

25              Actually, I skipped one.  I'm sorry.  16.

63

1    Are you prepared to testify about that topic?

2        A.    Yes, but we don't have any collection notes

3    or collection logs related to the debt.

4        Q.    What about topic 17?

5        A.    I'm prepared to say that we don't have any

6    collection notes or collection logs relating to the

7    plaintiff.

8        Q.    What about topic 18?

9        A.    Yes.

10       Q.    Topic 19?

11       A.    Yes, but I'm just prepared to say that

12   there's no -- to my knowledge, nothing -- no

13   communications have been made on behalf of TRAK.  The

14   only communications that have been made are on behalf

15   of the -- the owner -- actually, the creditor, which

16   is LVNV.  To -- and I think earlier, I -- I might have

17   conflated Resurgent and LVNV earlier, but truly, LVNV

18   is the plaintiff in the lawsuit, not Resurgent.

19       Q.    And LVNV is the debt collector here, right?

20           MR. MOHANDESI:  Objection, form.

21           THE WITNESS:  Yeah, I don't know if they're

22   technically the -- the debt collector, but they're the

23   owner of the debt.

24   BY MR. BRACKETT:

25       Q.    And LVNV would have been communicating to --

64

1    well, does LVNV communicate to TRAK?

2        A.    No, not directly.

3        Q.    But they do communicate directly with

4    Resurgent?

5        A.    They may.

6            MR. MOHANDESI:  Objection, form.

7            THE WITNESS:  I -- I don't have knowledge of

8    that.

9    BY MR. BRACKETT:

10        Q.    Does TRAK communicate directly with

11    Resurgent?

12        A.    Yes.

13        Q.    So any calls or letters made to the

14    plaintiff's place of employment, Raising the Standard

15    Consulting, Inc., would have been on behalf of LVNV

16    Funding?

17        A.    Yes.

18        Q.    What about topic 20?  Are you prepared to

19    talk about it?

20        A.    Yes, but there are no calls that we've made

21    or received related to the plaintiff or the debt.

22        Q.    No calls between TRAK and Nelson & Kennard

23    about the plaintiff?

24        A.    Not to my knowledge.

25        Q.    Would those possibly be handled by the legal

65

1  team?

2      A.    If there were calls, they would have been

3  made with the legal team after this lawsuit was filed.

4      Q.    Are you aware of any --

5      A.    I'm sorry?

6      Q.    Are you aware of any of those communications

7  between the legal team and Nelson & Kennard after this

8  lawsuit was filed?

9      A.    No, I'm not.

10     Q.    Do you have access to them?

11     A.    No.

12     Q.    What about topic 21?

13     A.    I'm prepared to discuss that, but there -- I

14  can say that there have been no searches or queries

15  related to the plaintiff or the plaintiff's place of

16  employment, but I mentioned before, they're not --

17  they don't appear to be the same party as the debtor

18  on this account.

19     Q.    What about topic 22?

20     A.    Yes.

21     Q.    You're privy to the investigation that was

22  done by the legal department?

23          MR. MOHANDESI:  Objection, form.

24          THE WITNESS:  No, but, I mean, I'm prepared

25  to talk about what investigation I did into the -- the

66

1    claims in the lawsuit.

2    BY MR. BRACKETT:

3        Q.    But not the investigation of TRAK in

4    general?

5        A.    Correct.

6        Q.    What about topic 23?

7        A.    I'm prepared to discuss that we haven't -- I

8    mean, this doesn't apply to any activities because the

9    plaintiff isn't the debtor on the account that's in

10   question, so there were no activities undertaken with

11   regard to the plaintiff on behalf of TRAK and

12   definitely no activities on behalf of TRAK.

13       Q.    And topic 24?

14           MR. MOHANDESI:  I'm going to object to that

15   one.  We're not going to -- this witness is not going

16   to be discussing our lawsuits.

17           MR. BRACKETT:  Are you instructing her not

18   to answer, Ben?

19           MR. MOHANDESI:  Actually, no.  To the extent

20   she has personal knowledge, she's free to answer.

21           THE WITNESS:  All of these items are handled

22   by our legal department, so I don't have any knowledge

23   of these -- specific knowledge of any of these times.

24   BY MR. BRACKETT:

25       Q.    And Mr. Harmer would know the information

67

1    that would be responsive to this?

2        A.    Yes, I believe so.

3        Q.    Then did you bring any documents with you to

4    today's deposition?

5        A.    I only have the document list for the

6    documents that we provided and the notice of

7    deposition.  That's it.  Those are the two documents.

8    And I have a -- I mean, I have a copy of the

9    settlement conference statement.  That was just

10   because I was part of the settlement conference.  But

11   I don't think it's relevant.

12       Q.    It was a very short settlement conference,

13   wasn't it?

14       A.    Yeah.

15       Q.    All right.  What about the -- you say that

16   you have those two documents.  One of them was a list

17   of documents.  What is on that list of documents?

18       A.    It's a list of the documents that were

19   exchanged with regard to the account between

20   Resurgent, TRAK, and Nelson & Kennard.

21       Q.    And what documents do you see on that list?

22       A.    It is the -- they're the documents that we

23   received at the time of placement from Resurgent that

24   were passed to Nelson & Kennard.  There are documents

25   that relate to a litigation process regarding the

68

1    lawsuit that Nelson & Kennard filed that were passed

2    back to Resurgent, and then there are also some

3    correspondence copies of, you know, debt collection

4    notices and looks like validation response

5    correspondence.

6         Q.   Anything else?

7         A.   No, I think that covers it.

8         Q.   That first placement document, you say it's

9    multiple documents, right?

10        A.   Yes.

11        Q.   And those were passed to TRAK from

12   Resurgent, right?

13        A.   Yes.

14        Q.   And then the litigation process, again, it's

15   multiple documents, right?

16        A.   Yes.

17        Q.   And those were placed -- or were sent to

18   TRAK by Nelson & Kennard?

19        A.   Right.

20        Q.   And then the third category would be debt

21   collection notices and correspondence.  Those would

22   have been transferred either from Nelson & Kennard to

23   TRAK or from Resurgent to TRAK, right?

24        A.   Correct.

25        Q.   Everything goes through TRAK?

69

1      A.   Yes.  Answer is yes.

2      Q.   If Nelson & Kennard wants to talk to

3  Resurgent, they must go through TRAK, right?

4           MR. MOHANDESI:  Form.

5           THE WITNESS:  I mean, we advise them to go

6  through -- to request a call through our office, yes.

7  We would facilitate a call between the law firm and

8  the client, if requested.

9  BY MR. BRACKETT:

10      Q.   And would TRAK participate in that call?

11      A.   Depends on the subject matter, but we would

12  generally facilitate setting up scheduling the call

13  and facilitate a conference call line for that

14  purpose.

15      Q.   All the communications between Nelson &

16  Kennard and Resurgent are either through TRAK, or at

17  least TRAK has access to them, right?

18      A.   Yes.

19      Q.   Again, TRAK is not a law firm, right?

20      A.   Correct.

21      Q.   Did TRAK see any requests from Mr. Soto for

22  clarification or supporting documents?

23      A.   Not that I saw, no.

24      Q.   Was anything sent from Nelson & Kennard on

25  behalf of the plaintiff, Mr. Soto, for clarification

70

1    or supporting documentation?

2         A.   I'm sorry, could you say that again?  You

3    said on behalf of plaintiff?

4         Q.   I'm asking was anything ever sent from

5    Nelson & Kennard to TRAK on behalf of the plaintiff

6    requesting clarification or supporting documentation.

7         A.   Well, like I mentioned earlier, there was a

8    data file that we received from Nelson & Kennard that

9    indicated that they received a validation of debt.

10   That data file was processed through our system and

11   Resurgent was notified of that.  I don't know if it

12   was from the plaintiff or the defendant or -- you

13   know, according to the account, it was a debt

14   validation request on -- with regard to that account.

15        Q.   Do you have that document with you today?

16        A.   No.  It's not a document.  It's --

17   there's -- it's an electronic file.

18        Q.   So it wouldn't be the letter that was

19   actually sent to Nelson & Kennard; it would be just a

20   summary of the letter in electronic format?

21        A.   Oh, I'm sorry.  Maybe -- so let me just

22   review the documents again.

23             If we -- if Nelson & Kennard did receive a

24   letter, then it should be uploaded to us and provided

25   to Resurgent.  So yes, I do see that we did receive

71

1    that document.  We also received a data file that

2    notified us that a validation request was received

3    that corresponds with that document.

4         Q.    And what did TRAK do in response to that

5    data file?

6         A.    We report through our data file to Resurgent

7    that a validation request was received on the account.

8         Q.    What happened next?

9         A.    Well, the normal process would be for

10   Resurgent to send a response to the debtor with the

11   validation of debt.  I'm saying, because I'm not

12   looking at the account, but that would be normally

13   what would happen; and I believe, from the documents,

14   that is what happened, because I think we have a copy

15   of the response from Resurgent on file.  Yeah.

16        Q.    Did Nelson & Kennard also respond?

17        A.    Based on the documents, yes, I believe they

18   also provided a response.

19        Q.    Did TRAK provide Nelson & Kennard authority

20   to respond to that dispute?

21             MR. MOHANDESI:  Objection, form.

22             THE WITNESS:  Not specifically.

23   BY MR. BRACKETT:

24        Q.    Does it provide the authority to communicate

25   with debtors through its agreement?

72

1  A. Yes.

2  Q. What dates did Mr. Soto speak with

3 Resurgent?

4    MR. MOHANDESI: Objection, form.

5    THE WITNESS: I don't have any knowledge of

6 Mr. Soto speaking with Resurgent.

7 BY MR. BRACKETT:

8  Q. What dates did Mr. Soto speak with Nelson &

9 Kennard?

10    MR. MOHANDESI: Objection, form.

11    THE WITNESS: I'm not familiar with those

12 dates or -- I don't know the dates.

13 BY MR. BRACKETT:

14  Q. But he did speak with Nelson & Kennard?

15  A. I don't -- I don't -- if it mentioned that

16 in the lawsuit, I'm forgetting. I don't know -- I

17 don't have any knowledge of that.

18  Q. So you have no knowledge of Michael Soto,

19 the plaintiff in this matter, speaking with Nelson &

20 Kennard?

21  A. The only knowledge I would have would be

22 through the complaint, this lawsuit complaint, if it

23 was described there, and I'm not remembering the

24 details of that.

25  Q. When Nelson & Kennard speaks with a debtor,

73

1    shouldn't it make a note of that?

2                MR. MOHANDESI:  Objection, form.

3                THE WITNESS:  We leave that up to the law

4    firm's discretion on what notes they make in their

5    system.

6    BY MR. BRACKETT:

7        Q.    Isn't it important for certain laws and

8    regulations to be complied with when a communication

9    is between a debt collector and a debtor?

10               MR. MOHANDESI:  Objection, form.

11               THE WITNESS:  Yeah, collection laws should

12   be followed.

13   BY MR. BRACKETT:

14       Q.    What collection laws are you familiar with?

15       A.    Primarily the Fair Debt Collections

16   Practices Act.

17       Q.    And what do you know about the Fair Debt

18   Collections Practices Act?

19               MR. MOHANDESI:  I'm going to object as to

20   form, object that it's outside the scope of the

21   deposition categories.

22               The witness may respond if she has personal

23   knowledge.

24               THE WITNESS:  I mean, my knowledge is that

25   it's generally in place to prohibit abusive or

74

1    inappropriate debt collection practices.

2    BY MR. BRACKETT:

3        Q.    Anything else?

4        A.    Well, I mean, I'm familiar with some of the

5    requirements of the Fair Debt Collection Practices

6    Act, such as -- if you would want me to go into

7    detail, I can.

8        Q.    Sure.

9        A.    So it outlines the -- some of the

10   disclosures that have to be provided to the consumer,

11   outlines some notices that are required to be

12   provided, talks about how -- not -- how you --

13   privacy, the consumer's privacy.

14       Q.    What about any process to handle a dispute

15   from a consumer?

16             MR. MOHANDESI:  Same objection as it

17   pertains to the categories.

18             If you have personal knowledge, you may

19   answer.

20             THE WITNESS:  Yeah, I mean, I believe

21   specifically, it talks about that -- the consumer's

22   right to dispute a debt within the first 30 days of

23   receiving notification and the creditor's requirement

24   to respond or cease collections.

25

75

BY MR. BRACKETT:

    Q.  Have you ever spoken to Michael Soto?

    A.  No.

    Q.  Did anyone at TRAK speak with him?

    A.  Not to my knowledge.

    Q.  Do you have personal knowledge of Michael Soto's account?

    A.  Yes.

        MR. MOHANDESI:  Objection, form.

        Debtor Michael Soto, I presume?

        MR. BRACKETT:  Yes, the debtor.

        MR. MOHANDESI:  To your knowledge.

        THE WITNESS:  Yes, debtor Michael Soto.

BY MR. BRACKETT:

    Q.  Has anybody at Resurgent ever spoke with the debtor, Michael Soto?

    A.  I do not know.

    Q.  Did Resurgent ever send a validation letter -- well, strike that.

        Did Resurgent ever send any letter correspondence to the debtor, Michael Soto?

    A.  They sent -- based on the documents that were uploaded, yes.

    Q.  What address did they send that correspondence to?

76

1      A.   I'd have to look at the letter.  I don't

2   remember the address on the letter.

3      Q.   Have you ever spoke with any of Michael

4   Soto, the debtor's, relatives?

5      A.   Nope.

6      Q.   Have you ever spoke with his place of

7   employment?

8      A.   Nope.

9      Q.   If not, which defendant has?

10         MR. MOHANDESI:  Objection, form.

11         THE WITNESS:  I'm not aware of anyone.

12   BY MR. BRACKETT:

13      Q.   When the dispute came in from the plaintiff,

14   Michael Soto, what did TRAK do in response?

15         MR. MOHANDESI:  Objection, form.

16         THE WITNESS:  I'm sorry, could you say the

17   question again?

18   BY MR. BRACKETT:

19      Q.   Sure.

20         When the dispute came in from the debtor --

21   I'm sorry -- from the plaintiff, my client, Michael

22   Soto, what did TRAK do in response?

23      A.   We didn't receive any dispute from the

24   plaintiff directly.

25      Q.   Was the dispute relayed up to you from

1  Nelson & Kennard?

2      A.   Yes.  A request for validation request

3  indication was relayed through the data file that I

4  described earlier.

5      Q.   And did any person at TRAK review that

6  verification request?

7      A.   No.

8      Q.   Did it have its automated system forward

9  that information request on up to Resurgent?

10     A.   Yes.

11     Q.   And was there any investigation done by TRAK

12  at all?

13     A.   No.

14     Q.   But TRAK could have?

15         MR. MOHANDESI:  Objection, form.

16         THE WITNESS:  I don't think.  So we're not

17  debt collectors.

18  BY MR. BRACKETT:

19     Q.   You have all of the information about the

20  account in your possession, right?

21     A.   We have the documentation that was sent at

22  the time of placement.

23     Q.   And that would have included -- included the

24  debtor, Michael Soto's, address, right?

25     A.   Yes.

78

1      Q.   So TRAK could have reviewed the address of

2  the debtor and determined whether or not it matched

3  the address of the plaintiff, Mike Soto?

4           MR. MOHANDESI:  Objection, form.

5           THE WITNESS:  Theoretically, yeah.  It's not

6  part of our process to review that.

7  BY MR. BRACKETT:

8      Q.   Instead, TRAK leaves it to their automated

9  system to process all of that?

10          MR. MOHANDESI:  Objection, form.

11          THE WITNESS:  Well, the automated system

12  passes the information to the client.  The client

13  presumably investigates the dispute and response.

14  BY MR. BRACKETT:

15     Q.   No investigation is done at TRAK?

16     A.   No.

17          MR. BRACKETT:  All right.  We're already at

18  11:02.  I went past my hour there.  Sorry about that.

19  Let's take another five-minute break, or ten.  How

20  much time do you need?

21          MR. MOHANDESI:  If I can get ten, that would

22  be awesome.

23          MR. BRACKETT:  Can do.

24          MR. MOHANDESI:  Thank you.

25          MR. BRACKETT:  Let's come back at 11:15.

79

1          THE WITNESS:  Okay.

2          MR. MOHANDESI:  Perfect.  Thank you.

3          (Recess ensued from 11:02 to 11:16 AM HST.)

4          MR. BRACKETT:  Back on the record at 11:16.

5          MR. BRACKETT:  Madame Court Reporter, I

6  request that you mark that notice of deposition as

7  Exhibit 1 to today's deposition.

8          COURT REPORTER:  Okay, will do.

9          MR. BRACKETT:  Thank you.

10  BY MR. BRACKETT:

11      Q.   Did Nelson & Kennard communicate directly

12  with LVNV for Resurgent in this matter before the

13  lawsuit was filed against Mr. Soto?

14      A.   Not to my knowledge, no.

15      Q.   Did Nelson & Kennard communicate directly

16  with LVNV or Resurgent in this matter after the

17  lawsuit was filed by Mr. Soto against LVNV?

18      A.   No, not that I know.

19      Q.   Did Nelson & Kennard communicate -- strike

20  that.

21          Does TRAK manage litigation for its clients?

22      A.   We manage accounts.  We manage accounts.

23      Q.   Part of managing those accounts includes

24  placing those accounts with law firms to pursue

25  litigation?

80

1      A.   Yes.

2      Q.   And that's what happened in this case,

3  right?

4      A.   Yes.

5      Q.   What did TRAK advise Nelson & Kennard to do

6  in response to Mr. Soto's disputes?

7           MR. MOHANDESI:   Objection, form.

8           THE WITNESS:   We didn't advise Nelson &

9  Kennard with regard to the disputes.

10  BY MR. BRACKETT:

11      Q.   TRAK took a more hands-off approach, right?

12      A.   Followed our normal process.

13      Q.   And that process is to allow the automated

14  service to forward any dispute, any request for

15  verification, on to the client, right?

16           MR. MOHANDESI:   Objection --

17           THE WITNESS:   Yes.

18           MR. MOHANDESI:   -- form.

19  BY MR. BRACKETT:

20      Q.   And the client -- I mean, Resurgent Capital?

21      A.   Yes.   Resurgent has a process that they have

22  established for handling validation requests, and

23  their process is to forward a notification of the

24  request to Resurgent, and Resurgent handles the

25  investigation and response.   That's a process that was

81

1    established by Resurgent.

2        Q.    So they don't want TRAK to do any

3    investigation, right?

4        A.    Correct.

5        Q.    They tell TRAK, "Just forward us the

6    disputes, and we'll take care of it from there"?

7        A.    Generally, yeah.

8        Q.    Who is Vincent Iacono?

9        A.    He is the CEO of TRAKAmerica.

10       Q.    And what about Abraham Perkins?

11       A.    He's a client services manager.

12       Q.    And we spoke about him earlier today, right?

13       A.    Right.

14       Q.    What about Alexander Brown?  What is his

15   role there at TRAK?

16       A.    I believe he's a client services manager as

17   well, but he's not on my team.

18       Q.    Is he an attorney?

19       A.    Not to my knowledge, no.

20       Q.    What about Alfredo Socarras?

21       A.    I believe that that person works in our

22   finance department, but -- the name is familiar, but I

23   don't know their exact title.

24       Q.    And Alyssa Tyson?

25       A.    I believe they're a TRAK employee, but I

82

1    don't recall their title.

2        Q.   Is she the quality assurance specialist?

3        A.   That sounds right.

4        Q.   What do you understand quality assurance

5    specialist to mean?

6        A.   I understand it to mean someone that listens

7    to telephone calls and score -- and assesses

8    compliance or identifies compliance problems.

9        Q.   Does TRAK have any record of any telephone

10   calls from the plaintiff, Michael Soto?

11       A.   Not to my knowledge.

12       Q.   Would Ms. Tyson know that?

13       A.   I don't think anyone would know that without

14   searching our call records in quality assurance.

15       Q.   And where would those call records come

16   from, Nelson & Kennard?

17       A.   Yes.

18       Q.   And the calls that Nelson & Kennard receives

19   from a consumer or debtor, does it forward all of

20   those calls to TRAK?

21       A.   Not to my knowledge, no.

22       Q.   Does the agreement between TRAK and Nelson &

23   Kennard require that any calls from consumers be

24   forwarded to it?

25       A.   No.

83

1      Q.   What information is included in those call

2  records, then?

3      A.   So in the context of quality assurance, if

4  we -- our clients, at times, have requirements to

5  listen to telephone calls; so we obtain those

6  telephone call recordings from the law firms and we

7  send them to the client.  There are sometimes when we

8  have our own quality assurance people listen to the

9  calls as well, if the client requires us to, but I

10  don't happen to recall what Resurgent's process is for

11  this, and if we do listen on calls for Resurgent.

12      Q.   Who would know that?

13      A.   The quality assurance -- or the -- the

14  compliance leader.

15      Q.   Who is that?

16      A.   Our V.P. of Audit, which would be Jennifer

17  Treadway.

18      Q.   Anyone else?

19      A.   There could be other people on her team that

20  are familiar with the requirements for Resurgent, but

21  I don't know all of the names of the people on her

22  team.

23      Q.   Would the agreement between TRAK --

24           (Discussion off the record.)

25

84

1    BY MR. BRACKETT:

2        Q.    Would the agreement between TRAK and

3    Resurgent tell whether or not it is a requirement that

4    phone calls be maintained?

5        A.    I don't recall if it is.

6        Q.    Would the agreement outline whether or not

7    Nelson & Kennard is required to forward any recordings

8    it has to TRAK?

9        A.    I'm sorry, could you say that again?

10       Q.    Sure.

11             Does the agreement between Resurgent and

12   TRAK require that any phone calls that Nelson &

13   Kennard receives from a consumer or debtor be

14   forwarded to TRAK for quality assurance?

15       A.    So I don't know what it says in the contract

16   related to call recording, but I know that our firms

17   are not required to provide 100 percent of calls to

18   Resurgent.  I -- I -- if the client requests a call

19   recording, the law firm provides it.  That's just a

20   normal course of business.  I don't know if it

21   specifically outlines that in the contract.

22       Q.    Are the law firms that you contract with

23   there at TRAK required to maintain recordings of all

24   calls?

25       A.    Yes.

85

1      Q.   But they may not be required to provide

2  100 percent of those calls to TRAK?

3      A.   Yeah, they are not required to provide

4  100 percent to TRAK.   Only upon request from the

5  client.

6      Q.   Is there a requirement of the law firms that

7  they respond to phone calls from consumer or debtors?

8      A.   I don't know that there's a written

9  requirement for that.

10     Q.   Do the notes show whether Nelson & Kennard

11 forwarded any recordings to TRAK in this case?

12          MR. MOHANDESI:   Objection as to form.

13          THE WITNESS:   Yeah, there's no notes of

14 anything related to call recordings.

15 BY MR. BRACKETT:

16     Q.   And --

17     A.   In --

18     Q.   Oh, go ahead.

19     A.   In our account history, there's no notes of

20 anything related to the call recording.

21     Q.   What is Data Search NY, Inc.'s phone number?

22     A.   While I don't know that we publish a phone

23 number -- we publish a phone number for TRAKAmerica,

24 which is our dba.

25     Q.   Okay.

86

1          A.   And I'm going to go off memory, but I think

2     it's (855)800-8449.

3          Q.   What is Data Search NY, Inc.'s website?

4          A.   We don't have a website for Data Search NY,

5     Inc. that I know of.

6          Q.   What about for TRAKAmerica?

7          A.   TRAKAmerica.com.

8          Q.   Have they had that website for a number of

9     years?

10         A.   Yes.

11         Q.   And it's currently active as well?

12         A.   Should be, yes.

13         Q.   Where is Data Search NY, Inc. located?

14         A.   Well, they're incorporated in the state of

15    New York.

16         Q.   Does it have any offices there?

17         A.   I don't believe so.

18         Q.   Where are its offices?

19         A.   Well, TRAKAmerica offices are in Florida and

20    in Bonita Springs, Florida and Richmond, Virginia.

21         Q.   Does it have a call center in Richmond,

22    Virginia?

23         A.   No.

24         Q.   What about in Bonita Springs, Florida?

25         A.   There's no outbound call center.

87

1      Q.   What about inbound call center?

2      A.   Well, there's a phone number, and it rings

3  into the Bonita Springs, Florida office.

4      Q.   And is that the same number that Nelson &

5  Kennard would call?

6      A.   Potentially they could call that phone

7  number, but normally we interact with Nelson & Kennard

8  from email, primarily.

9      Q.   What is Data Search NY, Inc.'s industry?

10         MR. MOHANDESI:  Objection, form.

11         THE WITNESS:  I'm not aware or familiar

12  with -- you mean, like, their SIC code or something?

13  I'm not aware.

14  BY MR. BRACKETT:

15     Q.   What is their, like -- what does it do to

16  generate sales?

17     A.   I don't know if I'm understanding the

18  question.

19     Q.   How does Data Search NY make any revenue?

20     A.   Well, Data Search NY, I believe they have

21  multiple businesses outside of TRAKAmerica, so -- I'm

22  only familiar with what TRAKAmerica does and how they

23  generate revenue.

24         And so TRAKAmerica generates revenue through

25  contingency on amounts collected by our supplier

88

1    network.

2        Q.    And what is that contingency percentage?

3            MR. MOHANDESI:  Objection.  That's going to

4    be private and confidential information that's likely

5    subject to a confidentiality provision, so I would ask

6    the witness to comply with the confidentiality of

7    that.

8            MR. BRACKETT:  And you're asserting

9    confidentiality pursuant to the agreement?

10           MR. MOHANDESI:  To the extent there's a

11   confidentiality provision between their clients,

12   TRAK's clients, and TRAK regarding the contingency

13   rate, then I'm going to ask the witness to adhere to

14   that confidentiality.

15   BY MR. BRACKETT:

16       Q.    What is the contingency agreement with

17   Resurgent Capital?

18       A.    That's something that we can't disclose,

19   based on our confidentiality agreement with Resurgent.

20       Q.    Have you reviewed that agreement prior to

21   today?

22       A.    Not recently.

23       Q.    Did you bring it with you?

24       A.    No.

25       Q.    Are you certain that that amount is

89

1    confidential?

2        A.    I'm certain that that would be included in

3    the confidentiality requirements of the agreement.

4        Q.    But nonetheless, Data Search NY, doing

5    business as TRAKAmerica, they generate revenue by

6    receiving a contingency of the amounts collected by

7    the attorney network, right?

8        A.    Yes.

9        Q.    So not every dollar that's collected by the

10   attorney network goes to the client?

11       A.    Well, technically, yes, every dollar does go

12   to the client, but the client pays a contingency.

13       Q.    Is the payment made directly to the client

14   itself, or does the payment go to TRAK first?

15       A.    The payment goes to either the law firm

16   first or to -- directly from the client, if paid by

17   the debtor to the client.  TRAK doesn't receive any

18   payments directly from the consumer.

19       Q.    When a payment is made to the law firm, does

20   the law firm then forward that payment to TRAK?

21       A.    When a payment is made to the law firm, they

22   don't forward the physical payment to TRAK.  They

23   deposit the payment and they send an electronic file

24   to TRAK of all of the payments that they've collected,

25   and they send a corresponding wire transfer for the

90

1   funds that correspond with those payments.  Those

2   payments then get sent electronically, notified to the

3   client that -- the client is electronically notified

4   of the payments in the similar file transition --

5   transfer process, and then a similar corresponding

6   wire transfer to the client comes from TRAK to the

7   client.  The payments that are sent by the firm to

8   TRAK can include payments from multiple clients.

9        Q.   So the wire goes from the law firm to TRAK?

10       A.   Right.

11       Q.   And then from TRAK to the client?

12       A.   Correct.

13       Q.   Before the payment is made from TRAK to the

14   client, does it take its percentage as contingency fee

15   out of that?

16       A.   No.

17       Q.   So it just notifies TRAK, "Here's how much

18   we collected, and we're forwarding all that amount to

19   you by wire," right?

20       A.   Yes.

21       Q.   And then TRAK sends an invoice saying, "We

22   collected this much.  Here's our cut," and then the

23   client -- in this instance, Resurgent -- would send

24   back a check to TRAK?

25       A.   Not exactly.  There's no check, but we send

91

1    the data to the client, the client determines the fee

2    based on the amounts collected, and Resurgent then

3    would wire TRAK back the fee for the amounts

4    collected.

5         Q.    And that's how TRAK makes revenue on these

6    accounts?

7         A.    Yes.

8         Q.    Are there any other ways that TRAKAmerica

9    makes revenue?

10        A.    Yes.  We -- yes.

11        Q.    What are those?

12        A.    We also engage attorney networks -- or

13   attorneys in our network to fulfill requirements like

14   satisfactions of judgments or dismissals of lawsuits

15   that the clients may need where they don't have the

16   attorney of record available to fulfill those; so we

17   process those in a similar manner through our network,

18   and we receive a portion of the fee, a flat fee, for

19   performing those services.

20        Q.    Does the client, such as Resurgent, pay that

21   fee to TRAK?

22        A.    Yes.

23        Q.    And then TRAK forwards that fee on to the

24   attorney?

25        A.    Yes.

92

1      Q.   In that instance, does TRAK keep a

2  percentage of what was sent to it from Resurgent?

3      A.   Yes.

4      Q.   What other ways does TRAK receive revenue?

5      A.   Those were the only ways I'm aware of.

6      Q.   Does TRAK do any skip tracing?

7      A.   No.

8      Q.   Does TRAK do any verification of place of

9  employment?

10     A.   We don't do any verification or skip

11 tracing, but we do engage vendors to perform those

12 services from time to time.

13     Q.   Is one of those vendors RNN Group?

14     A.   Yes.

15     Q.   Did TRAK engage RNN Group to receive the

16 verified place of employment of Mr. Soto?

17     A.   Yes, we did.

18     Q.   And did TRAK receive a fee for hiring RNN

19 Group?

20     A.   No.  But just to clarify, we did engage RNN

21 to do a search for Mr. Soto, the debtor, but they did

22 not return any results to us.

23     Q.   Did they pay RNN Group for that search?

24     A.   I'm not familiar on the terms of our

25 agreement with RNN, but my understanding is they only

93

1    are paid if an asset is returned -- or a place of

2    employment is returned; but I don't have personal

3    knowledge of the agreement with them.

4        Q.   Who would know that?

5        A.   Probably our legal department has access to

6    the agreement.

7        Q.   RNN Group allegedly provided a verified

8    place of employment to Nelson & Kennard.  Are you

9    aware of that?

10           MR. MOHANDESI:  Objection, form.

11           THE WITNESS:  I'm only aware that they

12   provided an asset -- or -- I'm sorry -- a place of

13   employment to Resurgent.

14   BY MR. BRACKETT:

15       Q.   And when they provided place of employment

16   to Resurgent, did TRAKAmerica receive a commission or

17   payment for that?

18       A.   No.

19       Q.   So it was Resurgent that requested the

20   verified place of employment --

21       A.   Yes.

22       Q.   -- from RNN Group?

23       A.   Yes.

24       Q.   And they did that without TRAK's assistance?

25       A.   Correct.

94

1      Q.   Is that common?

2      A.   Yes.

3      Q.   And you stated earlier that TRAK engaged RNN

4   Group to do a search.  What were they asking RNN Group

5   to search for?

6      A.   We were asking for -- or TRAK was asking for

7   a place of employment for Mr. Soto, the debtor, on the

8   account.

9      Q.   Was this before or after Resurgent had asked

10  for a place of employment?

11     A.   It was before.

12     Q.   So it was TRAK who originally engaged RNN

13  Group and asked them for a verified place of

14  employment of Mr. Soto?

15     A.   TRAK asked for a place of employment from

16  RNN on that account based on the account history, yes.

17     Q.   What date did it do that?

18     A.   I don't recall the date, but it's -- it's

19  independent of the request that Resurgent made of RNN.

20     Q.   Do you have access to the records that would

21  show the date?

22     A.   Not currently.  But I do recall from looking

23  at the account that it was before -- well before we

24  received the information from Resurgent.

25     Q.   And that date would be included in the notes

95

1    there at TRAKAmerica?

2              MR. MOHANDESI:  Object to form.

3              THE WITNESS:  It's included on the account

4    history, the transmission history, showing that we

5    sent a request to RNN.

6    BY MR. BRACKETT:

7         Q.   And is that history -- has it been provided

8    to your attorney, Mr. Mohandesi?

9         A.   I'm not sure.

10             MR. BRACKETT:  Ben, is that included in this

11   documents that were sent over this morning?

12             MR. MOHANDESI:  To the extent I understand

13   the information that she's mentioning, I do not

14   believe so.  The documents that were provided this

15   morning were all the documents that were exchanged

16   between Nelson & Kennard and Resurgent through TRAK.

17   I do not recall seeing that particular document in

18   that production.

19   BY MR. BRACKETT:

20        Q.   I would ask that that document be provided.

21   Of course, as we know, this is a very important detail

22   of this case, very material fact that we'd request

23   that information be produced so that we can find out

24   when that engagement by TRAKAmerica of RNN Group to do

25   a search for Michael Soto's place of employment was

96

1    made.  So I request those records be turned over.

2           Can you provide that to Mr. Mohandesi?

3           MR. MOHANDESI:  I can inquire during the

4    next break to see if that's something that can be

5    quickly identified.

6    BY MR. BRACKETT:

7        Q.   Are you willing -- I'm sorry -- Ms. Torres,

8    to forward that information to Mr. Mohandesi?

9        A.   If I can access it, yes.

10       Q.   Do you know who Terry Kulbaba is?

11       A.   That name doesn't sound familiar to me.

12       Q.   What about Carl Hernandez?

13       A.   There -- perhaps -- I don't -- I know a Carl

14   Hernandez.  I don't -- there isn't a Carl Hernandez

15   that works at TRAKAmerica currently.

16       Q.   There is?

17       A.   There is not that I know.

18       Q.   Did he used to work at TRAK?

19       A.   We had a person named Carl Hernandez that

20   worked for TRAK, to my knowledge, many years ago.

21       Q.   But he no longer works there?

22       A.   Not to my knowledge, no.

23       Q.   Do you know if he worked on this account?

24       A.   I -- I highly doubt it, based on the time

25   frame.  Again, it might -- if it's the same Carl

97

1  Hernandez I'm thinking of.  Otherwise, I don't know

2  any other one.

3       Q.   How many employees does Data Search NY, Inc.

4  have?

5       A.   I believe --

6            MR. MOHANDESI:  I object.  That is -- I'm

7  going to object.  Outside the scope of the categories.

8  However, if you have personal knowledge, you may

9  respond.

10           THE WITNESS:  Somewhere around 140.  I don't

11  know the exact number.

12  BY MR. BRACKETT:

13       Q.   And you say that they have other dbas other

14  than TRAKAmerica.  What are the other dbas?

15           MR. MOHANDESI:  Same objection.

16           THE WITNESS:  Yeah, and I'm going to say I

17  don't really know if I can answer that accurately.

18  BY MR. BRACKETT:

19       Q.   Just to the best of your knowledge.

20       A.   I don't know if they're dbas, to be clear.

21  I believe that there's other companies that are owned

22  by Data Search, but I don't know if they're dbas or

23  companies that are owned.

24       Q.   What are the name of those companies?

25       A.   One is called Millennium -- I think it's

98

1    Millennium Recovery Services or Capital --

2    Millennium -- maybe Millennium Recovery.  They're a

3    repossession company, auto repossession.

4        Q.    What others?

5        A.    The other company is called Novo 1, which

6    was just recently acquired.  Again not sure of the

7    ownership structure or if it's a dba or what.

8        Q.    Any others?

9        A.    No, not that I know of.

10        Q.    Kim Hurley, in her deposition on behalf of

11   LVNV, testified that TRAKAmerica is the servicer, and

12   then the subservicer is Nelson & Kennard.  Is that

13   accurate?

14            MR. MOHANDESI:  Objection, form.

15            THE WITNESS:  Based on -- to my knowledge,

16   my understanding, that's the way that Resurgent refers

17   to its vendors; so I believe Resurgent refers to us as

18   a servicer, similar to how we refer to them as a

19   client.

20   BY MR. BRACKETT:

21        Q.    Does TRAKAmerica service only consumer debts

22   on behalf of LV -- or Resurgent Capital and LVNV

23   Funding?

24        A.    We don't service accounts.  We only manage

25   accounts and place them to our supplier network.

99

1    Q.    That leads me to my next question.

2          What does TRAKAmerica do as the servicer of

3    an account for --

4          MR. MOHANDESI:  Objection, form.

5    BY MR. BRACKETT:

6    Q.    -- for Resurgent?

7          MR. MOHANDESI:  If you know.

8          THE WITNESS:  TRAKAmerica doesn't service

9    accounts.

10   BY MR. BRACKETT:

11   Q.    Who chooses the subservicer?

12   A.    It's primarily determined -- the

13   subservicer, being our supplier, our vendor attorney,

14   in our network, is primarily chosen based on the

15   state.  That's the first criteria.

16   Q.    What other criteria are used?

17   A.    Whether or not the law firm is part of the

18   law firms that are approved by -- or -- I don't -- I

19   don't know if "approved" is the right word, but

20   assigned to that particular client.  So like I

21   mentioned earlier, some law firms work with certain

22   clients and don't work other clients.  So if it's an

23   approved law firm by our performance team for that

24   particular client, then -- and they are in the state

25   where the account resides, then that's how we

100

1    determine how to place the account.

2         Q.   And TRAKAmerica makes that decision, that

3    determination, as to where to place the account?

4         A.   Generally, yes.  The client does have

5    discretion of which attorney firms cannot be used or

6    used at the -- you know, if they want to make that

7    direction.

8         Q.   What criteria are considered in making that

9    decision?

10             MR. MOHANDESI:  Objection, form, asked and

11   answered.

12             THE WITNESS:  I'm not familiar with the

13   criteria outside of what I explained.

14   BY MR. BRACKETT:

15        Q.   You said one of those criteria are the state

16   where they are licensed.  Is that right?

17             MR. MOHANDESI:  Objection, form.

18             THE WITNESS:  The attorney has to be -- has

19   to cover the state where the debtor resides.

20   BY MR. BRACKETT:

21        Q.   You also say that the law firm has to be

22   approved by your client.  Is that right?

23        A.   I -- I misspoke.  What I meant is we have --

24   we designate certain law firms to work for certain

25   clients.  We have a matrix of those law firms that are

101

1    allowed to work for certain clients, based on our --

2    based on a variety of not criteria, but just based on

3    how our performance team has determined to assign the

4    attorneys to certain clients.  The client has

5    discretion of not to use certain attorneys as well,

6    but there's -- the client doesn't necessarily approve

7    the attorney.  They just -- they have discretion to

8    discuss not to use them, if that makes sense.

9         Q.   What are the factors involved in that

10   matrix?

11        A.   The state and the client and the law firm

12   and which attorneys are assigned to which clients.

13        Q.   Do results matter?

14        A.   Theoretically, yeah.  Not with regard to the

15   matrix of how the process works on where to assign the

16   account.  The account gets assigned based on state,

17   client, and attorney.  The attorney -- so yeah.  I

18   mean, not with regard to the process itself, the

19   automated process that places the accounts.

20        Q.   What about the amount of money collected?

21   Does that factor into whether or not a law firm is

22   chosen by TRAK?

23             MR. MOHANDESI:  Objection, form.

24             THE WITNESS:  I can't really speak to that

25   because that -- I don't -- I'm not involved in

102

1    selecting the law firms.

2    BY MR. BRACKETT:

3        Q.   But you are the representative of

4    TRAKAmerica, right?

5        A.   I am.

6        Q.   And so you're here to testify on their

7    behalf?

8        A.   Yes.

9        Q.   And part of that would be that you are to

10   testify about how they chose Nelson & Kennard in the

11   first place, right?

12            MR. MOHANDESI:  Objection, form.  I don't

13   see that in the categories or --

14            THE WITNESS:  Nelson & Kennard has been part

15   of our network since before I worked for TRAK.

16   BY MR. BRACKETT:

17       Q.   What do you know about the Law Offices of

18   Marvin S.C. Dang?

19       A.   I know that they were an attorney firm that

20   was in our network previously, and I believe they were

21   acquired by Nelson & Kennard.

22       Q.   Okay.  And during your tenure, they were

23   acquired by Nelson & Kennard, right?

24       A.   That's my understanding.

25       Q.   So now, Resurgent no longer uses them as

103

1    their law firm here in Hawaii, right?

2              MR. MOHANDESI:  Objection, form.

3              THE WITNESS:  I'm not familiar with what

4    attorneys Resurgent may use directly.

5    BY MR. BRACKETT:

6        Q.   But it is true that if a law firm is not

7    collecting the debts that they're assigned to collect,

8    then they're no longer going to be chosen by

9    TRAKAmerica to continue working for them, are they?

10              MR. MOHANDESI:  Objection, form.

11              THE WITNESS:  Well, I mean, we can't -- we

12   can't do business with a company that is no longer

13   collecting debts.  I don't -- maybe I don't understand

14   the question.

15   BY MR. BRACKETT:

16       Q.   There's a productivity component of this,

17   right?

18              MR. MOHANDESI:  Objection, form.

19              THE WITNESS:  I don't understand the

20   question.

21   BY MR. BRACKETT:

22       Q.   The law firms that TRAK hires are hired to

23   collect money, right?

24       A.   Yes.

25       Q.   And if they aren't collecting, then what

104

1    happens?

2              MR. MOHANDESI:  Objection, form.

3              THE WITNESS:  I don't have any knowledge of

4    anybody -- of anyone not collecting -- or what happens

5    if they don't collect.

6    BY MR. BRACKETT:

7         Q.   What about if they are violating the laws in

8    their collection attempts?  What does TRAK do in

9    regards to that?

10        A.   Well --

11             MR. MOHANDESI:  Objection, outside the scope

12   of the categories.

13             To the extent you have personal knowledge,

14   you can answer.

15             THE WITNESS:  Yeah, as far as I know, if

16   that were to happen -- and I don't have any personal

17   knowledge of that occurring -- then it would be

18   evaluated by our leadership as to, you know, the

19   severity or -- or would be remediated or evaluated at

20   that point, depending on the circumstances.

21   BY MR. BRACKETT:

22        Q.   And what evaluation occurred in this case?

23        A.   I --

24             MR. MOHANDESI:  Objection, form.

25             THE WITNESS:  I don't -- I'm not aware of

105

1    what the evaluation was, if any.

2    BY MR. BRACKETT:

3        Q.   So Nelson & Kennard haven't been

4    reprimanded?

5            MR. MOHANDESI:  Objection, form.

6            THE WITNESS:  Not that I know.

7    BY MR. BRACKETT:

8        Q.   Nelson & Kennard have not been reprimanded

9    for their attempt to garnish from the plaintiff,

10   Michael Soto?

11           MR. MOHANDESI:  Objection, form.

12           THE WITNESS:  Yeah, I'm not aware of any

13   reprimand.

14   BY MR. BRACKETT:

15       Q.   Have they been advised to be more careful in

16   the future with their issuance of garnishments?

17           MR. MOHANDESI:  Objection, form.

18           THE WITNESS:  I'm not aware of such a

19   communication.  I'm not aware of any communication.

20   BY MR. BRACKETT:

21       Q.   But all the communications go through TRAK,

22   right?

23       A.   Right, prior to the lawsuit -- or, you know,

24   through my team, prior to the lawsuit.

25       Q.   And TRAK never advised Nelson & Kennard to

106

1    withdraw the garnishment?

2         A.   Not that I found, no.

3         Q.   But TRAK knew that it was the wrong debtor?

4              MR. MOHANDESI:  Objection, form.

5              THE WITNESS:  I don't -- I don't understand

6    what you mean by that.

7    BY MR. BRACKETT:

8         Q.   You stated earlier that you were of the

9    understanding that the plaintiff in this lawsuit had a

10   different Social Security number than the individual

11   debtor that was sued, Michael Soto, right?

12        A.   Yes.

13        Q.   And doesn't he also have a different place

14   of dwelling?

15        A.   I assume he does.  I don't have any

16   knowledge of where either party lives.

17        Q.   Did LVNV purchase this debt while it was in

18   default?

19             MR. MOHANDESI:  Objection, form, outside the

20   scope of the categories.

21             If you have personal knowledge, you may

22   answer.

23             THE WITNESS:  I don't know.

24   BY MR. BRACKETT:

25        Q.   Who did LVNV purchase this debt from?

107

1          MR. MOHANDESI:  Same objection.

2          THE WITNESS:  I don't recall, but the

3   information is in the documentation provided.

4   BY MR. BRACKETT:

5       Q.   Why did LVNV purchase this account?

6          MR. MOHANDESI:  Same objection.  Also

7   objection as to form.

8          THE WITNESS:  I don't know.

9          MR. MOHANDESI:  She's not here on behalf of

10  LVNV.

11         THE WITNESS:  I --

12  BY MR. BRACKETT:

13      Q.   But the account -- go ahead.  Sorry.

14      A.   Sorry.  I was just saying I don't know.

15      Q.   You said you previously testified on behalf

16  of TRAK in a matter in 2020, right?

17      A.   Yes.

18      Q.   Was that a lawsuit against TRAKAmerica?

19      A.   I don't recall.

20      Q.   What do you recall about that deposition?

21      A.   I just recall that it was in 2020, because I

22  checked, when I found out that I was going to do this

23  deposition, to see when -- how long ago it was that I

24  had done it before; and I saw that I had done it in

25  2020, but I don't recall the details of the case.

108

1       Q.    What did you check?

2       A.    My email.

3       Q.    And do you have access to that email now?

4       A.    No.

5       Q.    I thought you had your work computer right

6    there beside you.

7       A.    I'm not logged into the computer.

8       Q.    We're about to take another break.  Can you

9    log in and get that information for me during the

10   break?

11      A.    I should be able to.

12            MR. BRACKETT:  Let's take another ten-minute

13   break.  Is that enough time?

14            THE WITNESS:  Yes.  I can't believe it's an

15   hour already.  That was quick.

16            MR. BRACKETT:  I can't either.  It's really

17   only been 45 minutes, but we'll take 10 minutes, get

18   that information, and then -- yeah, I'm most of the

19   way through, so I don't think there's much more after

20   that.

21            MR. MOHANDESI:  If you want us to also check

22   about the other document you requested, maybe give us

23   15 and see if I can get that to you as well?

24            MR. BRACKETT:  That would be great.  Thank

25   you, Ben.

109

```
 1              MR. MOHANDESI:  Okay.

 2              MR. BRACKETT:  Okay.  Let's come back at

 3    12:15.

 4              Off the record at noon.  Thank you.

 5              (Recess ensued from 12:00 to 12:23 PM HST.)

 6              MR. BRACKETT:  Back on the record at 12:23.

 7    BY MR. BRACKETT:

 8         Q.   Ms. Torres, you understand you're still

 9    under oath.

10              Did you speak with your attorney during the

11    break?

12         A.   Yes.

13         Q.   And what did you speak with -- to your

14    attorney about?

15              MR. MOHANDESI:  Hang on.  Objection.  Come

16    on, you know better than that, Justin.  You're asking

17    attorney-client privilege?  Really?

18              MR. BRACKETT:  There's no attorney-client

19    privilege during the deposition, Ben.

20              MR. MOHANDESI:  No, no, no.  No.

21              MR. BRACKETT:  Hall vs. Clifton Precision,

22    150 F.R.D. 525.  When she's under oath during a

23    deposition is just like during trial.  You can't be

24    coaching the witness while she's testifying.

25              MR. MOHANDESI:  I wasn't coaching the
```

110

1  witness.

2       Well, I'll let her testify to what we did,

3  which is fine, but, I mean, you're walking a very fine

4  line here.  And I don't care what you're citing.  If

5  it was communication off the record with a witness,

6  that's going to be attorney-client-privileged

7  communication; but fortunately here, I think it's moot

8  because all we tried to do was identify the documents

9  that you wanted, and that's -- and I'll let her

10  explain that.

11       THE WITNESS:  Yeah, we -- I -- we talked

12  about the transmission history that you had requested

13  earlier in the questioning.  I logged into my system

14  to obtain that.  I made a screen shot of it and

15  emailed it to the attorney, and he -- we were

16  discussing whether or not he received the email.

17  That's why we took so long.  It took a while to get

18  through.

19       And, also, I searched my email for the word

20  "deposition," and I did identify an email with the

21  subject line "deposition" that was from 2020 that I

22  also emailed a copy to the attorney.

23  BY MR. BRACKETT:

24       Q.  And what was that case that you had your

25  deposition in 2020 about?

111

1        A.    The email didn't contain any details about

2   the case.  It was just an email from our outside

3   counsel and Greg Harmer about scheduling the

4   deposition; and I didn't see any other emails about

5   the case.

6        Q.    Did he provide the notice of deposition in

7   that email?

8        A.    No.  It was just the time that they wanted

9   to do it and my response with the availability.

10       Q.    What date did that occur on?

11       A.    I wrote it down.  So the email was

12  September 30th, and the date was 10/9/2020.

13       Q.    All right.  And do you remember, based on

14  your review of that email, any more about that case?

15       A.    No.

16       Q.    It doesn't provide the case name?

17       A.    No.

18       Q.    It doesn't provide any of the party names?

19       A.    No.  No.  There's no information about the

20  case.

21       Q.    Were you instructed not to provide the case

22  name to us?

23       A.    No.

24       Q.    If you were to follow up with Mr. Harmer,

25  could you obtain that case name?

112

1     A.   Potentially.

2     Q.   He's the one that sent you the email, right?

3     A.   I think the email was from the outside

4  counsel, but he was on the email as well.

5     Q.   Who was the outside counsel?

6     A.   I don't recall the attorney's name, but the

7  firm was Barrie Newberger from -- if I -- I may be

8  saying it wrong, but...

9     Q.   I'm familiar with Barrie Newberger.  Very

10 good.  And that was who was representing TRAK in that

11 matter?

12    A.   I honestly don't know.

13    Q.   Anything else discussed during the break?

14    A.   Nope.

15         MR. BRACKETT:  All right.  Moving on, you've

16 got another document.  I'm going to introduce

17 Exhibit 2 to today's deposition.

18         (Document was displayed.)

19 BY MR. BRACKETT:

20    Q.   And hopefully you can see it now.

21         Do you see the second amended complaint on

22 your screen?

23    A.   Yes.

24    Q.   Did you review this document in preparation

25 for today's deposition?

113

1        A.    I believe so.   I know that I reviewed the

2    lawsuit, so...

3        Q.    And you testified earlier you reviewed the

4    lawsuit that included Data Search NY, doing business

5    as TRAKAmerica as defendant?

6        A.    Yes.   This looks like what I reviewed.   I

7    just can't remember if it was the exact title.

8        Q.    So I've just got a few questions about this.

9           What did TRAK do in response to this

10   complaint?

11           MR. MOHANDESI:   Objection, form.

12           THE WITNESS:   I don't know.   I don't

13   specifically know.

14   BY MR. BRACKETT:

15       Q.    Did they communicate with Resurgent in

16   regards to the complaint?

17       A.    Well, based on our process, if we're

18   notified of a lawsuit, a direct lawsuit, against --

19   well, I guess I should say a lawsuit related to any of

20   the accounts placed by their office, we're required to

21   communicate that to them, yes; so I'm assuming that we

22   did.   That would have been through our legal

23   department.

24       Q.    And Nelson & Kennard, pursuant to the

25   procedures there at TRAK, would have forwarded this

114

1    complaint to TRAK, right?

2        A.    Yes.  They should have, yes.

3        Q.    And then TRAK would have forwarded it to

4    Resurgent?

5        A.    Yes, although it looks like they're named

6    directly, so I'm sure they were notified directly as

7    well.

8        Q.    So I'm looking at Exhibit 1, to the second

9    amended complaint now.  Do you see that on your

10   screen?

11       A.    Yes.

12             Yes, I --

13       Q.    Do you agree --

14       A.    Sorry.

15       Q.    Who is Casey Moon?

16       A.    I don't know this person personally, but

17   from the document, it appears that they're the affiant

18   for the -- I guess the authorized representative for

19   LVNV Funding.

20       Q.    Does he work for TRAK?

21       A.    No.

22       Q.    I could be wrong.  It could be a she.  Does

23   he or she work for TRAK?

24       A.    No, that person does not work for TRAK; and

25   TRAK doesn't have anyone that works for TRAK that

115

1  signs affidavits.

2          MR. BRACKETT:  Madame Court Reporter, please

3  mark this as Exhibit 2 to today's deposition.

4  BY MR. BRACKETT:

5      Q.  What was the amount owed by Mr. Soto as of

6  invoice 29, 2020?

7          MR. MOHANDESI:  Objection, form.  I'm

8  assuming you're saying Mr. Soto, the debtor?

9          MR. BRACKETT:  Yes.

10          THE WITNESS:  So yeah, based on the claim

11  here, it was $839.33.

12  BY MR. BRACKETT:

13      Q.  I may have misstated the date, but as of

14  September 30th, 2020, that was the amount owed,

15  $839.33, correct?

16      A.  Yes.

17      Q.  Who provided that information to Nelson &

18  Kennard?

19      A.  The information would have been contained in

20  the placement file that we sent -- that TRAK

21  transmitted to Nelson & Kennard.

22      Q.  Did the debtor, Mr. Soto, make any payment

23  on this account?

24      A.  I didn't see any payments on the account

25  when I reviewed it.

116

1    Q.    So no payments at all?

2    A.    No, not -- not according to our records, no.

3    Q.    Is this statement of claim filed to collect

4    the debt originally owed to Credit One bank?

5            MR. MOHANDESI:  Objection, form.

6            THE WITNESS:  Just based on what I'm looking

7    at, it says the original creditor is Credit One Bank.

8    BY MR. BRACKET::

9    Q.    And my understanding is this account was

10   charged off before it was transferred to LVNV Funding?

11   A.    I don't --

12           MR. MOHANDESI:  Are you asking her to

13   confirm your understanding?  Objection, form.

14           THE WITNESS:  I don't recall, but I do think

15   that that data is provided in the documentation that's

16   been provided.

17           Normally -- I wouldn't even say "normally."

18   I don't know.

19   BY MR. BRACKETT:

20   Q.    Where would we need to look to find that?

21   What information?

22   A.    I believe that the sale data is one of the

23   documents we provided from the document list, and I

24   believe it would contain the charge-off date.  It

25   might also be noted on the affidavit, so --

117

1        Q.   Who drafted this affidavit of indebtedness

2   and ownership of account, page --

3        A.   I don't --

4        Q.   It didn't have a page.

5             Page ID 382.

6        A.   I do not know for sure who drafted this.

7        Q.   Could it be that TRAK drafted this document?

8        A.   I don't believe so.  Normally, the clients

9   would draft this or the firm would draft this,

10  depending on the specific client process.

11            MR. BRACKETT:  Let the record reflect

12  Mr. Mohandesi laughed at that last one.  What was so

13  funny about that one, Ben?

14            MR. MOHANDESI:  I'm not here being deposed.

15  I can laugh if I want.  She's already told you that --

16  more than a dozen times that TRAK doesn't -- all TRAK

17  does is send the documents over.  So I'm sorry for

18  chuckling at the question, redundant from all the

19  questioning throughout the last few hours.  If that

20  offended you, I am sorry, but I find the question

21  absurd.

22  BY MR. BRACKETT:

23       Q.   Who provided this status report pursuant to

24  the Service Members' Civil Relief Act to Nelson &

25  Kennard?

118

1      A.    I -- I'm not sure.

2      Q.    Does TRAK ever pull information about

3  whether or not an individual is active duty military?

4      A.    We do, but, I mean, in the context of we are

5  constantly monitoring our inventory to check if anyone

6  is an active military member so that those accounts

7  can be properly statused back to the client and closed

8  down.  It's a compliance -- compliance exercise.

9      Q.    I see here that the Social Security number

10  and birthdate are blacked out.  Does TRAK have the

11  debtor, Michael Soto's, birthdate and Social Security

12  number?

13      A.    Yes.

14      Q.    It would have needed that to determine

15  whether he was in the military, right?

16      A.    I don't know if those are required elements,

17  but we have them.

18      Q.    Exhibit 2 to the second amended complaint is

19  a return of service dated December 26, 2020.  Do you

20  see that?

21      A.    Yes.

22      Q.    Who found the Mililani, Hawaii address

23  described in this document?

24      A.    I'm not sure.

25      Q.    Could it have been TRAK?

1    A.    I don't think so.    The addresses come at the

2    time of placement from the client, and then from

3    there, it's -- the attorney firm, they communicate

4    with the debtor at the address that the client

5    provided, or if they receive information either from

6    the debtor or from their skip tracing efforts that

7    there's a different address, they would update it; but

8    TRAK doesn't update the address on the account at any

9    time --

10    Q.    Was the --

11    A.    -- on our own --

12    Q.    Oh, go ahead.

13    A.    We don't update the address on our own

14    accord.

15    Q.    Was any skip tracing done on this account?

16    A.    Not to my knowledge, or not by TRAK.    There

17    may have been by the law firm.

18    Q.    It appears as though this document was

19    actually served on Michael Soto at that address.    It

20    says "full service," right?

21    A.    Yes.

22    Q.    Any reason that you know of to doubt the

23    authenticity of this document?

24    A.    No.

25    Q.    And it states that this process server went

120

1   there and Kainoa Rivers, who was the son or

2   co-resident, right?

3       A.   Yes.

4       Q.   So the debtor, Michael Soto, was aware of

5   the lawsuit, as far as we know, right?

6       A.   As far as we know, yes.

7            MR. MOHANDESI:  Objection, form.

8   BY MR. BRACKETT:

9       Q.   Does LVNV or Resurgent have any other

10  address of where Michael Soto, the debtor, resided?

11      A.   I'm sorry, could you say that again?

12      Q.   Sure.

13           Does LVNV or Resurgent know of any other

14  address where the debtor, Michael Soto, has resided?

15      A.   I'm not sure.

16      Q.   In reviewing the records, the notes from

17  this account, are there any other addresses that

18  showed up other than the Mililani, Hawaii address?

19      A.   Well, yeah.  In reviewing the transmission

20  history on the account, there was an address change on

21  the account when the -- there was an address change on

22  the account at one point.

23      Q.   When did that occur?

24      A.   I don't recall the date.  I'd have to look

25  at the transmission history.

121

1      Q.   Was it in response to the dispute letter?

2      A.   I believe so, yes.

3      Q.   Is that dispute letter this Exhibit 7 to the

4   second amended complaint?

5      A.   Yes, I believe so.

6      Q.   So sometime subsequent to September 14,

7   2022, the address of the debtor, Michael Soto, was

8   updated to this Waianae address?

9      A.   I would say on or about that time.  I don't

10  know if it was subsequent or before or after, but

11  around that time.

12     Q.   So in response to this dispute letter, the

13  address for the debtor, Michael Soto, was updated to

14  this 85-220, Apartment B, Ala Hema, Waianae, Hawaii

15  96792?

16     A.   Again, based on memory, I believe so.  I

17  didn't memorize the address, but I believe so.

18     Q.   And in your review of the records, you saw

19  that the address had been updated from Mililani to

20  Waianae?

21     A.   Again, I don't recall the exact address.  I

22  just recall there was an address change.

23     Q.   Is that reflected in the notes there at

24  TRAK?

25     A.   There is --

122

1          MR. MOHANDESI:  Objection, form.

2          THE WITNESS:  -- an entry -- there is an

3     entry in the transmission history that shows that the

4     address was changed by the law firm through their data

5     file.

6     BY MR. BRACKETT:

7          Q.   What did TRAK do in response to that address

8     change?

9          A.   Well, the process would be that if there's

10    data that's changed by the law firm, then it gets

11    transmitted in the next data file to the client to

12    notify them of any data changes.

13         Q.   So Nelson & Kennard notified you of the

14    address change there at TRAK, and then TRAK notified

15    Resurgent of the address change?

16         A.   Through the data files, yes.

17         Q.   And then TRAK would -- well, at that point,

18    Resurgent would send its collection notifications to

19    the new address, right?

20         A.   TRAK doesn't send any communications.

21         Q.   I'm sorry.  That's why I corrected myself.

22              At that point, Resurgent would send the

23    collection communications to the new address, right?

24         A.   I mean, the only communications that are

25    sent are sent by the law firm, to my knowledge, or by

123

1    the -- well, by the law firm.  Collection -- the law

2    firm is handling all the collection communications.

3        Q.    But isn't it true that Resurgent also

4    communicates directly with debtors?

5        A.    In the instance of responding to a dispute

6    or validation request, yes; but I don't know if the

7    communication is from LVNV or from Resurgent.  I don't

8    recall exactly.

9        Q.    And you can see here that the dispute letter

10   went to Nelson & Kennard in September -- September 16,

11   2022; and it was subsequent to that that the address

12   was updated to the Waianae address, correct?

13       A.    Well, I'm not familiar with this document.

14   I mean, presumably.  It looks like a certified mail

15   receipt that's addressed to Nelson & Kennard.

16       Q.    My question was subsequent to this note from

17   Plaintiff Michael Soto, the address of the debtor,

18   Michael Soto, was updated to his address there in

19   Waianae?

20       A.    Yeah, the address was updated.  As to when,

21   I can't tell you the exact date by memory.

22            MR. BRACKETT:  So let's take a look at the

23   records there for TRAK real quick.  I'm looking at the

24   document production for TRAK.  I'm going to share my

25   screen real quick for that.

124

1          (Document was displayed.)

2     BY MR. BRACKETT:

3          Q.    Have you reviewed these documents that TRAK

4     produced in this proceeding?

5          A.    Yes.

6          Q.    It appears to be a lot of the same documents

7     with this TRAK 001.

8               What is this document, TRAK 001?

9          A.    It's just a list of the documents provided.

10         Q.    Okay.  Does it show on here when the address

11    was updated?

12         A.    No, but the -- no.  All I'm stating is I

13    just don't know the exact date that the address was

14    updated.  I know that the address was updated in

15    correlation with receiving the dispute from the

16    plaintiff or the debt- -- from Michael Soto.

17         Q.    So in response to the dispute from the

18    plaintiff Michael Soto, the address was updated there

19    at Resurgent to be the Waianae address?

20         A.    I believe so, yes.

21         Q.    And from then forward, all collection

22    communications for Michael Soto, the debtor, went to

23    the Waianae address?

24         A.    I don't have knowledge of other debt

25    collection communications outside of the responses to

125

1  the validation request that we provided here, but

2  based on the process, if the -- any collection

3  communications that would -- that would go out would

4  be using the address that's on file.

5      Q.  And the address on file after mid-September

6  2022 was the Waianae Hawaii address, right?

7      A.  I believe so.

8      Q.  What does this claim number mean, this

9  S1104320?

10     A.  That's the internal identification number

11 for the account at TRAK.

12     Q.  So TRAK assigns that number?

13     A.  In our database, yes.  That's a unique

14 account number for every account in our database.

15     Q.  It shows an incoming correspondence here,

16 validation of debt request, on September 26, 2022.  Do

17 you see that?

18     A.  Yes.

19     Q.  Is that the letter that we were just looking

20 at in Exhibit 2?

21     A.  Yes.

22     Q.  Does it show that the document has been

23 saved as a PDF within your system?

24     A.  I don't understand the question.

25     Q.  What is this VOREQ_20220923.pdf?  What is

126

1    that?

2        A.    That's the name of the document that is --

3    was uploaded by Nelson & Kennard.

4        Q.    And is that, then, saved there at

5    TRAKAmerica?

6        A.    Yes.

7        Q.    Then it has a document ID.  So this document

8    relates to that.  Is that right?

9        A.    Yeah.  That's an internal identification

10   number for each document in our system.

11       Q.    And every document in your system receives a

12   new document ID number?

13       A.    Yes.

14       Q.    Did those document ID numbers start at 1?

15       A.    I don't know.

16       Q.    And then it says "miscellaneous" -- what is

17   this on September 28, 2022?  What's occurring here?

18       A.    So I believe that that is indicating that we

19   received a correspondence from Resurgent that was

20   received by Resurgent and passed to us to pass to the

21   law firm.  However, it could also be that they're

22   echoing back the correspondence that we sent to them.

23   I'd have to look at the document; and I don't recall.

24   The fact that it says "Resurg" means that it was a

25   document that came from Resurgent.

127

1          Q.   I also see that it says "cease and desist."
2     What does that mean?
3          A.   Well, it's a -- it just -- in the context of
4     this, it just means that that was part of the name of
5     the document, that that document was named the way
6     that it is portrayed there when we received it from
7     Resurgent.
8          Q.   I'm sorry, I didn't understand.  You said
9     "portrayed there"?  What was that?
10         A.   That's the naming convention that Resurgent
11    used when they provided the document to us.
12         Q.   Can you say it again?
13         A.   That's the naming convention that Resurgent
14    used when they provided the document to TRAK, when
15    they uploaded the document to TRAK.
16         Q.   What does "cease and desist" mean?
17         A.   Well --
18              MR. MOHANDESI:  Objection, form.
19              THE WITNESS:  Yeah, I don't know what is
20    contained on that document, but in general, the term
21    "cease and desist" means to cease communication about
22    a debt.
23    BY MR. BRACKETT:
24         Q.   So this is a request from Resurgent to cease
25    communication about this debt?

                                                                128

 1          MR. MOHANDESI:  Objection, form.

 2          THE WITNESS:  No.  Like I said, I can look

 3   at the document and see what it is and tell you what

 4   is in the document, but Resurgent doesn't communicate

 5   a request to cease and desist through this method; so

 6   in the context of what we're talking about, this is

 7   just a naming convention for a document that was

 8   uploaded to us.

 9   BY MR. BRACKETT:

10      Q.   Have you provided this document 142819757 to

11   your attorney, Mr. Mohandesi?

12      A.   Yes.

13          MR. BRACKETT:  Ben, have we been provided

14   that?

15          MR. MOHANDESI:  Yes, you have.  It's -- so

16   what this document -- this is the first page of the

17   production, and all the documents that followed after

18   this page are the documents that are identified in

19   this list.  So think of this as kind of like a table

20   of contents, and the documents that followed this list

21   are the documents that are identified.  Everything on

22   this list has been produced.

23          MR. BRACKETT:  And it would be a part of

24   these documents that were provided?

25          MR. MOHANDESI:  Yes, sir.

129

BY MR. BRACKETT:

1    Q.    So it appears as though based on this,

2  pretty close to the bottom, that there are two big

3  documents for that 54-page document and a 136-page

4  document.  The date of that document appears to be

5  9/28/22 to TIFF, but for some reason, I don't see a

6  page count here.

7    A.    The TIFFs don't -- this is a -- this is a

8  screen shot from our document management software that

9  lists all the documents on the account, and the TIFFs

10  don't give you a page number, a number of pages.

11    Q.    Based on what Mr. Mohandesi is explaining,

12  this document should be in these documents toward

13  maybe the middle-ish, but right after that debt

14  validation request, right?

15    A.    Yes.  It actually may be the exact same --

16  like a duplication of the debt validation request.

17    Q.    Let's go back.

18         Based on this, maybe 14, maybe 15.  There's

19  a lot of pages there.

20         MR. MOHANDESI:  I'm going to try to find G.

21  I'm going to look to see if I can find the specific

22  dates.

23         MR. BRACKETT:  I wish the document ID was on

24  there.  I could have searched and found it.  But look

130

1    down here and see if we can find that G letter in

2    response.

3              MR. MOHANDESI:  Try TRAK 143.

4              THE WITNESS:  Well, that's the same one,

5    right?

6              Is there two documents that are the same,

7    which is the -- the same as 143?

8    BY MR. BRACKETT:

9        Q.   Not back to back like that.  Maybe up here a

10   little higher.  I was looking in the 50s.  Looked like

11   there was some document here right before the dispute

12   response.

13             Let's just talk about these.  TRAK 53 --

14             MR. MOHANDESI:  Oh, Justin, I'm sorry.

15   Check TRAK 39.  You were right; it was before that

16   response.  That appears to be directed to LVNV.  It's

17   39 and 40.

18             THE WITNESS:  Yes.

19   BY MR. BRACKETT:

20       Q.   Can you access that document No. 142819757

21   and provide it to your attorney so that we can know

22   which one and, if at all possible, have that document

23   number on there so that we know that's the --

24       A.   I can, but I have a -- we've already

25   provided, I believe, the document name that's there;

131

1    but either way, yes, I can do that.

2         Q.   Because this is showing an incoming

3    correspondence validation debt request.  That's going

4    to be two pages, you know, the document and the

5    envelope, and then after the envelope, I don't know

6    what happens here before the validation debt response.

7         A.   Yeah.

8         Q.   Based on this record that Resurgent is

9    telling someone, maybe even through its nomenclature

10   of the document, that they should cease and desist

11   this communica--- this collection, right?

12        A.   Well --

13             MR. MOHANDESI:  Objection, form.

14             THE WITNESS:  All this is telling me is that

15   there's a document uploaded by Resurgent, and it

16   was -- it would have been passed to Nelson & Kennard.

17   BY MR. BRACKETT:

18        Q.   And, again, it would have went from Nelson &

19   Kennard to TRAK and then TRAK to Resurgent, right?

20        A.   Yeah.  All of the documents either start at

21   the client or at the firm, and they get transmitted to

22   the other through TRAK.

23        Q.   So on page TRAK 51, we see a responsive

24   letter to that dispute, right?

25        A.   Yes.

132

1      Q.    Did TRAK assist in drafting this letter?

2      A.    No.

3      Q.    Did TRAK review this letter before it was

4   sent to Mike Soto in Waianae?

5      A.    No.

6      Q.    But in response to the dispute letter from

7   Mr. Soto and September 2022, now Resurgent is

8   communicating to Michael Soto in Waianae because the

9   address has been updated, right?

10      A.    I can't say that that's the reason.  It

11   appears Resurgent also received a letter from --

12   received the same letter with the same address.

13      Q.    And when these letters were being sent by

14   Resurgent to the plaintiff, Michael Soto, in Waianae,

15   they were attempting to collect a debt from him,

16   correct?

17           MR. MOHANDESI:  Objection, form.

18           THE WITNESS:  Well, my understanding is --

19           MR. MOHANDESI:  Document speaks for itself.

20           THE WITNESS:  -- the purpose is to --

21           MR. MOHANDESI:  Go ahead.  I'm sorry.

22           THE WITNESS:  -- the purpose was to respond

23   to the request for validation.

24   BY MR. BRACKETT:

25      Q.    And now the balance has been updated to

133

1    $1,083.98, up from that 9- or -- I'm sorry -- 800 and

2    some-odd dollars in the original complaint and the

3    959.33 in the judgment.  How was that balance

4    increased?

5              MR. MOHANDESI:  Objection, form.

6              THE WITNESS:  My understanding is that it

7    would have been based on whatever the judgment awarded

8    amount was.

9    BY MR. BRACKETT:

10        Q.   And who would have been adding the interest

11   to the account?

12        A.   I don't know --

13             MR. MOHANDESI:  Objection, form, outside the

14   scope -- sorry.  Outside the scope of the categories.

15             You may answer if you have personal

16   knowledge.

17             THE WITNESS:  I'm not aware of any interest

18   being added, or familiar with that.

19   BY MR. BRACKETT:

20        Q.   Are you familiar with the data file that

21   came from Resurgent and was sent to TRAK for this

22   account?

23        A.   Yes.

24        Q.   Is this that data file, or at least part of

25   it, on TRAK 0047?

134

1        A.    Yes.

2        Q.    And 0046?

3        A.    Yes.

4        Q.    And 0045?

5        A.    Yep.  Yes.

6        Q.    And 0044?

7        A.    Yes.

8        Q.    0043?

9        A.    Yes.

10       Q.    0042?

11       A.    Yes.

12       Q.    So the data file that Resurgent sent to TRAK

13  to forward to Nelson & Kennard is here as TRAK 0042,

14  43, 44, 45, 46, 47, 48, 49, 50.  That would be that

15  data file, right?

16       A.    Yes.

17       Q.    Were any other documents provided other than

18  this data file from Resurgent to TRAK?

19       A.    Yes.

20       Q.    What other documents were included?

21       A.    If I were to refer to the list, statements,

22  account statements, the chain of assignment, and terms

23  and conditions, and statement of account.

24       Q.    And those statements, are they the ones here

25  we see as TRAK 0058?

135

1         A.    Yes.

2         Q.    Through 0067?

3         A.    Yes, appears so.

4         Q.    Any other statements that were forwarded?

5         A.    No.  Account statements, there was a total

6    of nine -- looks like a total of nine account

7    statements that we received, based on the list.

8         Q.    And none of these account statements have an

9    address in Waianae for the debtor, Michael Soto, do

10   they?

11        A.    It doesn't appear to have that, no.  I

12   didn't look at every address on every page, but I

13   don't believe it does.

14        Q.    You say there was also an original

15   agreement, account agreement?

16        A.    Yeah, there's a document that is named -- we

17   refer to as the terms and conditions.  I don't know

18   that there would be -- right there.

19        Q.    And that's it here, TRAK 0068?

20        A.    Yes.

21        Q.    And continues on through 00 --

22        A.    According to the log, it's 14 pages.

23        Q.    6882 or 81.  That would be 14 pages.

24              So that's the entire account agreement that

25   was received?

136

1          A.   Yes.

2          Q.   You state that you also received some

3     documentation in regards to the transfer of the

4     account or the assignment?

5          A.   Yeah.  There's a document that's called

6     chain of assignment, which is 12 pages.

7          Q.   Would this assignment of accounting be part

8     of those 12 pages?

9          A.   Yes.

10         Q.   So starting at TRAK 89 and going through --

11         A.   We just have to -- I -- it could also be

12    redundant, as part of the legal documents, so I would

13    just caution you on that.  I don't know if that's that

14    original one that we received, or that may have been

15    attached in the legal documents also.

16         Q.   Is the original one that you received

17    included in the documents you guys produced?

18         A.   Yes.

19         Q.   Separate from the response from the

20    attorneys?

21              MR. MOHANDESI:  Objection, form.

22              THE WITNESS:  Yeah, I don't -- well,

23    separate from the legal documents that were uploaded

24    by Nelson & Kennard.  I'm just saying that sometimes

25    the original documents are duplicated within the legal

137

1    documents, because they're used as part of the legal

2    process, so they might be in here in this group twice

3    is all I'm saying.

4    BY MR. BRACKETT:

5        Q.   You're saying it's 14 pages?

6        A.   Yes.

7        Q.   Do you have any reason to doubt or any --

8        A.   I'm sorry, it's 12 pages.  Chain of

9    assignment is 12 pages.  I'm sorry.

10       Q.   Do you have any reason to dispute that those

11   12 pages are identified here as TRAK 89, will be

12   through 101, right?

13       A.   Yeah, looks -- that appears to be right,

14   yes.

15            MR. MOHANDESI:  The same documents also

16   start at TRAK 26.  That's kind of the point.

17   BY MR. BRACKETT:

18       Q.   So 89 to 100.  That would be 12 pages,

19   correct?  So those are the assignment documents that

20   were provided on this account?

21       A.   Yes.

22       Q.   Any other documents that were included in

23   the transfer other than the data about the -- the

24   entire transfer of accounts, the original document,

25   original card member agreement, the statements from

138

1    Credit One Bank, and then these assignment documents?

2         A.   There's another document that's called

3    statement of account, and it's also a TIFF; so I don't

4    know page count, but a statement of account would have

5    been included or, according to the log, was included

6    by Resurgent.

7         Q.   And you're looking at TRAK 0001, as far as

8    that list?

9         A.   Yes.  Normally, a statement of account is

10   one page, but I don't know...

11        Q.   See that second item there?  It should be

12   around page 15, if I'm right.  The first document was

13   14 pages.  That's the terms and conditions.  And then

14   after that is a statement of account, right?

15        A.   I don't know if they're in that order, but

16   possibly.  Yeah, that's not...

17        Q.   15 is not the statement of account.  It

18   appears as though TIFFs aren't included in this

19   document production, correct?

20        A.   Well, the other one was.  We ultimately saw

21   it; so I -- I think it is here.

22        Q.   I don't think so.  I never saw the cease and

23   desist letter, so...

24             MR. MOHANDESI:  Justin, if I may help you

25   with that, since -- the cease and desist letter is in

139

1    reference to the cease and desist letter that was sent

2    by Mr. Soto, addressed to LVNV.  That's why it's

3    identified with that name.  So it is the document.  It

4    has been produced.  I think there's just a disconnect

5    to the documents being referred to.

6    BY MR. BRACKETT:

7        Q.   Again, as the record shows here on TRAK 001,

8    the first 14 pages are the terms and conditions, which

9    start after this or start on page 2, but --

10       A.   It doesn't appear that the documents are in

11   the same order as on the first page.

12       Q.   It does not.  Okay.  So unfortunately, this

13   is not an index of those documents.  I'll dig through

14   it later and see if we have those.  If not, I'll be

15   requesting they be produced; but I'm not finding the

16   TIFFs, unfortunately.

17       A.   I think the TIFF was No. 39 that we talked

18   about earlier for the letter to Resurgent.  I believe

19   this would be the item that is referred to -- that

20   you're referring to, the TIFF that was uploaded by

21   Resurgent.

22       Q.   This is the verification letter, and I'm not

23   seeing TIFFs.  I'm seeing PDFs.

24            All right.  Well --

25            MR. MOHANDESI:  This was -- Justin, these

140

 1    were all converted to PDF; so I would suggest asking

 2    the witness if -- what she believed what that document

 3    is.  She's going to be the best source to answer your

 4    question.  I think you are incorrectly stating that

 5    because it was saved as a PDF, that the TIFF was not

 6    produced.  It was provided.  That is the document.

 7    The TIFF was labeled Bates 39 and 40.

 8              MR. BRACKETT:  I hear what she's testifying.

 9    I don't know that it's accurate, though.

10    BY MR. BRACKETT:

11        Q.   All right.  So moving on, there's some other

12    names that are identified here in Exhibit -- well,

13    let's go ahead and move on to Exhibit 3 to today's

14    deposition.  I'll stop the share here, and I'll share

15    that one.

16              (Document was displayed.)

17    BY MR. BRACKETT:

18        Q.   All right.  Ms. Torres, have you ever seen

19    this document, RCS 0007 and 0008?

20        A.   No.

21              MR. BRACKETT:  Madame Court Reporter, I

22    request that this be identified as Exhibit 3 to

23    today's deposition.

24    BY MR. BRACKETT:

25        Q.   There's a couple of questions I have about

141

1    this.  Do you know who M. Stokes is?  Is that an

2    employee of TRAK?

3         A.   No.

4         Q.   What about -- there's another one here, a

5    kbehrendt.  Do you know of a kbehrendt working at

6    TRAK?

7         A.   Doesn't sound familiar.  I don't see the

8    name, but I don't recognize that name.  Yeah.  No,

9    I -- there's no employees at TRAK with that name that

10   I recall.

11        Q.   So these are the records that were provided

12   to us by Resurgent Capital Services.  Now, you've

13   never seen these notes before?

14        A.   No.

15        Q.   Are they maintained at all at TRAK?

16        A.   No.

17        Q.   Could they be in the legal department and

18   you're just not aware of them?

19        A.   I doubt it, no.  To my knowledge, there's no

20   notes that are provided to us by Resurgent.

21        Q.   Do you know a tbuchanan?

22        A.   No.

23        Q.   eberryhill?

24        A.   No.

25        Q.   chopkins?

142

1        A.    No.

2        Q.    rcole?

3        A.    No.

4        Q.    Do you know what this might mean as far as

5    "Scheduled Collection Status change to ACT on 11/8" --

6             MR. MOHANDESI:  Objection --

7             THE WITNESS:  No.

8             MR. MOHANDESI:  Objection, form, calls for

9    speculation.

10            MR. BRACKETT:  Going back to Exhibit 2.

11            (Document was displayed.)

12   BY MR. BRACKETT:

13       Q.    Other than forwarding the communication from

14   Nelson & Kennard to Resurgent, what steps, if any, did

15   TRAK take in response to the September 14, 2022 letter

16   identified as -- well, it's here, page ID 415 on

17   Exhibit 2?

18       A.    I can't think of any other steps that our

19   process would entail.

20       Q.    You said no individual reviewed this letter

21   at TRAK?

22       A.    Correct.

23       Q.    TRAK allowed its system to just forward the

24   information over to Resurgent and then let Resurgent

25   respond how they saw fit.  Is that right?

143

1       A.   Yeah.  Yes.

2       Q.   TRAK doesn't take any steps to see if this

3  was the correct individual?

4            MR. MOHANDESI:  Objection, form, asked and

5  answered.

6            THE WITNESS:  We didn't do anything but send

7  the letter to Resurgent through a -- transmit the

8  letter to Resurgent through our process.

9  BY MR. BRACKETT:

10      Q.   They never read the letter?  No one saw it

11  at all at TRAK?

12      A.   Not to my knowledge.

13      Q.   The system is set up so that that always

14  occurs, right?

15      A.   There's a process set up that is automated.

16  If the law firm uploads a request for validation, it

17  is transmitted to Resurgent's FTP site for their

18  review, yes.

19      Q.   Via the automated system?

20      A.   Yes.

21      Q.   With no human intervention?

22      A.   Not on TRAK's part, no.

23      Q.   Doesn't TRAK want to make sure that it is

24  assigning prompts to its attorneys that are legally

25  owed?

144

```
 1            MR. MOHANDESI:  Objection, form.

 2            THE WITNESS:  I don't understand the

 3    question.

 4    BY MR. BRACKETT:

 5       Q.   Does TRAK have any duty to make sure that

 6    the person that they are collecting from or assisting

 7    in collection of a debt from is the correct person

 8    that owes the debt?

 9            MR. MOHANDESI:  Objection, form, misstates

10    testimony.

11            THE WITNESS:  Yeah, I can't comment on what

12    our duties are with regard to what -- with regard to

13    our contract.  I don't know what you mean.

14    BY MR. BRACKETT:

15       Q.   Does TRAK have any duty to make sure that

16    the person that is being collected from is the person

17    who owes the debt?

18            MR. MOHANDESI:  Objection, form.

19            THE WITNESS:  Not to my understanding.

20    BY MR. BRACKETT:

21       Q.   Does TRAK have any legal obligation to make

22    sure that they only allow a garnishment to be issued

23    to the correct person?

24            MR. MOHANDESI:  Objection, form.

25            THE WITNESS:  Not that I understand.
```

145

BY MR. BRACKETT:

    Q.   But TRAK does acquire information about the verified place of employment, and it provides that verified place of employment to its attorney servicers, right?

    A.   In this case, we did not do that.

    Q.   But in other cases, TRAKAmerica does, right?

    A.   It's possible that we obtain place of employment information from other vendors and supply that to our network attorneys in other cases.

    Q.   And when that happens, it's important that TRAK got the information correct, right?

    A.   TRAK doesn't create the --

          MR. MOHANDESI:  Objection, form.

          THE WITNESS:  TRAK doesn't create the information.

BY MR. BRACKETT:

    Q.   But it does obtain the information from RNN Group and others like it, right?

    A.   Yes.

    Q.   Should there be some obligation that TRAK verifies that information on its own behalf?

          MR. MOHANDESI:  Form.

          THE WITNESS:  I'm not aware of any requirement, and we rely on the attorney firms to

146

1   decide how to utilize that information.

2   BY MR. BRACKETT:

3        Q.   So it's your testimony that TRAK has no duty

4   to make sure that the person that is being attempted

5   to collect from is the debtor who actually owes the

6   debt?

7             MR. MOHANDESI:  Objection, form.

8             THE WITNESS:  I'm not aware of any duty.

9   We're not attempting to collect any debt ourselves.

10  BY MR. BRACKETT:

11       Q.   So you have no duty to make sure the person

12  who a garnishment is sought from is the correct

13  person?

14            MR. MOHANDESI:  Objection, form.

15            THE WITNESS:  We don't file garnishments at

16  TRAK.

17  BY MR. BRACKETT:

18       Q.   What has TRAK done to correct the issue that

19  happened -- well, what has TRAK done to correct the

20  attempt at garnishment from Plaintiff Michael Soto?

21            MR. MOHANDESI:  Objection, form.

22            THE WITNESS:  I'm not aware of any

23  correction.

24  BY MR. BRACKETT:

25       Q.   Even if TRAK outsources the collection, it

147

 1  still has an obligation to make sure that the entity

 2  is complying with the law, right?

 3          MR. MOHANDESI:  Objection, form, asked and

 4  answered.

 5          THE WITNESS:  We rely on the law firms --

 6  the attorneys at the law firms to comply with the

 7  laws.

 8  BY MR. BRACKETT:

 9      Q.  So you're asserting a defense of counsel in

10  this matter?

11      A.  I don't --

12          MR. MOHANDESI:  Misstates the testimony.

13  Objection to form.

14          THE WITNESS:  I don't know what that means,

15  so I think no.

16  BY MR. BRACKETT:

17      Q.  But you rely entirely on the law firms to

18  make the decisions?

19      A.  We rely on the law firms to make decisions

20  related to initiating garnishments.

21      Q.  What training do you provide those law

22  firms?

23      A.  We do not provide them with any training.

24      Q.  What review process do you have for those

25  law firms?

148

1          MR. MOHANDESI:  Objection, form.

2          THE WITNESS:  What do you mean by "review

3    process"?

4    BY MR. BRACKETT:

5          Q.   Does TRAK have any review process for the

6    law firms it hires to collect debts?

7          MR. MOHANDESI:  Objection, form.

8          THE WITNESS:  We do have a -- I guess I

9    would call it an onboarding process if we were to add

10   a new law firm.  I am not familiar with all of the

11   requirements to onboard a new law firm.  Like I

12   mentioned, Nelson & Kennard has been in our network

13   since before I worked at TRAK.

14   BY MR. BRACKETT:

15         Q.   And since you've worked at TRAK in 2010, how

16   many audits has TRAK done of Nelson & Kennard?

17         MR. MOHANDESI:  Objection, form.

18         THE WITNESS:  I don't know the answer.

19   BY MR. BRACKETT:

20         Q.   Are you aware of any audits by TRAK of

21   Nelson & Kennard?

22         A.   Based on our process we do, I'm aware that

23   our audit team does audit law firms, so yes, there

24   have been audits.  To the number, I do not know.

25         Q.   What information is that audit seeking?

149

1        A.    I don't know.

2        Q.    Is it just the revenue received?

3        A.    I'm not familiar with the scope of the audit

4    in detail.

5        Q.    I'm sure TRAK wants to know that the law

6    firm is sending all the money to TRAK that it

7    receives, right?

8                MR. MOHANDESI:  Objection, form.  It's

9    outside the scope of the categories.

10                If you've got personal knowledge, you can

11    answer.

12                THE WITNESS:  Yeah, I'm not knowledgeable

13    enough about the details of the scope of the audit to

14    really speak -- speak on those.

15    BY MR. BRACKETT:

16        Q.    Does TRAK ever audit a law firm's compliance

17    with state statutes?

18                MR. MOHANDESI:  Same objection.

19                THE WITNESS:  Same answer.  I just don't

20    know what the details are of the audit.

21    BY MR. BRACKETT:

22        Q.    Who would know that?

23        A.    Our V.P. of Audit.

24        Q.    Who is that?

25        A.    Jennifer Treadway.

150

1       Q.    Does TRAK ever audit a law firm's ability to

2   comply with federal laws?

3       A.    I don't know.

4             MR. MOHANDESI:  Same objection.

5   BY MR. BRACKETT:

6       Q.    And who would know that?

7       A.    Our V.P. of Audit manages the firm audit

8   process.

9       Q.    And that would be Jennifer Treadway?

10      A.    Right.

11      Q.    For the most part, TRAK just delegates all

12  the responsibilities to the law firm it hires, right?

13      A.    What do you mean by "all the

14  responsibilities"?

15      Q.    The responsibilities of collecting the debt.

16      A.    Yes.  TRAK doesn't collect any debt.

17      Q.    But it assists those attorneys when they

18  need help in collecting a debt, right?

19            MR. MOHANDESI:  Objection, form.

20            THE WITNESS:  If we receive an inquiry from

21  an attorney requesting information, we relay that

22  request or question to the client, and then we relay

23  the answer back to the attorney.

24            MR. BRACKETT:  And I'm going to take a

25  break.  We've been at it for about -- I don't even see

151

1    the time, unfortunately.

2            MR. MOHANDESI:  Justin, sorry.  I apologize,

3    but before you take your break, I just want to note

4    for the record that I have confirmed that TRAK 39,

5    TRAK 40, and TRAK 41 was indeed the TIFF, and then the

6    other TIFF I've identified as well, which is the

7    summary of the account, and that one is TRAK -- just

8    want to make it -- note it for the record so there's

9    no ambiguity.  Summary of account is TRAK 57.

10           And I can tell you that because I've

11   identified the documents that I received, and those

12   two were in TIFF form, and they were part of the

13   production; so I was able to look at the TIFF

14   documents provided and then identify them in the

15   exhibit production.  So 57 is one of the TIFFs, and

16   the other starts with 39.

17           MR. BRACKETT:  Yeah, I wish you could

18   testify on behalf of them, Ben.

19           MR. MOHANDESI:  Oh, no, I'm not testifying.

20   I'm just telling you the production of the documents

21   that we gave you.  You can decide what you do with

22   that information.  It's going to be the same no matter

23   what happens; so I just wanted the record to reflect

24   that the documents that were provided to us have been

25   produced.

152

1          MR. BRACKETT:  Thank you for that.

2          MR. MOHANDESI:  Uh-huh.

3          MR. BRACKETT:  All right.  I'm going to take

4    about five minutes to see what additional questions,

5    if any, I have for this witness, and hopefully we can

6    wrap it up here real soon.  So maybe five minutes,

7    folks.  Thanks so much.

8          (Recess ensued from 1:34 to 1:39 PM HST.)

9          (Document was displayed.)

10   BY MR. BRACKETT:

11      Q.   So the Exhibit 3 is this RCS 1, or 001,

12   through RCS 0018.

13          My question about that is were all of these

14   documents, other than the notes on RCS 7 and 8 and the

15   policies of RC -- of Resurgent Capital, RCS 9 through

16   13 -- have all of those been transferred, at some

17   point in time, through TRAK?

18          MR. MOHANDESI:  Objection, form, vague.

19          I don't understand the question.  If you

20   understand the question, Crystal, you can answer.

21          THE WITNESS:  I'm not familiar with this RCS

22   document.

23   BY MR. BRACKETT:

24      Q.   Have you seen this document, this

25   declaration of Kimberly Hurley, before?

153

1      A.   No, I don't believe so.

2      Q.   So you're not familiar with any of the

3  information within it?

4      A.   No.

5           MR. MOHANDESI:  Well, she hasn't read it

6  yet.

7           THE WITNESS:  I don't think so.  I don't

8  know what it is.  But I guess to answer your question,

9  you could compare all the documents if -- that we

10  provided.  Those are all the documents that we've

11  passed.

12  BY MR. BRACKETT:

13      Q.   Do you know who Scott Mingus is?

14      A.   No.

15      Q.   You said that the documents you have passed

16  on to Nelson & Kennard or from Nelson & Kennard to

17  Resurgent Capital are the documents that you guys

18  produced, the TRAK production TRAK 0001 through

19  TRAK 0293?

20      A.   Yeah.  And they're listed on the first page.

21  So anything that starts with "RESURG" came from

22  Resurgent, and the documents that don't start with

23  "RESURG" came from Nelson & Kennard in the naming

24  convention.

25           MR. BRACKETT:  Okay.  And I'm going to share

154

1    my screen and have you clarify what I'm looking at.

2              (Document was displayed.)

3    BY MR. BRACKETT:

4         Q.    Is this what you're referring to?

5         A.    Yes.

6         Q.    And this is TRAK 0001.  These documents that

7    were produced were all transferred to TRAK at some

8    point in time, and then from TRAK, through its

9    automated service, on to the other entity, whether it

10   be the client, Resurgent Capital, or the attorney,

11   Nelson & Kennard, right?

12        A.    Yes.

13        Q.    And TRAK has all of these documents in its

14   database and stores them there, correct?

15        A.    Yes.

16        Q.    TRAK also stores within its database all the

17   communications that it has with Nelson & Kennard in

18   regards to this account, right?

19        A.    Well, it stores data related to the account;

20   and if we had communications, we would make a record

21   of that, but there were no communications on the

22   account that I could see.

23        Q.    And any communications that TRAK had with

24   Resurgent Capital would also be preserved there at

25   TRAK?

155

1        A.    By the client services team, yes.  If it was

2   an inquiry from the client through the client services

3   team, yes.  I mean, it -- it's possible that there

4   could be communications with other departments for

5   other reasons that are not stored -- there's not a

6   record of.

7        Q.    And every communication that happens between

8   Resurgent and Nelson & Kennard goes through TRAK?  At

9   least it did on this account, right?

10       A.    Yeah.  So there's no communication between

11  Nelson & Kennard and Resurgent.  Any communication

12  would go through TRAK.

13       Q.    Are you aware of any previous incidents

14  where LVNV has issued a garnishment to the wrong

15  person's place of employment before?

16       A.    No.

17            MR. BRACKETT:  With regards to -- there's

18  another document in addition to the original 293 pages

19  that TRAK produced.  I'll share that with you now and

20  request that Madame Court Reporter mark this as

21  Exhibit 4 to today's deposition.

22            (Document was displayed.)

23  BY MR. BRACKETT:

24       Q.    Zoom in here so we can see it.  A very large

25  document.

156

1          Do you see the "TRAK 0294" here at the

2   bottom?

3          A.   Yes.

4          Q.   Then in the top left -- this may answer some

5   of the questions.  I just got this one today.  What

6   does this "FHD" stand for?

7          A.   I believe it stands for file header.

8          Q.   What about "ADU"?

9          A.   I know "DU" stands for data update.  I think

10  "A" stands for additional data update, but I can't

11  recall what the "A" stands for 100 percent.

12         Q.   And this "PLU"?

13         A.   I believe it stands for placement level

14  update or placement update.

15         Q.   And then "AEU"?

16         A.   I think -- every "U" -- every "U" stands for

17  update.  I know that.

18              "AEU," I don't know what the "A" stands for,

19  but I believe "E" stands for employer.

20         Q.   And "BIU"?

21         A.   Balance itemization update.

22         Q.   Okay.  To the right of that first BIU, I see

23  a 741403.  Any idea what that number relates to?

24         A.   I believe it relates to the batch ID for

25  that particular account that would correspond with the

157

1    purchase.

2        Q.   It says here "Charge Off."  Does that mean

3    that the account was charged off by Credit One Bank?

4        A.   Yes, but more specifically it means that

5    this balance itemization information is based on the

6    charge-off date.

7        Q.   And what is the date of charge-off?

8        A.   Based on this, it's 2/3/19.

9        Q.   February 3rd, 2019?

10       A.   Right.

11       Q.   And then the judgment was obtained by LVNV

12   Funding on April 14, 2021.  Is that what this is

13   telling us?

14       A.   Yes.

15       Q.   And we, again, have that original balance,

16   839.33.  That was the amount that was sought in the

17   original complaint, I do believe.

18            Any reason to dispute that?

19       A.   No.

20       Q.   And then what is the 11.72 to the right of

21   this LVNV Funding?

22       A.   I don't know.

23       Q.   "AdlPhone," what does that stand for?

24       A.   I believe it stands for additional phone --

25   additional phone number.

158

1      Q.    Are there any records that you have seen

2  where either Resurgent or TRAK or Nelson & Kennard

3  called that phone number?

4      A.    No.

5      Q.    I noticed on Resurgent's document,

6  Exhibit -- I think it was 3 to today's deposition,

7  there was something about a text message.  Does TRAK

8  have any involvement in text messaging to consumers?

9      A.    No.

10     Q.    Then it's got another number here,

11 8084263464.  Is that a number that TRAK has in its

12 database as belonging to the debtor, Michael Soto?

13     A.    I don't believe so.  Based on this data, it

14 is a phone number that's related to the employment

15 information on that record.

16     Q.    That would be related to the Raising the

17 Standard Consulting, Inc.?

18     A.    Yes.

19     Q.    Did TRAK ever attempt to contact Raising the

20 Standard Consulting, Inc?

21     A.    No.

22     Q.    Did it ever hire any entity to contact

23 Raising the Standard Consulting, Inc.?

24     A.    No.

25     Q.    RNN Group says that they did contact Raising

159

1    the Standard Consulting, Inc.  And previously, I think

2    you testified that you guys had hired RNN Group to

3    verify a place of employment at some time?

4        A.   Yes, independently of the time that

5    Resurgent hired them.  Yes.

6        Q.   Do you know of anywhere in the records that

7    have been provided, this TRAK 0001 to TRAK 0294, where

8    it shows when that hiring of RNN Group by TRAK

9    occurred?

10       A.   No.  It's in the document that we discussed

11   earlier that I emailed to the attorney already or a

12   little bit ago.

13           MR. MOHANDESI:  I forwarded that to you,

14   Justin, as you requested.  That's the transmission

15   history.

16           MR. BRACKETT:  Thank you.

17   BY MR. BRACKETT:

18       Q.   Has TRAK ever reached out to this

19   MichaelSotoJr@gmail.com?

20       A.   No.

21       Q.   Do you know if Resurgent or Nelson & Kennard

22   have ever reached out to MichaelSotoJr@gmail.com?

23       A.   I do not know.

24       Q.   What is this number to the right of the

25   839.33, this 103.95?

160

1      A.    So I believe that that would be any interest

2   that's been added to the account since charge-off.

3      Q.    Who adds that interest?

4      A.    Well, for this particular account, it would

5   have been Nelson & Kennard.

6      Q.    And who receives that interest?

7           MR. MOHANDESI:  Objection, form.

8           THE WITNESS:  What do you mean by receives

9   the interest?

10  BY MR. BRACKETT:

11     Q.    If this account were paid, this $1,063.28,

12  which included the $103.95 in interest and apparently

13  some other costs as well -- $120 for additional costs,

14  it looks like -- is that interest paid to TRAK?

15     A.    No, that -- it's paid to Resurgent.

16     Q.    So that's not the contingency agreement.

17  It's not that TRAK gets to keep all interest that

18  accrues?

19     A.    No.

20     Q.    That's just a percentage of the total amount

21  collected on all accounts?

22     A.    What is?

23     Q.    The contingency agreement.

24     A.    Yes.

25          MR. BRACKETT:  I'm going to grab that

161

1    document that Ben has just sent me.  I appreciate it,

2    Ben.  In fact, it's TRAK 0295 to 299 that I'm just now

3    receiving.  Looks like it was emailed to me an hour

4    ago.  Thank you for forwarding that, Ben.  I wish I

5    would have had it before today.  Here we are.

6            Okay.  I'm going to request this be included

7    as Exhibit 5 to today's deposition.

8            (Document was displayed.)

9    BY MR. BRACKETT:

10       Q.   Ms. Torres, have you ever seen this document

11   before?

12       A.   Yes.

13       Q.   And what is this?

14       A.   This is a screen shot -- or it's a -- it's

15   the data from our transmission history, from our --

16   from AccuTerm.

17       Q.   And what is AccuTerm?

18       A.   AccuTerm is the name of the system we use --

19   or the name that we call the database that we maintain

20   all of the data on the accounts.

21       Q.   And where does it show that a place of

22   employment was requested by TRAK?

23       A.   If you go back to the beginning, you see on

24   8302021, I think, where it says "Account Sent to

25   RNNG."

162

1        Q.    Does it say on this document what response

2   RNN provided you?

3        A.    No.  We only would log an update if we

4   received a hit back, what we referred to as a hit.

5        Q.    You say these are screen shots from your

6   computer there?

7        A.    It's an export of the data in the account

8   history.

9        Q.    That's the first time I've ever looked at

10  it.  Sorry.  I'm trying to see what, if anything, is

11  important here.

12            Yeah, I see the address change occurring

13  here on September 30th, 2022.

14       A.    Yes.

15       Q.    Is that right?

16       A.    Correct.

17       Q.    So it was TRAK that requested that address

18  change?

19       A.    No.

20            MR. MOHANDESI:  Objection, form.

21            THE WITNESS:  This is just reflecting that

22  the address was changed in our system when we received

23  the maintenance file from the attorney on that day --

24  when we processed the maintenance file from the

25  attorney on that day.

163

BY MR. BRACKETT:

    Q.    So when you received the dispute or
verification letter from Nelson & Kennard, TRAK
updated the address in the system?

    A.    No.  The data is maintained through data
file transmissions.  It does correlate with the
information in the documents, but the data is updated
itself -- the data itself is updated through a file --
data file transmission from the firm.

    Q.    Okay.  So the automated system does that?

    A.    Yes.

    Q.    And that automated system is controlled by
TRAK?

    A.    Yes.

    Q.    It's TRAK's proprietary system, right?

    A.    Correct.

    Q.    So it automatically takes the information
from a dispute letter, scans it, and provides an
update to everyone, "Hey, this is what we've
received"?

    A.    No.  There's a file that gets sent by the
attorney to TRAK, which gets imported into our system,
and then any changes are reported to the client
through a data file to the client.  The documents are
passed -- are uploaded separately.  In this case, the

164

1    data and the document -- the data update corresponds

2    with the documents that were uploaded.

3         Q.    And it was the automated system that updated

4    the address?

5         A.    It was the file that came from Nelson &

6    Kennard that had a new address it in, and when that

7    file was processed, the address was updated in our

8    database using the address that Nelson & Kennard

9    provided.

10        Q.    And then TRAK relayed that new updated

11   address to Resurgent?

12        A.    Correct.

13        Q.    It also shows something on October 3rd,

14   2022, "Work Restriction received from client."  What

15   does that mean?

16        A.    That generally means that the client has

17   received a dispute and they have placed the account on

18   hold while they perform their investigation, and, you

19   know, it stays on hold until they respond and remove

20   the hold.

21        Q.    And who is it that responds?

22        A.    Based on the process, it's Resurgent.

23        Q.    And so that hold would stay in place until

24   Resurgent responds to the dispute, right?

25        A.    It should, yes.

165

1      Q.    When it says "Written C&D\CDU," what does
2   that mean?
3      A.    That means that Resurgent communicated that
4   they received a cease and desist request on 10/3.
5      Q.    What does "CDU" mean?
6      A.    It's a record -- a cease and desist update.
7   It's a record type.
8      Q.    So when the dispute was received from
9   Mr. Soto, the plaintiff in this matter, work was
10  initially suspended by Nelson & Kennard, right?
11     A.    I can't tell that from this document, but
12  based on the process, they should have, yes.
13     Q.    And Resurgent initially responded or wrote
14  within their own database that this is a cease and
15  desist and it was updated to cease and desist, right?
16     A.    Yes.  They communicated to us that a cease
17  and desist was received.
18     Q.    But the collections didn't cease or desist,
19  did they?
20     A.    As far as my understanding, they did, but I
21  don't know what you're referring to.
22     Q.    Wasn't there, then, collection letters that
23  came from Resurgent to Mr. Soto, the plaintiff in this
24  action?
25           MR. MOHANDESI:  Objection, form.

166

1          THE WITNESS:  I didn't see any collection

2    letters.

3    BY MR. BRACKETT:

4       Q.    So the letters that say, "This is an attempt

5    to collect a debt," those aren't collection letters?

6          MR. MOHANDESI:  Objection, form.

7          THE WITNESS:  My understanding is that those

8    are a response to a validation request from a

9    consumer.

10   BY MR. BRACKETT:

11      Q.    Did they ask for payment from him?

12      A.    I don't recall.

13      Q.    If they had asked for payment, are they

14   collection letters?

15         MR. MOHANDESI:  Objection, form.

16         THE WITNESS:  I mean, in my opinion, a

17   collection letter --

18         MR. MOHANDESI:  Outside the scope -- sorry,

19   outside the scope of the categories.

20         If you have personal knowledge, go ahead.

21         THE WITNESS:  Yeah, I don't know if there's

22   a definition.

23   BY MR. BRACKETT:

24      Q.    And it included language such as the account

25   balance?  That's not an attempt to collect a debt,

1    according to --

2            MR. MOHANDESI:  Same objection.

3    BY MR. BRACKETT:

4        Q.   -- TRAK?

5        A.   I don't -- yeah, I don't -- I don't have an

6    opinion on that.

7        Q.   What is this showing as occurring on

8    October 8, 2022?

9        A.   It looks like it was an address update but

10   just moving the apartment number portion of the

11   address from the first line to the second line or vice

12   versa, yeah.  It wasn't a material change; it was just

13   moving an apartment number to one of the lines.

14   There's two lines for the address, and looks like it

15   was moving it to the first line from the second line.

16       Q.   So the address was updated on October 3rd,

17   right, 2022?

18       A.   Yes.

19       Q.   And it was updated again on October 8, 2022?

20       A.   Yes.

21       Q.   Did TRAK take any steps at all to verify if

22   this is the correct address of the debtor, Michael

23   Soto?

24       A.   No.

25       Q.   And then moving forward in regards to this

168

 1  line on October 10, 2022, what does that tell us?

 2       A.   It tells us that Nelson & Kennard sent us a

 3  code through their data file that indicated that they

 4  had shared the validation request.

 5       Q.   Where do you see that this came from Nelson

 6  & Kennard?

 7       Q.   Because it says "reported by KENN." K-E-N-N

 8  is the code that we use in our system to identify

 9  Nelson & Kennard.

10       Q.   So Nelson & Kennard, the hold had been

11  satisfied.  Is that right?

12       A.   Yes.

13       Q.   And then what does "VOD SOD" stand for?

14       A.   It's validation of debt or substantiation of

15  debt hold.

16       Q.   So the debt was validated; it was

17  substantiated.  Now the collection can start again,

18  right?

19       A.   Well, based on the process, the account

20  should remain on hold until Resurgent lifts their hold

21  which they placed on the account when they -- earlier,

22  like we discussed.

23       Q.   Where does it show that that happened?

24       A.   It looks like on November 9th.  And then

25  underneath that, it says "Dispute Was Lifted By

169

1    Resurgent."

2        Q.    What does "CLIENT HOLD/WR - Dispute

3    satisfied" mean?

4        A.    "WR" stands for work restriction.  That's

5    the terminology that Resurgent uses when they put that

6    collection activity on hold.

7        Q.    And the "Regulator Data details updated from

8    BIU record," what does that tell us?

9        A.    That tells us that we received a BIU record

10   similar to the one we reviewed in the file earlier,

11   which is a balance itemization update.  And it looks

12   like that's something that Resurgent just updates to

13   us on a regular basis in every data update file we get

14   from them.

15       Q.    Does that then show they're adding interest

16   to the account?

17            MR. MOHANDESI:  Objection, form.

18            THE WITNESS:  No, it doesn't.  It just shows

19   the balance itemization data that itemizes the current

20   balance against the balance at the time of charge-off

21   or the balance at the time of judgment.

22   BY MR. BRACKETT:

23       Q.    Why would that need to be updated every

24   week?

25       A.    Well, it's a -- it's a write-off requirement

170

1    that that data is included on an initial validation

2    notice that's sent to the consumer, but it doesn't

3    really need to be updated unless there's a change.

4    But it might be updated with -- I think it's only

5    updated if there's a change.

6         Q.   What is the DUF file?

7         A.   It's the data update file that we receive

8    from Resurgent.  It's the file that we were reviewing

9    earlier, is a redacted version of the DUF file.

10        Q.   What is this happening on March 30 of 2023,

11   the "PREJ-Resurg"?

12        A.   That just indicates that Nelson & Kennard

13   reported that there was a suit filed.  It looks like

14   direct suit supplier and client named, meaning the

15   firm and the client are Resurgent.

16        Q.   And this "DSI INFO DSA Monitoring Removed"?

17        A.   That indicates that the account is removed

18   from monitoring for a debt settlement company

19   enrollment.

20        Q.   Where are the notes after April 2nd, 2023?

21             MR. MOHANDESI:  Objection, form.

22             THE WITNESS:  Those are all of the notes.

23   All of the notes were -- or all of the transmission

24   history was provided.  There's no notes.

25

171

BY MR. BRACKETT:

    Q.    Okay.  Where are the transmission history records after April 2nd, 2023?

    A.    That was the final entry.

    Q.    So there was no entry earlier this year when TRAK was added to the lawsuit?

    A.    No.  The account was recalled from us on March 28th of '23, and the account was recalled from Nelson & Kennard, so generally there's not any file transmissions after that.

    Q.    Where are the litigation notes maintained there at TRAK?

        MR. MOHANDESI:  Objection, form.

        THE WITNESS:  There aren't any notes maintained, but there is data maintained, which is the same data that's in the legal documents.

BY MR. BRACKETT:

    Q.    So when TRAK communicates with Resurgent now, in 2024, it doesn't keep a record of that?

        MR. MOHANDESI:  Objection, form.

        THE WITNESS:  I'm not -- I'm not familiar with what records the legal department keeps about communications with the client.  If my team communicated with the client, it would be notated -- or it would be documented here.

172

1    BY MR. BRACKETT:

2        Q.    The legal team may have a separate set of

3    notes for this account?

4        A.    I'm not aware of what they -- what records

5    they keep.

6        Q.    Then it says here, "OneClick BANK/POE

7    Search" on November 29, 2022.  What does that tell us?

8        A.    It tells us that the debtor's information

9    would have been sent to a vendor called OneClick to

10   search for bank or POE information, "POE" meaning

11   place of employment.

12       Q.    Is one click related to RNN Group?

13       A.    Not that I'm aware of.

14       Q.    Did TRAK pay for these place of employment

15   searches?

16       A.    I don't believe so.  I -- like I mentioned,

17   we didn't receive any what we would call a hit, so we

18   didn't receive any information back; and to my

19   knowledge, we only are charged by the vendor if we

20   receive information.

21       Q.    But you're not for sure?

22       A.    Right.  I don't know all of the -- I don't

23   know the details of the agreement with OneClick.

24   That's just general knowledge.

25       Q.    These are requests here at the top of

173

1   TRAK 295.  These are requests by TRAK for information

2   relating to this account, right?

3        A.   I'm sorry, what specific one are you

4   referring to?

5        Q.   Says "LexisNexis BK DEC Monitoring

6   Triggered" --

7        A.   Yes.

8        Q.   -- "No Hit" --

9        A.   Sorry.

10            That -- that entry means that we are

11  utilizing LexisNexis to monitor for bankruptcy or

12  deceased status of the debtor.  In the event that we

13  have a hit there, then those accounts are returned to

14  the client.

15       Q.   And TRAK paid for that search, right?  Every

16  LexisNexis search you got to pay for, correct?

17       A.   I don't know the terms of our contract with

18  LexisNexis, and I don't know if we pay for it or not.

19       Q.   What about this "Military/SCRA scrub"?

20       A.   That indicates that we performed -- TRAK

21  performed the scrub with the Department of Defense

22  database to check if the debtor is an active military.

23       Q.   What does "Servicemaster Management" mean?

24       A.   It looks like Servicemaster Management is

25  part of the above note, which is the change in

174

1    employment information that was received from Nelson &

2    Kennard in 2020.

3        Q.   And then TRAK changed the debtor's date of

4    birth on September 26, 2020.  Is that right?

5        A.   TRAK didn't change it.  We would have

6    received a maintenance file from Nelson & Kennard that

7    updated that field.  That's what that note -- that

8    entry is indicating, that the date of birth was blank

9    and now it was updated to 5/6/90.

10       Q.   What about this home phone number on

11   December 7, 2020?

12       A.   This --

13       Q.   That --

14       A.   That's just an indicator that we sent the

15   updated phone number to Resurgent via the DUF file,

16   which is the data update file that we send to

17   Resurgent.

18       Q.   How did you receive that new phone number?

19       A.   It would have only come from a file from

20   Nelson & Kennard.

21       Q.   I don't see it.  Agency management until

22   December 12 or agency maintenance or whatever.  Agency

23   MNT.  Isn't that what shows that Nelson & Kennard is

24   providing that information?

25       A.   Oh, I'm sorry.  Excuse me.  That was a phone

175

1   number that we received from Resurgent in their data

2   update file to us.

3       Q.   And then you relayed that number to Nelson &

4   Kennard?

5       A.   We would have relayed that to Nelson &

6   Kennard, although it's not something that we --

7   anything that comes from the client is relayed to

8   Nelson & Kennard.  You can see on the next line that

9   Nelson & Kennard removed that number the following

10  update on the 12th.

11      Q.   What about this one?  What is this "Score

12  updated from 'B' to 'B VPOE'"?

13      A.   I believe that there's a score that's

14  identified on the account by the client, so there --

15  they're changing the score on the account.

16      Q.   What does a B score mean?

17      A.   I don't recall.

18           Sorry, I know my face is all the way in the

19  screen.  Just trying --

20      Q.   Oh, no.  I can zoom.  Sorry.

21      A.   Oh, thank you.

22      Q.   What's the difference between "B" and "B

23  VPOE"?

24      A.   I believe that the difference is that one --

25  the VPOE indicates that there's an employer on -- on

176

1  file in the data, employment information.

2      Q.   So verified place of employment have been

3  added to this file, right?

4      A.   I'm not sure that that means.  It's

5  specifically a verified place of employment, although

6  that's what the code probably stands for, those words.

7  I believe it just means that there's employment

8  information populated on the file.

9      Q.   And that's more advantageous, right?  You

10 want to know where the debtor works, right?

11         MR. MOHANDESI:  Objection, form.  Who wants

12 to know?

13         THE WITNESS:  Yeah, I don't know what you

14 mean.

15 BY MR. BRACKETT:

16     Q.   Isn't it advantageous for the debt

17 collector, Resurgent, the debt law firm, Nelson &

18 Kennard, and the intermediary in this scenario, of

19 course, TRAKAmerica, to know that hey, we've got a

20 verified place of employment for this account?

21     A.   Part of the process of executing on a

22 judgment is identifying a place of employment for a

23 wage garnishment.

24     Q.   Which is what occurred here, right?  He

25 verified a place of employment as Raising the Standard

1    Consulting, Inc. and attempted to garnish at that

2    place of employment, correct?

3              MR. MOHANDESI:  Objection, form, asked and

4    answered, misstates the testimony.

5              THE WITNESS:  Yeah, this data doesn't

6    indicate any of that.  The data that we're looking at

7    just indicates that a score was changed on this

8    account from "B" to "B VPOE."

9         Q.   And so my question is why would that change

10   occur?

11        A.   Objection to form.

12             THE WITNESS:  Well, it's a process that is

13   maintained by Resurgence, so I'm not sure exactly why

14   they are changing that, but my understanding is that

15   it has to do with the fact that there's employment

16   information populated on the account.

17   BY MR. BRACKETT:

18        Q.   And once that verified place of employment

19   was added to the account, the score changed, was

20   updated, correct?

21        A.    It seems that -- it seems that way, yes.

22   But again, this is a process that's owned by

23   Resurgent, so I don't know all of the ins and outs of

24   how -- what they use to determine when they change

25   their score.

178

1          Q.    This is TRAK's document, correct?

2          A.    This is the transmission history in our

3    system that identifies data that's changed by the

4    client or by the firm.

5          Q.    And you just allow your automated service or

6    automated system to update this all the time, right?

7          A.    Generally.

8          Q.    TRAK takes a hands-off approach?

9          A.    I don't know what you mean by that exactly.

10         Q.    They're privy to everything, all of the

11   communications, but they don't want to pay attention

12   to any of the communications, right?

13         A.    Our --

14               MR. MOHANDESI:  Objection, form.  Hang on.

15   Hang on, Crystal.  Sorry.

16               Objection, form.  It's also harassing.

17               You can answer the question if you

18   understand it.

19               THE WITNESS:  Our involvement --

20               MR. MOHANDESI:  And argumentative.

21               THE WITNESS:  My understanding of our

22   involvement is to relay information between the client

23   and the firm.

24   BY MR. BRACKETT:

25         Q.    I don't see the subsequent verified places

179

 1  of employment.  TRAK took no steps to stop the attempt

 2  to garnish at Mr. Soto, the plaintiff's, place of

 3  employment, correct?

 4       A.   Correct.

 5       Q.   And it took no steps to remedy the incorrect

 6  attempt to garnish at that place of employment,

 7  either, did it?

 8       A.   TRAK has no involvement in filing of the

 9  garnishment.

10       Q.   It didn't attempt to contact Nelson &

11  Kennard and ask that they release the garnishment or

12  withdraw the garnishment?

13            MR. MOHANDESI:  Objection, form, asked and

14  answered.

15            THE WITNESS:  Not that I know of.

16            MR. MOHANDESI:  I see --

17  BY MR. BRACKETT:

18       Q.   Sorry, you verbally got to state it.

19       A.   Not that I'm aware of.

20       Q.   Has TRAK done anything to apologize to the

21  plaintiff, Michael Soto?

22       A.   Not that I know of.

23            MR. MOHANDESI:  Objection --

24            THE WITNESS:  I don't know.

25

180

BY MR. BRACKETT:

1

2      Q.   What steps, if any, has TRAK taken since

3  this lawsuit was filed against it?

4           MR. MOHANDESI:  Objection, form.  Also going

5  to object to the extent it calls for any sort of

6  attorney-client communication or work product

7  communication.

8           If you have any personal knowledge outside

9  the scope of your attorneys, you can answer.

10          THE WITNESS:  I'm not aware of anything, of

11  what steps.

12          MR. BRACKETT:  There's no attorney-client

13  privilege here.  This is a third party that's been

14  communicating with all the entities.  And it's not an

15  attorney.  It's not representing either of the

16  entities.  It's basically like a spouse going into a

17  law firm and letting the spouse talk about what

18  information they need to talk about legally with the

19  attorney, and they're sitting there the whole time and

20  have access to all the information, so the

21  attorney-client privilege is nonexistent now.

22          MR. MOHANDESI:  To your question, it was.

23  To the extent that she has had discussions with

24  internal counsel or outside counsel related to the

25  lawsuit that was filed against TRAK, that's all

181

1  privileged, so that's what I'm referring to.  So if

2  she had discussions with her internal counsel about

3  the lawsuit after TRAK was named, that is all

4  privileged communications.

5           If you had communications with me as

6  counsel, that's all privileged communications.

7           That's all I'm saying is to the extent

8  you're asking for that information or any knowledge

9  she obtained from attorneys or work-product-related or

10  attorney-client-privileged communications, that's

11  privileged.  Her personal knowledge is fair game.

12          You can ask your questions.  You've already

13  asked a lot of questions that are way outside the

14  scope of the deposition notice, and those are based on

15  her personal knowledge; so you can continue to do so.

16          MR. BRACKETT:  Yeah, and, again, there's no

17  attorney-client privilege here.  Unfortunately --

18          MR. MOHANDESI:  I disagree.

19          MR. BRACKETT:  -- this has been a situation

20  where at all times, the third party has been involved.

21  The third party has unfortunately, you know,

22  disintegrated any attorney-client privilege that could

23  have existed; so yeah, I don't think that there's any

24  need to be hiding behind an attorney-client privilege

25  in this matter anymore.

182

1          MR. MOHANDESI:  Just preserving the

2    objection, not hiding behind it.  That's all.

3    BY MR. BRACKETT:

4          Q.   Going back to this document one more time,

5    where -- I mean, all of the updates by TRAK are on

6    here, right?

7               I'm going to show it to you again.  Just one

8    second.

9               MR. MOHANDESI:  Objection, form, misstates

10   the testimony.  There are not updates by TRAK.  She's

11   testified to that.

12               (Document was displayed.)

13               MR. BRACKETT:  Going back to TRAK 296 -- and

14   please stop the speaking objections.  Just say

15   "Objection to form" and let her testify.

16               MR. MOHANDESI:  Please stop trying to trick

17   the witness, and stop harassing the witness with these

18   argumentative questions.

19   BY MR. BRACKETT:

20          Q.   These "Regulatory Data details updated from

21   BIU Record," that's information that Resurgent is

22   providing and updating in the system, right?

23          A.   Yeah.  It's similar to the data we reviewed

24   in the other exhibit.

25          Q.   This "REG. DATA not sent to vendor data out

183

1    of balance," is that also updated from Resurgent?

2         A.   It just indicates that the data that was

3    sent by Resurgent -- it indicates that the reg data,

4    the balance itemization history, like we looked at

5    earlier, is out of balance with the current balance;

6    and so when that occurs, that data doesn't get

7    forwarded to the vendor until it becomes imbalanced.

8    It can happen sometimes when there's a timing issue

9    with frequent updates.

10        Q.   What did you call this document, this

11   TRAK -- or Exhibit 5 to today's deposition, TRAK 296

12   to 299?

13        A.   It's the account history from AccuTerm.

14        Q.   And this has all of the account history of

15   the account as it's been placed with TRAK, right?

16        A.   Yes.

17        Q.   Where is Resurgent's request for verified

18   place of employment notated on this document?

19        A.   Resurgent's activities are not documented

20   here unless they send us information that -- to pass

21   to the law firm.

22        Q.   Okay.  And where is that information that

23   was being passed to the law firm about the verified

24   place of employment?

25        A.   I think it's -- can you scroll up one page?

184

1          I think it's on July 1st, 2022 and

2   June 30th, 2022.

3          Q.   It's this on TRAK 0296, this entry

4   June 30th, 2022 at 8:37 AM?  Is that the one you're

5   referring to?

6          A.   Yes.

7          Q.   Where does it tell you that?

8          A.   It tells me that -- this is the date that we

9   process the DUF file that we were reviewing earlier

10  that contained the employment information.  And then

11  on July 1st is when we delivered the employment

12  information to the firm.

13         Q.   How do we know this came from Resurgent?

14         A.   Resurgent sends the DUF file.

15         Q.   And RNN Group provided the DUF file?

16         A.   No.

17         Q.   Why not?

18         A.   The DUF file is a file layout that is

19  specific to Resurgent.  It's the file that we looked

20  at earlier.

21         Q.   So you guys hired RNN Group to do a verified

22  place of employment, correct?

23         A.   Yeah.  I believe it was in 2021.

24         Q.   And so they were searching for the verified

25  place of employment pursuant to your request, correct?

185

1          MR. MOHANDESI:  Objection, form.

2          THE WITNESS:  I don't -- I don't know that

3    they would still be searching a year later.

4    BY MR. BRACKETT:

5          Q.   You don't know that they wouldn't, either,

6    right?

7          A.   I don't really know the process.  You're

8    right.

9          Q.   And so pursuant to TRAK's request to RNN

10   Group, which we know they did, RNN Group verified a

11   place of employment at some point in time to

12   Resurgent, correct?

13         A.   I understand that from the lawsuit.  Based

14   on this information, I just know that Resurgent

15   provided us a place of employment hit.  It doesn't

16   tell me where it came from.

17         Q.   And that place of employment hit could have

18   came pursuant to your request to RNN Group, right?

19         A.   No.  If we would have requested it, if it

20   would have came directly to us by RNN, we would have a

21   notation that it came from RNN.  This notation

22   indicates that it comes from the DUF file, which is

23   sent by Resurgent.

24         Q.   But didn't RNN Group know that you were

25   requesting a verified place of employment on behalf of

186

1   your client, Resurgent Capital?

2       A.   I don't know what that has to do with what I

3   said.  What does that --

4       Q.   Well --

5       A.   Resurgent doesn't know who our client --

6       Q.   Go ahead.

7       A.   I don't understand what you mean.

8       Q.   RNN Group knew that you were asking for the

9   verified place of employment on behalf of Resurgent,

10  correct?

11      A.   I don't know that they know who our client

12  is.

13      Q.   Do you have a copy of the communication that

14  you made to RNN Group in 2021?

15      A.   There probably exists a data file that was

16  sent to RNN.

17      Q.   Okay.

18      A.   I haven't reviewed it.

19           MR. BRACKETT:  I request that that be

20  produced.

21  BY MR. BRACKETT:

22      Q.   If they knew that Resurgent was your client,

23  then they could have also sent the verified place of

24  employment, pursuant to your request, directly to

25  Resurgent, right?

187

1        A.    That's not my understanding of how the

2   process works.

3        Q.    But it is possible?

4        A.    I don't believe it is possible.  RNN --

5   Resurgent has a relationship with RNN that's

6   independent of TRAK's relationship with RNN and a

7   process -- a separate -- completely separate process.

8        Q.    I'm not seeing any requests from either

9   RNN -- or from -- strike that.

10            I've not seen any request from either TRAK

11  or Resurgent to RNN Group.  So you guys made a

12  request.  You said that it would update when the

13  verified place of employment was provided, and it

14  shows the place of employment hit was delivered

15  subsequent to your request in 2021 and here in the

16  middle of 2022, right?

17       A.    The file that we reviewed earlier, the file

18  that came from Resurgent that contains the verified

19  POE information that we're discussing here.

20       Q.    Which was that?

21       A.    The DUF file, which --

22       Q.    Which one is the DUF --

23       A.    I don't have the number.

24            MR. MOHANDESI:  The prior exhibit, Justin.

25  It's a single-page exhibit.  It's --

188

1          MR. BRACKETT:  See, I don't see -- here we

2    are looking at Resurgent's notes.  I don't see any

3    request to RNN Group from Resurgent.

4          MR. MOHANDESI:  It's TRAK 294 is the

5    document the witness was referring to that you

6    previously showed her.

7    BY MR. BRACKETT:

8     Q.   Shouldn't a request by Resurgent of RNN

9    Group be in Resurgent's notes?

10    A.   I have no idea how --

11         MR. MOHANDESI:  Objection, form.

12         THE WITNESS:  -- the notes...

13    BY MR. BRACKETT:

14    Q.   Is it your understanding that Resurgent

15    keeps accurate notes?

16    A.   I have --

17         MR. MOHANDESI:  Objection, form.

18         THE WITNESS:  I have no knowledge of how

19    Resurgent maintains their system.

20         MR. BRACKETT:  I'm going to share another

21    document here.  This is going to be Exhibit 5 [sic] to

22    today's deposition.

23         (Document was displayed.)

24    BY MR. BRACKETT:

25    Q.   Exhibit 6 to today's deposition.

189

1          These are the discovery responses to our

2     interrogatories by Resurgent Capital, and it states

3     many times that Defendant Resurgent is the Master

4     Servicer for LVNV Funding, manages LVNV's accounts.

5     Defendant placed the subject account with Nelson and

6     Kennard through TRAKAmerica to collect LVNV's -- or on

7     LVNV's behalf.

8          Is that your understanding of how this all

9     works?

10         A.   That sounds the same as I described it,

11    unless I'm missing something.  Defendant...

12         Q.   It appears in this answer to Interrogatory

13    No. 7 that they basically equate Nelson & Kennard and

14    TRAKAmerica together, right?

15         MR. MOHANDESI:  Objection, form, calls for

16    speculation, misstates the answer, citing the document

17    that pertains to TRAKAmerica.

18         If you have personal knowledge of this

19    somehow, by some miracle, you may answer.

20         THE WITNESS:  I've never seen this before.

21    BY MR. BRACKETT:

22         Q.   When I asked Resurgent all the persons that

23    have personal knowledge of facts or issues involving

24    this lawsuit, why didn't they identify TRAK?

25         I know it calls for speculation.

190

1              MR. MOHANDESI:  Object --

2    BY MR. BRACKETT:

3         Q.   -- but do you know why they would have left

4    you guys off?

5              MR. MOHANDESI:  Objection, form.

6              THE WITNESS:  I have no idea about the

7    process of -- this process that this document

8    discusses.

9              MR. BRACKETT:  I'm going to share Exhibit 7

10             (Document was displayed.)

11   BY MR. BRACKETT:

12        Q.   Have you seen this document before,

13   TRAKAmerica's answer to the plaintiff's second amended

14   complaint?

15        A.   I don't believe so.

16        Q.   And you weren't involved in the response?

17        A.   Not to my knowledge.

18        Q.   But you do represent TRAKAmerica?  You are

19   the corporate representative, correct?

20        A.   I'm -- I'm the -- yes.  I'm prepared to

21   answer to the -- the items in the categories that we

22   reviewed on the motion earlier.

23             MR. MOHANDESI:  Exactly.  Objection.

24   There's no reference in the categories identified in

25   the deposition notice to the answer.

191

1          If you have personal knowledge, you can

2     respond to his questions.  It's not going to be on

3     behalf of TRAK in your capacity.

4     BY MR. BRACKETT:

5          Q.    There's a few categories I think it could

6     fall within, but regardless, how did Plaintiff fail to

7     state a claim in this matter?

8               MR. MOHANDESI:  I don't know if you want me

9     to object to every single question, but I'm going to

10    state my objection once.  The affirmative defenses are

11    outside the scope of the categories for this witness,

12    and I think going through all these affirmative

13    defenses is going to be an utter waste of time and

14    harassing to a witness who is now testifying at

15    8:42 PM her time.

16              So I think you should just ask her a general

17    question, "Do you have any knowledge or information as

18    to any of these affirmative defenses?"  I'm going to

19    object to every single one if you're going to go

20    through them.  It's not part of the deposition notice.

21    It's not part of the data search categories.  She's

22    not here to testify as to the affirmative defenses.

23              MR. BRACKETT:  Actually, it is.  On

24    topic 22, she said that she would testify as to TRAK's

25    investigation into the claims made by Plaintiff in his

192

1  complaint, so...

2       MR. MOHANDESI:  That has nothing to do with

3  the affirmative defenses.

4       MR. BRACKETT:  It absolutely would have to

5  do with how they responded to that complaint.

6       MR. MOHANDESI:  Not at all.  If you wanted

7  that, you should have stated your responses in the

8  affirmative defenses.  You just referred to the

9  claims, not to the affirmative defenses.

10      MR. BRACKETT:  It's my deposition, and I do

11 believe it applies how they investigated into the

12 claims made by Plaintiff in his complaint.  The claims

13 were made.  These defenses were lodged in response to

14 it after their investigation.

15 BY MR. BRACKETT:

16      Q.   Are you aware of anything to support any of

17 these affirmative defenses on behalf of TRAKAmerica?

18      A.   I'm not familiar with what the affirmative

19 defenses are, and I don't know if I'm qualified to

20 speak about them because they seem like it's something

21 that would require an attorney to explain.

22      Q.   And in that situation, Mr. Harmer would be

23 the one that would know that, right?

24      A.   Presumably.

25      MR. MOHANDESI:  Objection --

193

1          THE WITNESS:  He's their general counsel.

2          MR. MOHANDESI:  -- form.

3          THE WITNESS:  I don't know.  I don't know

4     who prepared this.

5     BY MR. BRACKETT:

6          Q.   And you weren't involved --

7          A.   No.

8          Q.   You did not review it in preparation for

9     today?

10         A.   I did not.

11         Q.   And you did not bring any documents with you

12    in response to our request for documents?

13         MR. MOHANDESI:  Objection, form.  We

14    produced responsive documents.  In fact, we've gone

15    out of our way to give you additional documents during

16    the deposition.

17         THE WITNESS:  The documents that I already

18    mentioned earlier, which was the -- the motion that

19    has the list of categories, the document list, and the

20    settlement conference statement that I happened to

21    have from when I participated in the settlement

22    conference.

23    BY MR. BRACKETT:

24         Q.   Right.  And unfortunately, that tells us

25    that you aren't able to respond to some of these

194

1   categories.  You certainly haven't provided any of the

2   documents.  So I must object and --

3           MR. MOHANDESI:  I don't know what you're

4   objecting to, but okay.

5           MR. BRACKETT:  We can continue the

6   deposition to where we have a witness that can testify

7   as to these topics, and these documents can be

8   provided so that we can have a meaningful discussion.

9           In regards to the documents that were

10  produced during the deposition or immediately before

11  the deposition, we all know that's very untimely and I

12  have no chance to review those documents.  I've been

13  shooting blind from the hip on a lot of this stuff

14  today due to that.  It's just unacceptable behavior,

15  but here we are.

16          There's no privilege that the Court has

17  granted.  There's no court order restricting my

18  questioning today.  I understand objections were made

19  very late, last Friday and then yesterday, but

20  unfortunately, I've been stymied many times during

21  this deposition, and it has taken a lot more time than

22  necessary because of that.

23          I shouldn't be put on the spot to have to go

24  through 200-plus pages of documents while I'm taking a

25  deposition.  I need those in advance or, you know, at

195

1    least bring the documents that I asked.

2          There were only four categories of documents

3    I requested, and none of those were brought.  I still

4    need the agreement from TRAK or any company or entity

5    as they relate to the debt.  That's going to tell us

6    who had the authority.

7          The records and communications, I think I

8    have some of those, but not all.

9          Documents consulted or reviewed to determine

10   whether and where to garnish from plaintiff, I think

11   there's still some documents missing there, as we --

12         MR. MOHANDESI:  You're absolutely wrong.

13   The testimony has been crystal clear.  You can try

14   to -- you can try to insert some sort of garnishment

15   activity on TRAK, but it's just not a fact.

16         Regarding the deposition notice, you emailed

17   it to me on July 8th.  That's eight days ago.  So the

18   fact that we gave you any documents is a courtesy to

19   you.

20         The documents, responsive documents, were

21   produced.  This -- this witness -- you went through

22   all the categories.  She testified that she was there

23   to testify as to all of them except for the last one,

24   which was ludicrous, and she did do so.  So the fact

25   that you did not include certain categories that you

196

1    want to talk about is not on us.  The fact that you

2    sent me a deposition notice eight days before is

3    not -- is not on us.  So I'm -- I don't want to engage

4    in a back-and-forth, but I do need to respond to your

5    statements on the record, because they are skewed.

6              MR. BRACKETT:  I appreciate your response.

7    Are you finished so I can continue my discussion?

8              MR. MOHANDESI:  Please go ahead.

9    BY MR. BRACKETT:

10        Q.   Ms. Torres --

11             MR. MOHANDESI:  If you have got more

12   questions for the witness, please go ahead.

13   BY MR. BRACKETT:

14        Q.   Ms. Torres, the notice of deposition --

15             MR. BRACKETT:  Yeah, it only happened

16   eight days ago because I've been asking for a date for

17   a considerable amount of time, months.  I've been

18   wanting to get TRAK's deposition.  We've been talking

19   about that.  Here we are, and unfortunately, we aren't

20   able to complete it.

21   BY MR. BRACKETT:

22        Q.   But Ms. Torres, today what I can get, I've

23   gotten.  And I'll try to wrap this up so that I can

24   let you go home.  I apologize for keeping you so late.

25   This has been way more difficult because I haven't

197

 1    been able to get the information I need timely.

 2            But nonetheless, my final questions,

 3    unfortunately I don't think you can answer, but are

 4    you familiar with the ruling --

 5            MR. MOHANDESI:  Let the record -- so sorry.

 6    I was going to say while you're reviewing, let the

 7    record reflect I sent you an email on June 17th

 8    providing you a date of July 16th or July 17th for the

 9    deposition.  I didn't get a deposition notice until

10    July 8th.

11            I'm sorry to interrupt you.  Please go

12    ahead.

13    BY MR. BRACKETT:

14        Q.   Are you familiar with the Rule 26(a)(1)

15    disclosures?

16        A.   No.

17        Q.   Have you worked with your attorneys at all

18    to prepare any initial disclosures in this matter?

19        A.   No.  I don't know what you mean by

20    "disclosures."

21        Q.   No problem.

22            MR. BRACKETT:  That is all the questions

23    that I have at this time for this witness.  We'll

24    unfortunately be keeping this deposition open until we

25    have a qualified representative who can testify as to

198

1    the matters that this particular representative was

2    not able to testify to today.

3              MR. MOHANDESI:  Are you able to identify

4    those?

5              MR. BRACKETT:  Yes.  Specifically the last

6    category that you said was ludicrous.  I certainly

7    want to have someone that can testify about the formal

8    or informal complaints that have been made against

9    TRAK in the past three years.  This individual

10   testified as to -- as to being a deponent in at least

11   one case in 2020.  I know that was before three years

12   ago, but we don't even know the name of that case or

13   any information about it, much less anything that

14   happened in the past three years.  So there's that

15   category.

16             And then some of the other categories, like

17   category 21 --

18             MR. MOHANDESI:  She testified as to that.

19   You asked her questions.  Feel free to ask her some

20   more.

21   BY MR. BRACKETT:

22      Q.   Previously, I think you testified that there

23   were no searches or queries related to Plaintiff.  Is

24   that correct?

25      A.   Correct.  The plaintiff is not the debtor on

199

1    the account.

2        Q.    But you also stated that the information was

3    updated pursuant to the plaintiff's dispute letter.

4        A.    The address on the account was updated.

5        Q.    What, if anything, did TRAK do to verify

6    that address?

7        A.    Nothing.

8        Q.    Earlier, we talked about all collection

9    notes or collection logs related to Plaintiff on

10   paragraph 17.  You said there were none.

11       A.    TRAK doesn't have collection logs or

12   collection notes.  We don't collect debt.

13       Q.    Again, on section 16, is that your same

14   testimony?

15       A.    I don't recall what section 16 is.  Sorry.

16       Q.    All collection notes or collection logs

17   relating to the debt.

18       A.    We don't -- TRAK doesn't perform any

19   collection activity, so we don't have any collection

20   logs or collection notes.

21            MR. BRACKETT:  I'll open this document up so

22   you can see it as well.

23            (Document was displayed.)

24   BY MR. BRACKETT:

25       Q.    Section 4.  What is the relationship between

200

1    TRAK and LVNV Funding, LLC?

2        A.    LVNV Funding is a creditor that owns debt

3    that is placed to TRAK by Resurgent Capital Services.

4    That is then forwarded to our network of attorneys for

5    debt collection.

6        Q.    So that would be LVNV Funding is the

7    original creditor?

8        A.    No.    They're the current owner of the debt.

9        Q.    And they purchase that debt after it goes

10   into default, right?

11       A.    Presumably.    That's my understanding.    But

12   we could verify that based on the data.    I think we

13   looked at it earlier.    The charge-off had occurred

14   prior -- prior to the purchase.

15       Q.    My question was the account was in default

16   at the time that LVNV Funding acquired it?

17       A.    The only information I have on that is

18   the -- whatever date is in that documentation that we

19   reviewed.    I believe so.

20       Q.    Does TRAK have an agreement with LVNV

21   Funding?

22       A.    No.

23       Q.    Does TRAK have any relationship with Credit

24   One Bank?

25       A.    No.

201

1      Q.    Does TRAK have a relationship with Resurgent

2  Capital Services, L.P.?

3      A.    Yes.

4      Q.    And what is that relationship?

5      A.    Resurgent Capital Services is our client

6  that places accounts to our office that are placed up

7  to our attorney network.

8      Q.    Resurgent is a debt collector?

9          MR. MOHANDESI:  Objection, form.

10          THE WITNESS:  I don't believe so.  I don't

11  know if they are.

12  BY MR. BRACKETT:

13      Q.    Resurgent hired TRAK to assist it in

14  collecting this account, right?

15          MR. MOHANDESI:  Objection, form.

16          THE WITNESS:  They hired TRAK to forward

17  their accounts up to attorneys, for debt collection by

18  the attorneys.

19  BY MR. BRACKETT:

20      Q.    And how is TRAK paid by Resurgent?

21          MR. MOHANDESI:  Objection, form.

22          THE WITNESS:  By wire transfer.

23  BY MR. BRACKETT:

24      Q.    And they're paid a percentage?  A

25  contingency fee.  What is that fee?

202

1          MR. MOHANDESI:  Objection.  We discussed

2    that.  It's subject to confidentiality and not

3    material to the claims or defenses in this case.  And

4    I'm going to ask the witness to adhere to any sort of

5    confidentiality related to the rate.

6          THE WITNESS:  Yeah, I can't share that with

7    third parties, based on our agreement with Resurgent.

8    BY MR. BRACKETT:

9       Q.   Is that why the agreement was not produced

10   pursuant to our request?

11      A.   I don't know.

12      Q.   But you withheld that agreement.  You have

13   not provided it today, correct?

14      A.   I have not provided it, no.

15      Q.   And you do not intend to provide it today?

16      A.   No.

17      Q.   Can you tell me any more about the

18   relationship between TRAK and Resurgent Capital

19   Services?

20          MR. MOHANDESI:  Objection, form.

21   BY MR. BRACKETT:

22      Q.   Is that the entirety of your understanding

23   of that relationship?

24      A.   That Resurgent Capital Services places

25   accounts to TRAK to be forwarded to attorneys in our

203

1    attorney network.  Yes.

2         Q.   That's the entirety of your understanding?

3         A.   Yes.

4         Q.   Who are the individuals involved in deciding

5    to issue a garnishment at Plaintiff's place of

6    employment, Raising the Standard Consulting, Inc.?

7              MR. MOHANDESI:  Objection, form, asked and

8    answered.

9              THE WITNESS:  My understanding is that the

10   garnishment was issued by Nelson & Kennard, so the

11   individuals involved would be at Nelson & Kennard.  I

12   don't know who those individuals are.

13   BY MR. BRACKETT:

14        Q.   As far as the lawsuit that was filed against

15   the debtor, Michael Soto, in small claims court, that

16   information was relayed through TRAK to Nelson &

17   Kennard, correct?

18        A.   The information regarding the case that was

19   filed was relayed by Nelson & Kennard through TRAK to

20   Resurgent.

21        Q.   And the information that was sent to

22   Nelson & Kennard in advance of the lawsuit being filed

23   was relayed from Resurgent to TRAK and then from TRAK

24   to Nelson & Kennard, correct?

25        A.   Yes, the placement data and documentation.

204

1       Q.   What policies/procedures/processes does TRAK

2   have to decide -- well, what policies, procedures, and

3   processes are in place there at TRAK in relation to

4   the issuance of a garnishment?

5           MR. MOHANDESI:  Not what the category says,

6   but go ahead and answer.

7           THE WITNESS:  TRAK doesn't issue

8   garnishments.  We don't have any policies about

9   issuing garnishments.

10  BY MR. BRACKETT:

11      Q.   There's no policies to verify if the

12  garnishment is going to the right place of employment

13  or not?

14      A.   There's no policies about issuing

15  garnishments at all.

16      Q.   And TRAK doesn't have anything in place to

17  direct its attorney servicers on issuing garnishments?

18          MR. MOHANDESI:  Objection, form.

19          THE WITNESS:  It's our attorneys -- our

20  attorneys make the decision to issue a garnishment,

21  and they have internal processes to follow with regard

22  to issuing garnishments.

23  BY MR. BRACKETT:

24      Q.   So you rely on Nelson & Kennard?

25      A.   Well, we don't have any requirements for

205

1    policies around issuing garnishments.

2        Q.    Who are the TRAK employees and departments

3    responsible for managing and maintaining this

4    technology infrastructure?

5        A.    Well, we have an IT team that maintains our

6    infrastructure.  We don't have technology

7    infrastructure that's used for collecting debts or

8    this debt.

9        Q.    What authority, if any, did TRAK have for

10   collecting this debt from Plaintiff?

11       A.    We don't collect debt.

12       Q.    But this debt was attempted to be collected

13   from the plaintiff, correct?

14       A.    I believe it was attempted to be collected

15   by Nelson & Kennard, but from the debtor.  From the

16   debtor.

17       Q.    And they attempted to collect also from the

18   plaintiff, Michael Soto, as well, correct?

19       A.    Not to my knowledge.

20       Q.    The collection letters you're asserting are

21   not attempts to collect the debt?

22            MR. MOHANDESI:  Objection, form.

23            THE WITNESS:  Which collection letters are

24   you referring to?

25

206

BY MR. BRACKETT:

    Q.   Looking for Exhibit 3.

          (Document was displayed.)

BY MR. BRACKETT:

    Q.   This October 4, 2022 letter, is it your
understanding that this is a collection letter?

          MR. MOHANDESI:  Objection, form.

          THE WITNESS:  My understanding is the
purpose of this letter is to notify the consumer that
they are investigating their dispute.

BY MR. BRACKETT:

    Q.   So this statement, "As of today, the amount
you owe is $1,083.98" is not an attempt to collect a
debt?

          MR. MOHANDESI:  Objection, form,
argumentative.  It's not a TRAK document.

          THE WITNESS:  I don't know what they're
attempting by providing that statement.

BY MR. BRACKETT:

    Q.   Did TRAK draft this document?

    A.   No.

    Q.   This RCS 3?

    A.   No.

    Q.   Does TRAK draft any documents for Resurgent?

    A.   No.

207

1       Q.   Does TRAK draft or assist in drafting any

2  documents for Resurgent Capital?

3       A.   Not to my knowledge.

4       Q.   Does TRAK draft or assist in drafting any

5  documents for Nelson & Kennard?

6       A.   Not to my knowledge, no.

7       Q.   So when an account is disputed and

8  information is requested of TRAK, does TRAK ever

9  assist the law firm in formulating the response?

10      A.   No.

11      Q.   RCS 4 says, "Total amount of the debt now,"

12 and it says "We are trying to collect a debt that you

13 owe to LVNV Funding."

14           Is it TRAK's position that it is not a

15 collection attempt?

16           MR. MOHANDESI:  Objection, form.  She's not

17 here to testify about other parties' documents.

18           THE WITNESS:  I mean, this looks to me like

19 a model validation notice that's sent out to -- as an

20 initial contact with a debtor when an account was

21 placed.

22 BY MR. BRACKETT:

23      Q.   This is RCS 5, again stating: As of today,

24 you owe this amount.  Still no -- not a collection

25 attempt, right?

208

1          MR. MOHANDESI:  Objection, form,

2     argumentative.

3          THE WITNESS:  I don't understand.  Are these

4     two different letters, or are these the same letter

5     that you're showing me?

6     BY MR. BRACKETT:

7     Q.   What about the garnishment that was -- the

8     garnishment notice, the writ of garnishment, that was

9     sent to Raising the Standard Consulting, Inc.?  Was

10    that a collection attempt?

11         MR. MOHANDESI:  Objection, form.

12         Are you -- RCS 6 is not the garnishment

13    letter, by the way.  It's the judgment, what you're

14    showing on the screen right now.

15         MR. BRACKETT:  Please let the deponent

16    testify.

17         MR. MOHANDESI:  I don't know if you're

18    trying to ask her about a garnishment notice and you

19    inadvertently identified the judgment.  So I have no

20    idea.

21         MR. BRACKETT:  Let her answer.  If she's

22    confused, she's a smart lady; she can ask me

23    questions.

24         MR. MOHANDESI:  It's 9:08, and you've been

25    working really hard to trick her, so let's be fair.

209

1          Go ahead.  You may answer if you -- if

2     there's a question pending.

3               THE WITNESS:  Can you repeat the question,

4     please?

5     BY MR. BRACKETT:

6          Q.   Can the issuance of a garnishment at Raising

7     the Standard Consulting, Inc., is that not a -- is

8     that not a collection attempt?

9               MR. MOHANDESI:  Objection, form.

10              THE WITNESS:  It's -- it's an issuance of a

11    garnishment.

12    BY MR. BRACKETT:

13         Q.   Is it an attempt to collect a debt?

14         A.   I guess it depends on your definition.

15         Q.   How do you define attempting to collect a

16    debt?

17         A.   Personally?  I would say it was --

18         Q.   Not personally.  How does TRAK define

19    attempting to collect a debt?

20              MR. MOHANDESI:  Objection, form.

21              THE WITNESS:  I -- I don't know the answer.

22              MR. BRACKETT:  Category 20.

23              (Document was displayed.)

24    BY MR. BRACKETT:

25         Q.   Says, "All calls TRAK made or received which

210

1  relate to Plaintiff or the Debt."

2          Earlier, you testified there were none.

3      A.   Well --

4          MR. MOHANDESI:  Is that your question?

5  BY MR. BRACKETT:

6      Q.   Is that TRAK's position?

7      A.   Yes, as far as I know.  I could find no

8  evidence of any calls; and as a normal course of

9  business, we don't make any calls.

10     Q.   So subsequent to this lawsuit being filed,

11 your legal department did not call anyone to check and

12 see what was going on?

13         MR. MOHANDESI:  Objection --

14         THE WITNESS:  No.

15         MR. MOHANDESI:  -- form.

16         THE WITNESS:  I'm not aware if they did.

17 BY MR. BRACKETT:

18     Q.   The legal department (audio cut out)?

19     A.   I'm sorry?

20     Q.   And the legal department would know that?

21     A.   Potentially, yeah.

22     Q.   You're not privy to their communications and

23 their records?

24     A.   Correct.

25         MR. BRACKETT:  Okay.  As I was saying,

211

1    unfortunately, that's been stated a few times today.

2    There's a separate set of records in the legal

3    department there at TRAK, so, again, I'll suspend

4    today's deposition; but before I do, Ben, do you have

5    any questions for this deponent?

6            MR. MOHANDESI:  No, thank you.

7            MR. BRACKETT:  All right.

8    BY MR. BRACKETT:

9        Q.   My last two questions are would you like to

10   receive a copy of today's deposition transcript?

11       A.   Yes.

12       Q.   And secondly, would you like the opportunity

13   to read and review it?

14       A.   Yes.

15       Q.   Okay.  And like I said --

16           MR. MOHANDESI:  Just for the -- just for the

17   record, it looks like you've identified two

18   categories, 24, which is a disputed category, and

19   apparently 20 is -- you are unhappy with the response

20   and you think there's more information there.  It

21   appears as though that the other categories the

22   witness has been here, she's testified to, and she's

23   acknowledged that she's the witness for those

24   categories.  I didn't see any other categories that --

25   you know, I understand you don't like some of her

212

1   answers, but they were still responsive to the

2   categories.

3           MR. BRACKETT:  You anticipated then --

4   there's been multiple times today when we've come to

5   the understanding that there are a separate set of

6   notes that are maintained within the legal department

7   there at TRAK, and those notes have not been produced

8   or reviewed, so I would like to see those; and that

9   may very well, you know, fall within some of these

10  other categories, so...

11          MR. MOHANDESI:  That's an incredibly broad

12  assumption, but we'll proceed.

13          MR. BRACKETT:  All right.  Thank you for

14  your time today.  Sorry for keeping you so late.

15          THE WITNESS:  Okay.

16          (The deposition adjourned at 3:15 PM HST.)

17

18

19

20

21

22

23

24

25

213

1      I, CRYSTAL TORRES, hereby certify that I have read

2    the foregoing typewritten pages 1 through 212,

3    inclusive, and corrections, if any, were noted by me,

4    and the same is now a true and correct transcript of

5    my testimony.

6      DATED:  _____.

7

8

9      _____

10        CRYSTAL TORRES

11

12   Signed before me this _____

13   day of _____, 20_____.

14

15   _____

16

17

18

19

20

21

22

23   Case: SOTO vs. LVNV FUNDING, LLC, et al.
     Case No.: 1:23-CV-00181 DKW-KJM
     Deposition Dated: Tuesday, July 16, 2024
24   Taken By: Teri Hoskins, CSR #452
             Registered Merit Reporter

25

```
 1                    C E R T I F I C A T E

 2     STATE OF HAWAII                )

 3                                    )  SS:

 4     COUNTY OF HAWAII               )

 5

 6        I, TERI HOSKINS, Certified Shorthand Reporter, do
       hereby certify

 7
          That on Tuesday, July 16, 2024, at 9:03 AM HST,
 8     appeared before me CRYSTAL TORRES, the witness whose
       deposition is contained herein; that prior to being
 9     examined the witness was by me duly sworn;

10        That the deposition was taken down by me in machine
       shorthand and was thereafter reduced to typewriting;
11     that the foregoing represents, to the best of my
       ability, a true and correct transcript of the
12     proceedings had in the foregoing matter;

13        That pursuant to Rule 30(e) of the Hawaii Rules of
       Civil Procedure, a request for an opportunity to
14     review and make changes to this transcript:

15        _x__ Was made by the deponent or a party (and/or
               their attorney) prior to the completion of
16             the deposition.
             ____ Was not made by the deponent or a party
17             (and/or their attorney) prior to the
               completion of the deposition.
18           ____ Was waived.

19        I further certify that I am not an attorney for any
       of the parties hereto, nor in any way concerned with
20     the cause.

21        Dated this 8th day of August, 2024 in Hilo,
       Hawaii.

22

23                      _____Teri Hoskins_____
                        TERI HOSKINS, CSR #452
24                      Registered Merit Reporter

25
```